# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **EL PASO NATURAL GAS COMPANY**, a Delaware corporation, 2 North Nevada Avenue Colorado Springs, Colorado 80944 <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF ENERGY** and the Honorable **SAMUEL W. BODMAN**, its Secretary, **UNITED STATES NUCLEAR REGULATORY COMMISSION, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY** and the Honorable **STEPHEN L. JOHNSON**, its Administrator, **UNITED STATES DEPARTMENT OF THE INTERIOR** and the Honorable **DIRK KEMPTHORNE**, its Secretary, **BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES** and the Honorable **MICHAEL O. LEAVITT**, its Secretary, **INDIAN HEALTH SERVICE, UNITED STATES DEPARTMENT OF DEFENSE** and the Honorable **ROBERT GATES**, its Secretary, <br><br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. _____ <br><br><br><br> **COMPLAINT** |

Plaintiff EL PASO NATURAL GAS COMPANY ("EPNG"), a Delaware corporation, ("Plaintiff"), by and through the undersigned attorneys, and for its Complaint against Defendants the UNITED STATES OF AMERICA ("United States"), the UNITED STATES DEPARTMENT OF ENERGY and the Honorable SAMUEL W. BODMAN, its Secretary (collectively "DOE"), the UNITED STATES NUCLEAR REGULATORY COMMISSION ("NRC"), and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, the Honorable STEPHEN L. JOHNSON, its Administrator (collectively "EPA"), UNITED STATES

DEPARTMENT OF THE INTERIOR and the Honorable DIRK KEMPTHORNE, its Secretary, BUREAU OF INDIAN AFFAIRS ("BIA") (collectively "DOI"), UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, the Honorable MICHAEL O. LEAVITT ("Leavitt"), its Secretary, INDIAN HEALTH SERVICE ("IHS") (collectively "DOI"), and the UNITED STATES DEPARTMENT OF DEFENSE and the Honorable ROBERT GATES, its Secretary ("DOD"), states as follows:

## STATEMENT OF THE CASE

1.      This is a civil action relating to: 1) DOE's decision not to designate certain sites containing residual radioactive materials from the Tuba City Uranium Mill (the "Mill"), which is approximately 6 miles east of Tuba City, Arizona, as "vicinity properties" pursuant to the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), 42 U.S.C. §§ 7912(a) & (e); 2) Defendants' violation of Subtitle C of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, relating to their treatment, storage or disposal of hazardous waste at the "vicinity properties" or other properties near the Mill on the Navajo or Hopi Reservations or federal land; and, 3) Defendants' past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment at "vicinity properties" or other properties near the Mill on the Navajo or Hopi Reservations or federal land (the "Properties"). The Properties at issue include, but are not limited to, a dump site immediately adjacent to the north-northwest of the Mill and on the north side of Highway 160 (the "Highway 160 Dump Site"), the Tuba City Landfill, any "vicinity properties" of the Mill designated or defined pursuant to UMTRCA and any sites near the Mill on the Navajo or Hopi Reservations or federal land where Defendants have handled, treated, stored, disposed of or transported hazardous waste. The Mill

and the Highway 160 Dump Site are located on the Navajo Reservation. The Tuba City Landfill is located on both the Hopi and Navajo Reservations.

2.      At the direction and instruction of the United States Atomic Energy Commission ("AEC"), n/k/a DOE, and DOD, the Mill was operated by EPNG or its predecessor Rare Metals Corporation of America ("RMCA") from approximately 1956 to 1966 to produce enriched uranium to certain specifications for Defendants' Cold War nuclear weapon program. In 1968, Defendants directed EPNG to stabilize the Mill, including its tailings and other Mill-related waste, in the manner required by then-applicable law. Defendants required this Mill reclamation and stabilization as a condition of terminating licenses issued to EPNG under the Atomic Energy Act. Since terminating EPNG's Atomic Energy Act licenses and directing EPNG to leave the Mill in December 1968, Defendants have owned, maintained or operated the Mill and certain of its vicinity properties for nearly four decades.

3.      In 1978, Congress declared through the passage of UMTRCA that the United States shall be exclusively responsible for the remediation of uranium mill tailings and related waste generated at the Mill and for the remediation of "vicinity properties" containing soil or ground water impacted by this residual radioactive uranium mill waste.

4.      In stating the legislative purpose for UMTRCA, Congress explained: "There is a general finding that uranium mill tailings pose a potential and significant radiation health hazard to the public and that the protection of the public health, safety, and welfare . . . require a federal effort to provide for the stabilization, disposal, and control, in a safe and environmentally sound manner, of the tailings in order to prevent and minimize health and environmental hazards." H.R. Rep. 95-1480(II), 1978 U.S.C.C.A.N. 7450, at 7461-62.

3

5.      In addition, Congress described in various reports the nature of the threat posed

by uranium mill tailings and the importance of a federal response to these threats:

> Uranium mill tailings are the sandy waste produced by the uranium
> ore milling process. Because only 1 to 5 pounds of usable uranium
> is extracted from each 2,000 pounds of ore, tremendous quantities
> of waste are produced as a result of milling operations. These
> tailings contain many naturally-occurring hazardous substances,
> both radioactive and nonradioactive. The greatest threat to public
> health and safety is presented by the long radioactive decay
> process of radium into Radon-222, an inert gas which may cause
> cancer or genetic mutations. This decay process, and the dangers
> which accompany it, will continue for a billion years. As a result
> of being for all practical purposes, a perpetual hazard, uranium mill
> tailings present the major threat of the nuclear fuel cycle.
>
> In its early years, the uranium milling industry was under the
> dominant control of the Federal government. At that time,
> uranium was being produced under federal contracts for the
> government's Manhattan Engineering District and Atomic Energy
> Commission Program. Under these contracts, uranium tailings
> piled up so that now nearly 90 million tons of such waste are
> attributable to Federally-induced production. Of this amount,
> about 27 million tons of tailings have been left at sites where no
> commercial milling has taken place and which are not the
> responsibility of any active milling company.

H.R. Rep. 95-1480(I), 1978 U.S.C.C.A.N. 7433, at 7434.

6.      The Navajo Nation and the Hopi Tribe (the "Tribes") have informed EPNG that

they have identified and observed certain residually radioactive uranium mill-related waste,

including but not limited to yellowcake (which is used to manufacture nuclear weapons), ceramic

mill balls, tailings and other hazardous waste, on the Highway 160 Dump Site, the Tuba City

Landfill and other Properties. The Tribes have also informed EPNG that notwithstanding the

observation of these residual radioactive uranium mill-related waste materials at levels above the

regulatory level set by the EPA to protect human health and the environment at 40 C.F.R. Part

192, Defendants have made a determination that this adjacent property is not a "vicinity

property" within the meaning of 42 U.S.C. § 7911(6)(B) and that Defendants have no obligation

to perform remediation of these residual radioactive uranium mill-related wastes or impacted groundwater. As a result of Defendants' determination, the Tribes have now threatened to file a lawsuit against EPNG to force EPNG to pay for or to perform cleanup activities the Tribes have informed EPNG are necessary to abate threats to human health and the environment posed by these residually radioactive uranium mill-related wastes.

7.     For these reasons, EPNG now requests a judicial determination that: 1) the Highway 160 Dump Site, the Tuba City Landfill and certain Properties which contain soil or groundwater impacted by residually radioactive uranium mill waste materials are "vicinity properties" within the meaning of 42 U.S.C. § 7911(6)(B); 2) the residually radioactive materials located at these "vicinity properties" are "source, special nuclear or byproduct materials" as defined under the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*; 3) DOE is exclusively responsible for the remediation of groundwater and soil at these vicinity properties which are impacted by residually radioactive uranium mill waste materials; 4) DOE's decision not to designate these vicinity properties adjacent to the Mill was arbitrary and capricious, an abuse of discretion or not in accordance with law; and, 5) DOE, EPA and NRC failed to comply with the public participation provisions of UMTRCA, 42 U.S.C. § 7921, inasmuch as they failed to encourage public participation or to hold public hearings relating to the designation of vicinity properties immediately adjacent to or in the vicinity of the Mill.

8.     In the alternative, and to the extent the hazardous wastes the Tribes have informed EPNG are located on the Properties are not residually radioactive source, special nuclear or byproduct materials, or are otherwise subject to RCRA, EPNG states a citizen suit claim under RCRA, 42 U.S.C. § 6972, against Defendants for violation of Subtitle C of RCRA and to abate the imminent and substantial endangerment caused by Defendants at the Properties.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367.

This action arises under and requires the interpretation and construction of the United States

Constitution and laws of the United States, including but not limited to the Atomic Energy Act,

42 U.S.C. § 2011 *et seq.*, UMTRCA, the Administrative Procedures Act ("APA"), 5 U.S.C. §

701 *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et*

*seq.* EPNG has provided notice of intent to sue under RCRA to Defendants as required pursuant

to 42 U.S.C. § 6972(b).

10.     Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1) because

one or more Defendants reside in the District.

11.     There exists now between the parties an actual, justiciable controversy in which

the Plaintiff is entitled to have a declaration of its rights and of the Defendants' obligations, and

further relief because of the facts and circumstances set forth below.

12.     This Court also has jurisdiction over the parties to this action.  EPNG, and its

former subsidiary RMCA, operated the Mill under contract with the AEC from 1956 to 1966.

DOE, NRC and EPA are administrative agencies created by federal statute, having authority and

responsibility to conduct activities on behalf of the federal government relating to the

designation and remediation of uranium mill sites and vicinity properties under UMTRCA.

DOE, DOI, BIA, DHHS, IHS and DOD each own or have owned, and have stored or disposed of

uranium mill-related hazardous waste, medical waste and other solid and hazardous waste at, the

Tuba City Landfill, the Highway 160 Dump Site or other Properties in violation of Subtitle C of

RCRA or in a manner constituting an imminent and substantial endangerment to health or the

environment.

13.    The United States has waived sovereign immunity under Sections 7002 and 6001 of RCRA, 42 U.S.C. §§ 6972, 6961, for claims of liability brought thereunder, and under the APA and UMTRCA for review of Defendants' decision not to designate "vicinity properties" under UMTRCA.

## PARTIES

14.    Plaintiff EPNG is a Delaware corporation whose principal place of business is in Colorado Springs, Colorado. RMCA was incorporated in Delaware on May 24, 1954, and, on July 9, 1962, was merged into EPNG pursuant to the provisions of Section 253 of the Delaware General Corporation Law. Beginning in approximately 1955, RMCA entered into contracts with the AEC, including but not limited to mining contracts, leases and mining claims, to mine for and to process uranium bearing ores for the recovery of uranium to be sold to the AEC. EPNG ceased these uranium mining, milling and processing operations in 1966.

15.    Defendants include the United States of America, acting for itself and through its federal agencies.

16.    Defendant DOE is responsible for the designation and remediation of the Mill and its "vicinity properties" pursuant to 42 U.S.C. § 7912. DOE is also responsible for remediation of the Mill and its "vicinity properties" pursuant to UMTRCA. On information and belief, at various times since December 1968, DOE owns or has owned, and has stored or disposed of uranium mill-related hazardous waste and other solid and hazardous waste at, the Tuba City Landfill, the Highway 160 Dump Site or other Properties in violation of Subtitle C of RCRA or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.

17.     Defendant NRC has responsibility for the regulation, oversight and management of uranium mill tailings-related activities at the Mill and its vicinity properties. It is also responsible for reviewing and concurring with remedial actions taken at the Mill and its vicinity properties by DOE, and for providing post-cleanup oversight of these sites, among other things, pursuant to the Atomic Energy Act and UMTRCA. In this regard, Congress explicitly directed the NRC to set all standards and requirements relating to management concepts, specific technology, engineering methods, and procedures to be employed to achieve desired levels of control for limiting public exposure, and for protecting the general environment. On information and belief, the NRC is also partly responsible for designation of vicinity properties of the Mill or for approval or implementation of activities relating to the treatment, storage, or disposal of hazardous waste at the Mill or its vicinity properties.

18.     Defendants EPA and Johnson (collectively "EPA") are responsible for promulgating standards applicable to DOE's planned remedial actions at the Mill and its vicinity properties designated pursuant to UMTRCA. Congress explicitly directed that the standards and criteria developed should limit the exposure or potential exposure of the public and protect the general environment from either radiological or non-radiological substances to acceptable levels.

19.     Defendant DOI on information and belief owns or has owned, and has stored or disposed of uranium mill-related hazardous waste, medical waste and other solid and hazardous waste at, the Tuba City Landfill or other Properties in violation of Subtitle C of RCRA or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment. DOI manages or operates, or has managed or operated, the Tuba City Landfill.

20.     Defendant DHHS on information and belief has stored or disposed of medical waste and other solid and hazardous waste at the Tuba City Landfill or other Properties in

8

violation of Subtitle C of RCRA or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.

21.    Defendant DOD on information and belief at times relevant to the facts stated in this Complaint directed the AEC, NRC or others in the manner and scope of uranium exploration, mining, milling, processing, storage and disposal at the Mill and other Properties necessary to generate yellowcake needed for the production of nuclear weapons.  On information and belief, by and through these activities DOD generated hazardous waste or operated the Mill or other Properties.  On information and belief, by and through these activities DOD has stored or disposed of uranium mill-related hazardous waste, medical waste and other solid and hazardous waste at, the Tuba City Landfill, the Highway 160 Dump Site or other Properties in violation of Subtitle C of RCRA or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.

## FACTS

### A.    Uranium Processing for Nuclear Weapons at Tuba City

22.    During the period 1955 to 1968, Defendants directed and contracted with EPNG or its predecessor RMCA to mine, mill, enrich, and deliver yellowcake for the manufacture of nuclear weapons.

23.    EPNG and its predecessor RMCA's mining and milling operations were conducted pursuant to federal mining circulars and schedules, licenses issued by the AEC, contracts between the AEC and EPNG, leases between EPNG and the Navajo Nation which were approved by DOI, and subleases between the AEC and EPNG, and were performed in compliance with applicable federal, state and tribal law.  Importantly, the land leased from the

Navajo Nation for the Mill and related activities, as well as the land subleased by the AEC, included the land upon which both the Mill and the Highway 160 Dump Site are located.

24. On July 15, 1955, RMCA entered into a contract with the AEC, Contract No. AT(05-1)-293.

25. Contract AT(05-1)-293 was authorized and executed under the Atomic Energy Act of 1954, in the interest of the common defense and security. The AEC's stated purpose for entering into contract AT(05-1)-293 was the AEC's desire "to increase the domestic production of source material by having uranium-bearing ores tributary to the Tuba City, Arizona district, processed for the recovery of uranium to be sold to the [AEC] in the form of uranium concentrate. . . ."

26. Under the terms of Contract AT(05-1)-293, RMCA agreed to construct a uranium processing mill at Tuba City, Arizona, for the processing of uranium-bearing ore mined by RMCA. The uranium processed was for exclusive purchase by the AEC. From 1956 to 1966, the Mill received and processed uranium ore from mines in the area. During this time, the Mill processed a total of 796,489 tons of uranium ore.

27. The AEC received 100 percent of the Mill's production for the national defense program, specifically, the development of nuclear weapons.

28. Under the terms of the agreement between AEC and RMCA, the AEC set price schedules for uranium ore and established bonuses for new discoveries of uranium ore.

29. In 1955 and 1956, RMCA obtained from the federal government various mining permits, lease agreements and licenses in order to operate open-pit, class 1 uranium mines in the Cameron/Tuba City area within the Navajo Reservation, including but not limited to a Prospecting Permit covering the entirety of the Navajo Reservation.

30.    On December 14, 1955, the AEC entered into an agreement with RMCA under which the AEC subleased land that RMCA had leased from the Navajo Nation to conduct its milling operations.

31.    On January 1, 1956, the AEC entered into an agreement with RMCA under which the AEC subleased land that RMCA had leased from the Navajo Nation and upon which RMCA had built its ore buying station and sampling plant.

32.    These contracts contained the specifications for mining and milling uranium ore at the Mill.  These contracts also made Defendants exclusively responsible for the uranium mill tailings materials generated by or disposed of at the Mill, the Highway 160 Dump Site, the Tuba City Landfill or any other Properties.  Indeed, these contracts made the government the owner of these materials.

**B.    Conditions for Discontinuing Tuba City Uranium Operations**

33.    Beginning in 1963, Defendants informed EPNG of the conditions for their potential discontinuation of uranium processing activities at Mill.

34.    On November 14, 1963, AEC sent a letter to EPNG explaining that AEC would not terminate any uranium milling licenses without reaching a decision as to what control measures were appropriate under the circumstances of each site.

35.    In November 1965, the Arizona State Department of Health studied the Mill and concluded that the tailings at the Mill would need to be reconfigured and stabilized from wind erosion prior to EPNG's ceasing operations.

36.    On December 6, 1965, the Navajo Nation Tribal Mining Department sent a letter to EPNG inquiring whether EPNG had evaluated the potential harmful effects the Mill tailings may present after the Mill ceased operations.

37.     On December 13, 1965, EPNG responded to the Navajo Nation Tribal Mining Department explaining that it was studying the potential harmful effects the Mill tailings may present after the Mill ceased operations.

38.     On February 7, 1966, EPNG wrote again to the Navajo Nation Tribal Mining Department to explain that although there were no existing regulations regarding the remediation or reclamation of tailings, EPNG intended to meet with the AEC to determine an appropriate method for addressing any potential impacts from tailings at the Mill.

39.     On May 27, 1966, EPNG sent a letter to the AEC explaining that it was studying the potential hazards associated with tailings at the Mill after EPNG ceased operations, and that it would determine a feasible solution to such hazards if one was required.

40.     On December 6, 1966, the State of Arizona Atomic Energy Commission ("AAEC") sent a letter to EPNG stating, in part, that: "[I]t is apparent that we cannot rightfully require stringent measures from your company . . . . We, therefore, request only that the company use its best efforts to stabilize the piles to a reasonable extent, such as firming the berms that circle the downstream borders of the piles."

41.     In July 1967, the Technical Services Program for the Southwestern Radiological Health Laboratory, National Center for Radiological Health, U.S. Public Health Service, Department of Health, Environment and Welfare ("DHEW") (the "U.S. Public Health Service" or "Service"), n/k/a DHHS, performed and published an "Environmental Survey of Uranium Mill Tailings Pile, Tuba City, Arizona" to "evaluate any potential radiation hazards which exist and to recommend methods of control" at the Mill and its "vicinity properties." After inspecting the properties in the vicinity of the Mill, the Service concluded, in part, that: "At the present time there appears to be no contamination of surface or ground water in the surrounding area from

12

leaching of radioactive materials from the tailings area." The Service concluded further that:

"As a result of the external radiation levels on the tailings area itself, this area should not be

released for public use in its present state. Action which would permit release of the area would

be to cover the tailings with uncontaminated dirt to an extent that would diminish the external

radiation to an acceptable level and to stabilize the covering against wind erosion."

42.    On November 29, 1967, the AAEC sent a letter to EPNG explaining that its

tailings reclamation obligation would be satisfied, and EPNG could cease operations and leave

the Mill, upon stabilization of the tailings piles at the Mill. More specifically, the AAEC stated:

> You are directed to develop a plan for the stabilizing of the
> [tailings] pile against wind erosion and a time schedule indicating
> the dates on which work will be commenced and finished. This
> plan and schedule are to be submitted to this Commission for
> review by March 31, 1968. The work itself must be completed by
> the end of 1970.
>
> To be acceptable the work must encompass (1) rounding off and
> surface stabilization of the pile to prevent wind scour; (2) return to
> the pile of visible tailings material which has already blown
> outside the mill site; and (3) adequate restoration of the radiation
> warning signs and the fence surrounding the mill site, to prevent
> access by unauthorized people.
>
> The Bureau of Mines of the Department of Interior has developed
> a competence in the stabilizing of waste piles. Extensive
> consultation is available to your company should you desire to help
> in planning the work . . . .
>
> A meeting of officials of the Navajo Tribe, the U.S. Public Health
> Service, and this Commission was held in Farmington, New
> Mexico on November 27, 1967. At that time, the extent of control
> measures needed for the tailings pile was agreed upon. It was
> determined that if the El Paso Natural Gas Company adequately
> protects the pile against wind erosion, no further control work will
> be required at a later date against other lesser hazards, such as
> underground water pollution, radon gas emanation hazard directly
> on the pile, or gamma radiation over the pile. The Tribe will
> undertake to protect the public against these hazards by restricting
> access to the fenced area indefinitely.

43.    On March 25, 1968, DOI inspected the Mill and prepared a written

recommendation to EPNG detailing the specific stabilization practice which EPNG was required

to implement at the Mill.  Specifically, DOI made the following "Recommendations" to EPNG:

> 1.    The berms should be leveled to eliminate irregularity of
> outline and thus to decrease wind erosion.  The sand drift area
> should be returned to the tailing pond proper.
>
> 2.    DCA-70, an elastomeric polymer, should be applied to the
> approximately 40,000 square yards of berms and beaches
> surrounding the carbonate No. 1 and acid tailings area.
> Application of DCA-70 at the rate of 8 cents per square yard
> reagent cost should effectively stabilize these areas for an
> indefinite time.
>
> 3.    Application of Trastan SL or Torinal B may be beneficial
> for other areas including the beaches of the carbonate No. 1 and
> acid piles if access to these areas is possible.

44.    On March 27, 1968, EPNG submitted to AAEC a work plan for stabilizing the

tailings piles at the Mill adopting precisely the "Recommendations" made by DOI.  EPNG

explained to AAEC in its transmittal letter that: "Mr. [Karl] Dean [of the U.S. Bureau of Mines]

has assured me by telephone that he and his department will aid El Paso with the acquisition and

proper application of the polymer as well as the execution of his recommended plan."

45.    On April 22, 1968, AAEC approved EPNG's stabilization work plan, explaining

that:

> Your Company's plan for the stabilizing of the tailings pile at the
> Tuba City millsite, as set forth in your letter of March 27, was sent
> for informal review to the Public Health Service office in Window
> Rock, the Public Health Service Laboratory in Las Vegas, and to
> the Minerals office of the Navajo Tribe in Farmington.  All of
> these agencies indicated their approval of the plan, and by this
> letter I am giving the formal approval of this Commission to the
> work as outlined.

14

46.    On May 15, 1968, AAEC sent a letter to EPNG providing EPNG with the

appropriate language for warning signs posted on the fence surrounding the Mill.  More

specifically, AAEC explained that:

> This letter has to do with the material to be put on the signs posted
> around the tailings pile at Tuba City.  It is suggested that each sign
> have three lines.  The top line could say "DANGER".  The middle
> line, "RADIATION AREA", and the bottom line "KEEP OUT".
> There need be no identity given at the bottom regarding who
> posted the sign.
>
> This Commission is waiving any requirement, real or implied,
> regarding inclusion of the conventional radiation symbol, the
> three-bladed propeller in purple on a yellow background.  These
> colors fade rapidly in sunlight and would not be very meaningful
> on a fence surrounding an abandoned tailings pile.  It is suggested
> the lettering on the sign be black against a white background.

47.    On May 21, 1968, AAEC wrote back to EPNG to suggest that EPNG change the

word "DANGER" to "CAUTION" on its sign, explaining that: "The latter conveys less of a

feeling of immediate hazard.  As the material left in the tailings pile gives a high reading of

about 5 or 6 mR/hr, it does represent a long-term problem but not an hour-by-hour hazard to life

or limb."

48.    On July 17, 1968, the Navajo Nation wrote to the AAEC to request that the EPNG

work plan be modified to include restrictions against entry by unauthorized personnel.

49.    On July 19, 1968, AAEC wrote to BIA to explain that EPNG had agreed to

stabilize the tailings piles at the Mill as recommended by the Bureau of Mines, and that once this

work was completed AAEC would terminate EPNG's radioactive material license.  AAEC

stated, in part, that: "In the view of the [AAEC], the El Paso Company has done everything

within reason to leave the property in a safe condition.  With the covering of the pile there will

be no health hazard outside of the fence and a minimal hazard over the pile itself.  This

Commission, in fact, has been very impressed with the willingness of the El Paso Company to

carry out the protective measures recommended by the Public Health Service and the Bureau of

Mines."

   50.    On July 26, 1968, AAEC wrote to EPNG to explain that any residually

radioactive mill equipment could be disposed of at the Mill site.  More specifically, AAEC stated

that: "The El Paso Company has done a more than adequate job of recording the levels of

contamination in mill equipment as this has been dismantled.  Any equipment removed from the

premises has been monitored; that with measurable levels of radiation have been returned to

El Paso property elsewhere.  That equipment left on mill premises at Tuba City may be disposed

of by burial in the emergency waste holding pit inside the fenced area.  Following burial of all

contaminated material, the pit should be filled with earth and the surface stabilized as the pile has

been (or soon will be)."

   51.    On August 1, 1968, BIA wrote to EPNG and approved EPNG's work plan for

stabilizing the tailings piles at the Mill.

   52.    On October 17, 1968, AAEC wrote to EPNG to memorialize that the tailings pile

had been stabilized, and that once the mill equipment was buried in the emergency waste holding

pit and fenced in, AAEC would terminate EPNG's radioactive material license.  More

specifically, AAEC stated that:

> I am pleased to report that the pile has been stabilized in
> accordance with the plans of the Bureau of Mines and the
> recommendations of the Southwestern Radiological Health
> Laboratory.  Also, tailings material which had migrated downwind
> has been returned to the pile.  The entire pile has been securely
> fenced except for access to the emergency waste holding pit, and it
> has been posted in the manner we requested.
>
> Accordingly, we have determined that the El Paso Natural Gas
> Company has fulfilled its responsibility with regard to safe
> abandonment of the tailings pile.  At such time as you inform us
> that contaminated material in the mill building has been buried in

> the emergency waste holding pit and fencing completed past the
> pit, we will terminate your license (SUA-666) upon your request.

53.     By the end of October 1968, on information and belief EPNG or Defendants had

stabilized all mill tailings and other uranium mill-related waste at the Mill, the 160 Highway

Dump Site, the Tuba City Landfill, or other vicinity properties of the Mill pursuant to work plans

approved by the AEC and the AAEC.

54.     On December 9, 1968, AAEC issued a formal termination of EPNG's Radioactive

Material License No. SUA-666, stating in part that:

> WHEREAS the licensee has terminated the activities authorized by
> this license and desires to abandon his uranium mill property
> located six (6) miles east of Tuba City, Arizona;
>
> WHEREAS the licensee has effectively decontaminated the mill
> building;
>
> WHEREAS the licensee has stabilized the tailings pile against
> wind erosion, in accord with letter dated March 27, 1968, signed
> by W.T. Hollis;
>
> WHEREAS the licensee has fenced and posted the tailings pile in
> accord with our letters of May 15, 1968, and May 21, 1968;
>
> NOW THEREFORE this license numbered SUA-666, issued by
> the United States Atomic Energy Commission and administered by
> the State of Arizona Atomic Energy Commission is hereby
> TERMINATED, effective this date.

## C.     Defendants' Decision Not to Designate UMTRCA Vicinity Properties

55.     The lands upon which the Highway 160 Dump Site and Tuba City Landfill are

located on, and on information belief other "vicinity properties" of the Mill are held in trust by

the United States for, as appropriate, the Navajo Nation or Hopi Tribe. Thus, fee title to these

properties resides in the United States, with, as appropriate, the Navajo Nation or Hopi Tribe

holding beneficial title thereto.

56.    The United States and the Defendants owe a general fiduciary duty to the Navajo Nation and the Hopi Tribe and specifically a trust responsibility to protect, enhance, and ameliorate damage caused to the beneficial ownership interests of the Tribes in the lands comprising the Highway 160 Dump Site, the Tuba City Landfill and other "vicinity properties" of the Mill; particularly when the damage done thereto or the contamination in question occurred at the hands and/or direction of the Tribes' trustee, *i.e.*, the United States.

57.    Despite these facts and legal requirements, the Defendants have taken no steps to cleanup the Highway 160 Dump Site, the Tuba City Landfill and other "vicinity properties" of the Mill. Quite to the contrary, the Defendants took affirmative actions seeking to disavow their responsibilities for such sites and thereby their trust and fiduciary obligations to the Tribes.

58.    Congress granted the DOE the continuing responsibility for the remediation and long-term stewardship of the Mill and its vicinity properties, including the groundwater cleanup program and long-term site monitoring. DOE and the Navajo Nation executed a Custodial Access Agreement ("CAA") that "conveys to the federal government title to the residual radioactive materials stabilized at the repository site and ensures that DOE has perpetual access to the site." Further, per requirements of the NRC and under authority of UMTRCA, DOE entered into a Cooperative Agreement ("CA") with the Navajo Nation to perform remedial actions at the Mill, which brought the site under the NRC general license. Currently, DOE is the general licensee and is responsible for the custody and long-term care of the site, as defined by DOE Policy 454.1 (including general control of premises, fencing, signage, and security).

59.    UMTRCA was passed in 1978 and assigned DOE the responsibility for remediating residual radioactive material at mill sites and "vicinity properties."

60.    UMTRCA required the Secretary of DOE, after consultation with EPA and the NRC, to designate twenty-two processing sites at locations specified by the Act to be evaluated and remediated. 42 U.S.C. § 7912(a)(1). Tuba City, Arizona is one of the original 22 "processing sites" designated for DOE remediation.

61.    UMTRCA also required EPA to promulgate standards for the protection of the public health, safety, and the environment from hazards associated with the possession, transfer, and disposal of byproduct materials, and required NRC to implement and enforce the EPA standards.

62.    Finally, UMTRCA continued DOE's authority to remediate ground water at the UMTRCA mill sites.

63.    In April 2007, the Tribes contacted EPNG to inform it that: (a) Defendants had taken final agency action to deny vicinity property designation of the Highway 160 Dump Site, the Tuba City Landfill, and other sites; and (b) the Highway 160 Dump Site, the Tuba City Landfill, and other vicinity properties of the Mill may present an immediate and substantial endangerment to public health and the environment.

64.    In April 2007, the Tribes provided EPNG with a copy of a document containing a final agency action from Donna Bergman-Tabbert, the Director of Land & Site Management for DOE, to Joe Shirley, Jr., President of the Navajo Nation. In that document, dated April 22, 2004, the DOE issued a determination that the Tuba City Landfill, the Highway 160 Dump Site, and other properties adjacent to the Mill were not vicinity properties under UMTRCA and, based on this determination, denied remediation of ground water contamination at the Tuba City Landfill, the Highway 160 Dump Site and other vicinity properties of the Mill. Ms. Bergman-Tabbert stated in her decision that "DOE believes that the ground water contamination discussed in your

letter is not from the former mill site but is from the Tuba City landfill or some other nearby source."

65.     This determination that the Highway 160 Dump Site, the Tuba City Landfill or other properties adjacent to the Mill are not "vicinity properties" under UMTRCA, and the decision to deny remediation of ground water contamination at the Highway 160 Dump Site, the Tuba City Landfill and other vicinity properties of the Mill violates the Administrative Procedures Act ("APA").

66.     DOE's failure to designate known "nearby" areas as being vicinity properties to the Tuba City "processing site" or Mill designated for DOE remediation was arbitrary and capricious, not in accordance with law or otherwise constituted an abuse of discretion.  In addition, DOE, NRC and EPA's failure to initiate section 7921 public participation, comment, and input once they learned of ground water contamination near the Highway 160 Dump Site or other vicinity properties of the Mill, was arbitrary and capricious, not in accordance with law or an abuse of discretion.

67.     DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Landfill and other properties in the vicinity of the mill "vicinity properties" and to deny remediation at these "vicinity properties" is now final and ripe for judicial review.

68.     Because DOE has not assumed the responsibilities mandated under UMTRCA and complete the clean-up at the Highway 160 Dump Site, the Tuba City Landfill and other vicinity properties of the Mill, EPNG has been harmed.  Among other things, and without limitation, the Tribes have informed EPNG that children and other tribal members are living and playing in, on or adjacent to residually radioactive materials or other radioactive materials at the Mill, the Highway 160 Dump Site, the Tuba City Landfill and other Properties.  The Tribes have

further informed EPNG that the continued exposure to these materials presents a threat or
potential threat to the health of these individuals. One such family, the Netzsosie family, has
already sued EPNG for personal injury and wrongful death allegedly stemming from such
exposure. Although EPNG served as an independent contractor to AEC and operated the Mill
and certain vicinity properties from 1956 to 1966, EPNG no longer has any ownership interest or
legal right to enter upon these properties. As a result, if Defendants continue to deny statutory
and trust responsibility to remediate these wastes, with each passing day EPNG's exposure to
liability or potential liability for Defendants' historic operation of these properties for the
production of nuclear weapons will continue to grow.

     **D.**     **RCRA Violations and Imminent and Substantial Endangerment Posed by
Defendants' Radioactive Waste**

     69.     On information and belief, during the period 1968 through the present Defendants
have handled, managed, treated, stored, disposed of, or transported solid or hazardous waste at
various Properties, including but not limited to the Highway 160 Dump Site and the Tuba City
Landfill, without a permit or in violation of Subtitle C of RCRA, including but not limited to the
Part 262 generator requirements, the Part 270 permit requirements, the Part 265 interim status
TSD requirements and the Part 268 land disposal requirements.

     70.     Prior to ceasing operations at the Mill and other Properties, including but not
limited to the Highway 160 Dump Site, EPNG reclaimed or remediated these sites at the
direction of the AEC, the AAEC and the Navajo Nation, and in compliance with applicable
federal, state and local law.

     71.     The Tribes have informed EPNG that residually radioactive materials, including
but not limited to yellowcake, mill tailings containing uranium, radon, molybdenum, selenium,
nitrate or other hazardous wastes, ceramic mill balls, cables and other mill equipment (the "Mill

Waste"), and other solid and hazardous wastes, have been stored or disposed of at the Highway 160 Dump Site, the Tuba City Landfill and other Properties.

72.    On information and belief, during the period 1968 through the present and following EPNG's reclamation of and departure from the Mill and other Properties, Defendants have periodically and continuously handled, managed, generated, treated, stored, disposed of and transported the Mill Waste and other solid and hazardous waste, including mill tailings, soil, ground water, equipment and other mill-related waste, each containing uranium, radon, molybdenum, selenium or nitrate, at the Highway 160 Dump Site, the Tuba City Landfill and other Properties.

73.    On information and belief, during the period 1968 through the present Defendants DHHS or IHS have disposed of medical waste and other solid and hazardous waste at the Tuba City Landfill.

74.    In addition, on information and belief, Defendants' past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the Mill or other Properties, including but not limited to the Highway 160 Dump Site and the Tuba City Landfill, may present an imminent and substantial endangerment to health or the environment.

75.    The Tribes have informed EPNG that Mill Waste, medical waste and other solid and hazardous waste has been disposed of and is currently lying exposed on the surface of the Highway 160 Dump Site, the Tuba City Landfill and other Properties. On information and belief, these wastes were treated, stored or disposed of by Defendants at these properties, and may present an imminent and substantial endangerment to health or the environment.

76.    The Tribes have further informed EPNG that children have been observed playing in or on the Mill Waste, medical waste and other solid and hazardous waste which has been

22

disposed of and is currently lying exposed on the surface of the Highway 160 Dump Site, the Tuba City Landfill and other Properties.

77.    The Tribes have further informed EPNG that the Mill Waste, medical waste and other solid and hazardous waste which has been disposed of and is currently lying exposed on the surface of the Highway 160 Dump Site, the Tuba City Landfill and other Properties has impacted ground water underneath these properties, including certain ground water which may be used for drinking water, during the period 1968 through the present. The Tribes have informed EPNG that the impacts to groundwater caused by this disposal of Mill Waste, medical waste and other solid and hazardous waste are continuing, and that plumes containing Mill Waste, medical waste and other solid and hazardous waste continue to emanate from Properties on which such disposal occurred.

78.    On information and belief, as a result of Defendants' treatment, storage or disposal of the Mill Waste, medical waste and other hazardous waste, and Defendants' decision not to maintain the protective covering stabilizing these hazardous wastes at the Highway 160 Dump Site, the Tuba City Landfill and other Properties during the period 1968 through present, the wind transport, erosion and migration of hazardous wastes at these sites has continued to occur and may present a threat or potential threat of imminent and substantial endangerment to human health and the environment, including but not limited to impacts to surface and ground water adjacent to and beneath these sites and impacts to the health of children and other residents who live adjacent to and who have been observed by the Tribes to play in or on these materials.

## First Claim for Relief
### (Declaratory Judgment – UMTRCA Vicinity Properties)

79.    Plaintiff repeats the allegations of paragraphs 1 through 78, inclusive, as if set forth fully herein.

80.    Pursuant to 42 U.S.C. §§ 7912(a)(1), (e)(1) & (e)(2), the Secretary of DOE was required to designate a processing site at the Mill, and to the maximum extent practicable to designate vicinity properties relating to this site under 42 U.S.C. § 7911(6)(B).

81.    Pursuant to 42 U.S.C. § 7912(a)(1), the Secretary of DOE "shall complete remedial action at the above listed sites before his authority terminates." While the Secretary's authority to perform remedial action under UMTRCA terminated on September 30, 1998, the Secretary's authority to perform groundwater restoration activities is without limitation.

82.    Pursuant to 42 U.S.C. § 7921, in connection with the designation of processing sites and vicinity properties "the Secretary [of DOE], the Administrator [of EPA], and the [NRC] shall encourage public participation and, where appropriate, the Secretary [of DOE] shall hold public hearings relative to such matters in the States where processing sites and disposal sites are located."

83.    The Highway 160 Dump Site, the Tuba City Landfill and other properties at which residually radioactive materials from the Mill have been disposed of are in the vicinity of the Mill.

84.    The Tribes have informed EPNG that the Highway 160 Dump Site, the Tuba City Landfill and other properties in the vicinity of the Mill are contaminated with residual radioactive materials, including but not limited to yellowcake, ceramic mill balls, uranium mill tailings and other materials. The Tribes have further informed EPNG that these properties contain ground water impacted by residual radioactive materials.

85.    The Highway 160 Dump Site, the Tuba City Landfill and other vicinity properties contain residual radioactive materials that are derived from the Mill.

24

86.    The Secretary of DOE, the Administrator of EPA and the NRC have not encouraged public participation in, or held public hearings relating to, the designation of the Highway 160 Dump Site, the Tuba City Landfill and certain other properties at which residually radioactive materials from the Mill are alleged to have been disposed.

87.    DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Landfill, and other properties as "vicinity properties" under UMTRCA, 42 U.S.C. §§ 7912(a) & (e), at which residually radioactive materials derived from the Mill have been disposed of constitutes final agency action.

88.    Because of DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Landfill, and other properties at which residually radioactive materials derived from the Mill have been disposed of as "vicinity properties" under UMTRCA, EPNG has and will suffer direct and immediate harm.

89.    EPNG is an aggrieved party under 5 U.S.C. § 702 whose rights are within the zone of interest contemplated by Congress in enacting UMTRCA. Action and threatened action by the Tribes to hold EPNG liable for continued clean-up at the Mill and its "vicinity properties," including but not limited to the Highway 160 Dump Site and the Tuba City Landfill, could subject EPNG to the burden, expense, and hardship of a uranium mill tailings site clean-up that Congress unequivocally directed DOE to undertake.

90.    DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Landfill and other properties at which residual radioactive materials derived from the Mill have been disposed of as "vicinity properties" under UMTRCA is arbitrary and capricious, not in accordance with law, constitutes an abuse of discretion, and is subject to review under 5 U.S.C. § 706.

25

91.    DOE, EPA and NRC's decision not to encourage public participation in, or hold public hearings relating to, the designation of the Highway 160 Dump Site, the Tuba City Landfill and certain other properties at which residual radioactive materials derived from the Mill have been disposed of as required by UMTRCA, 42 U.S.C. § 7921, is arbitrary and capricious, not in accordance with law, constitutes abuse of discretion, and is subject to review under 5 U.S.C. § 706.

92.    An actual and justiciable controversy presently exists between EPNG and DOE concerning: (a) EPNG's potential liability for damage to human health and the environment and clean-up costs relating to disposal of residual radioactive materials and other hazardous and radioactive waste for which Defendants are responsible at the Mill, the Highway 160 Dump Site, the Tuba City Landfill or other "vicinity properties" of the Mill; and (b) DOE's authority and responsibility to designate and remediate such processing sites and "vicinity properties" under UMTRCA.

93.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, UMTRCA and the APA, 5 U.S.C. § 706, EPNG is entitled to a judicial declaration that DOE has not met its obligations under federal law, and that Defendants, and not EPNG, are legally liable for the remediation costs and damage to the environment resulting from residual radioactive material or other deleterious or hazardous substances that emanated or are emanating from the Mill.

**Second Claim for Relief**
**(RCRA Citizen Suit, 42 U.S.C. §§ 6972(a)(1)(A) & (B))**

94.    Plaintiff repeats the allegations of paragraphs 1 through 93, inclusive, as if set forth fully herein.

95.    Defendants are persons as defined by 42 U.S.C. § 6903(15).

96.    Defendants are in violation of, and continue to violate, a permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to Subtitle C of RCRA, 42 U.S.C. §§ 6921-6939e.  More specifically, and without limitation, on information and belief Defendants have handled, disposed of, stored, treated or transported hazardous waste containing uranium, radon, molybdenum, selenium, nitrate and other materials generated at the Mill at various locations in the vicinity of the Mill, including but not limited to the Highway 160 Dump Site, the Tuba City Landfill and other Properties without a permit or in violation of the requirements applicable to generators of hazardous substances at 42 U.S.C. § 6922 and 40 C.F.R. Part 262, as well as the Part 270 permit requirements, 40 C.F.R. Part 270, the Part 265 interim status TSD requirements, 40 C.F.R. Part 270, and the Part 268 land disposal requirements, 40 C.F.R. Part 268.

97.    The waste disposed of, stored or treated by Defendants is solid waste as defined at 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.2.  Among other things and without limitation, on information and belief Defendants have abandoned, stored or disposed of this waste at the Highway 160 Dump Site, the Tuba City Landfill and other Properties.

98.    The waste disposed of, stored or treated by Defendants is hazardous waste as defined at 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.3.  Among other things and without limitation, on information and belief this waste is characteristic hazardous waste due to its elevated levels of cadmium, chromium and selenium.  In addition, because of its quantity, concentration, or physical, chemical, or infectious characteristics, this waste may cause, or significantly contribute to, an increase in mortality or an increase in serious, irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health

or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

99.    Defendants are past or present generators, past or present transporters, or past or present owners or operators of a treatment, storage or disposal facility, including but not limited to the Highway 160 Dump Site, the Tuba City Landfill and other Properties.

100.    Defendants have contributed to or are contributing to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the Highway 160 Dump Site, the Tuba City Landfill and other Properties which may present an imminent and substantial endangerment to health or the environment.

101.    EPNG has provided prior notice to Defendants, the Administrator of EPA, the Navajo Nation, the Hopi Tribe and the State of Arizona regarding the foregoing alleged violations and imminent and substantial endangerment, and EPNG's intent to file a lawsuit to abate these matters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EPNG prays for entry of judgment against Defendants as follows:

A.    For judgment declaring that the Highway 160 Dump Site, the Tuba City Landfill and certain other properties in the vicinity of the Mill which contain soil or groundwater impacted by residual radioactive uranium mill waste materials are "vicinity properties" within the meaning of 42 U.S.C. § 7911(6)(B).

B.    For a judgment declaring that the residual radioactive materials located at the Highway 160 Dump Site, the Tuba City Landfill and certain other properties in the vicinity of

the Mill are "source, special nuclear or byproduct materials" as defined under the Atomic Energy

Act, 42 U.S.C. § 2011 *et seq.*

C.    For a judgment declaring that DOE is exclusively responsible for the remediation

of the groundwater and soil at the Highway 160 Dump Site, the Tuba City Landfill and certain

other properties in the vicinity of the Mill which are impacted by residually radioactive uranium

mill waste materials.

D.    For a judgment declaring that DOE has violated UMTRCA and the APA through

their failure to designate the Highway 160 Dump Site, the Tuba City Landfill and certain other

properties in the vicinity of the Mill as "vicinity properties."

E.    For judgment declaring that DOE, EPA and NRC have violated the public

participation requirements of Section 7921 of UMTRCA and ordering that DOE immediately

notice and convene a public hearing to discuss the status of efforts to designate the Highway 160

Dump Site, the Tuba City Landfill and properties in the vicinity of the Mill contaminated with

residual radioactive waste derived from the Mill as "vicinity properties" of the Mill under 42

U.S.C. §§ 7912 & 7911(6)(B).

F.    For judgment declaring, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 6972, that

Defendants have violated Subtitle C of RCRA or have created an imminent and substantial

endangerment to public health and the environment by their treatment, storage, disposal or

management of solid or hazardous wastes at the Highway 160 Dump Site, the Tuba City Landfill

Site or other Properties.

G.    For a preliminary and permanent injunction ordering that Defendants perform

cleanup activities necessary to abate present and imminent threats to human health or the

environment caused by Defendants' treatment, storage, disposal or management of solid,

hazardous or radioactive wastes at the Highway 160 Dump Site, the Tuba City Landfill Site or other Properties.

H.    For appropriate civil penalties to be paid to the U.S. Treasury pursuant to 42 U.S.C. §§ 6972(a), 6928(a) & 6928(g) in response to the ongoing violations alleged by EPNG.

I.    For an order directing Defendants to prospectively reimburse EPNG for the cost of all cleanup activities which EPNG is ordered or required to perform at the Highway 160 Dump Site, the Tuba City Landfill or other Properties;

J.    For moratory, pre-judgment and post-judgment interest, to the maximum extent permitted by law;

K.    For Plaintiffs' attorneys' fees, costs and expert witness fees to the maximum extent permitted by law; and

L.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of any and all issues so triable.

Dated this 14th day of May, 2007.

Respectfully submitted,

By: _Thomas L. Sansonetti_

Thomas L. Sansonetti, D.C. Bar No. 949610
HOLLAND & HART, LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY 82001-3164
307.778.4200 (Telephone)
303.778.8175 (Facsimile)

William G. Myers III, D.C. Bar No. 408573
HOLLAND & HART, LLP
U.S. Bank Plaza
101 S. Capitol Boulevard, Suite 1400
Boise, ID 83702-7714
208.342.5000 (Telephone)
208.343.8869 (Facsimile)

By: _____

Jerry Stouck, D.C. Bar No. 343400
Robert L. Shapiro, D.C. Bar No. 415854
GREENBERG TRAURIG, LLP
800 Connecticut Ave., N.W., #500
Washington, DC 20006
202.331.3100 (Telephone)
202.331.3101 (Facsimile)

David G. Palmer
Brian L. Duffy
Naomi G. Beer, D.C. Bar No. 450875
Christopher J. Neumann
GREENBERG TRAURIG, LLP
The Tabor Center
1200 Seventeenth Street
Twenty-Fourth Floor
Denver, CO 80202
303.572.6500 (Telephone)
303.572.6540 (Facsimile)

*Attorneys for PLAINTIFF El Paso Natural Gas Company*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| El Paso Natural Gas Company, a Delaware corporation | United States of America, United States Department of Energy and the Hon. Samual W. Bodman, its Secretary, et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **88888**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jerry Stouck
Robert L. Shapiro
Greenberg Traurig LLP
800 Connecticut Avenue NW, Suite 500
Washington, DC 20006
202-331-3100

ATTORNEYS (IF KNOWN)

N/A

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>**\*(If pro se, select this deck)\*** | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>**\*(If pro se, select this deck)\*** | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Review of failure to designate sites under 42 U.S.C. Sec. 7912(a) & (e) and violation of 42 U.S.C. Sec. 6901 et seq.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☒  NO ☐ |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐  NO ☒    If yes, please complete related case form.

DATE 05/14/2007    SIGNATURE OF ATTORNEY OF RECORD    *Robert L. Glen*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

    I.        COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

    III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

    IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

    VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

    VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.