# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **EL PASO NATURAL GAS COMPANY**, a Delaware corporation, 2 North Nevada Avenue Colorado Springs, Colorado 80944 | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 07-00905  RJL |
| **UNITED STATES OF AMERICA**, **UNITED STATES DEPARTMENT OF ENERGY** and the Honorable **SAMUEL W. BODMAN**, its Secretary, **UNITED STATES NUCLEAR REGULATORY COMMISSION**, **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY** and the Honorable **STEPHEN L. JOHNSON**, its Administrator, **UNITED STATES DEPARTMENT OF THE INTERIOR** and the Honorable **DIRK KEMPTHORNE**, its Secretary, **BUREAU OF INDIAN AFFAIRS**, **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES** and the Honorable **MICHAEL O. LEAVITT**, its Secretary, **INDIAN HEALTH SERVICE**, **UNITED STATES DEPARTMENT OF DEFENSE** and the Honorable **ROBERT GATES**, its Secretary, | § § § § § § § § § § § § § § § § § § § § § | **AMENDED COMPLAINT** |
| Defendants. | § | |

Plaintiff EL PASO NATURAL GAS COMPANY ("EPNG"), a Delaware corporation,

("Plaintiff"), by and through the undersigned attorneys, and for its Amended Complaint against

Defendants the UNITED STATES OF AMERICA ("United States"), the UNITED STATES

DEPARTMENT OF ENERGY and the Honorable SAMUEL W. BODMAN, its Secretary

(collectively "DOE"); the UNITED STATES NUCLEAR REGULATORY COMMISSION

("NRC"); the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and the

Honorable STEPHEN L. JOHNSON, its Administrator (collectively "EPA"); the UNITED

STATES DEPARTMENT OF THE INTERIOR, the Honorable DIRK KEMPTHORNE, its

Secretary, and the BUREAU OF INDIAN AFFAIRS ("BIA") (collectively "DOI"); the UNITED

STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, the Honorable MICHAEL

O. LEAVITT ("Leavitt"), its Secretary, and the INDIAN HEALTH SERVICE ("IHS")

(collectively "DHHS"); and the UNITED STATES DEPARTMENT OF DEFENSE and the

Honorable ROBERT GATES, its Secretary (collectively "DOD"), states as follows:

<u>**STATEMENT OF THE CASE**</u>

1.    This is a civil action relating to, for EPNG's primary claim, DOE's decision not to

designate certain sites containing residual radioactive materials from the Tuba City Uranium Mill

(the "Mill"), which is approximately 6 miles east of Tuba City, Arizona, as "vicinity properties"

pursuant to the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), 42 U.S.C.

§§ 7912(a) & (e).  The sites at issue include, but are not limited to, a dump site immediately

adjacent to the north-northwest of the Mill and on the north side of Highway 160 (the "Highway

160 Dump Site," a/k/a the Tuba City Radiation Site), the Tuba City Landfill, a/k/a the Tuba City

Open Dump Site (the "Tuba City Open Dump Site"), any "vicinity properties" of the Mill

designated or defined pursuant to UMTRCA and any sites near the Mill on the Navajo or Hopi

Reservations or federal land where Defendants have handled, treated, stored, disposed of or

transported hazardous waste (the "Properties").  The Mill and the Highway 160 Dump Site are

located on the Navajo Reservation.  The Tuba City Open Dump Site is located on both the Hopi

and Navajo Reservations.

2.    In the alternative, and only to the extent the waste materials at issue are not

residual radioactive materials exclusively regulated under UMTRCA but rather hazardous wastes

regulated under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et*

*seq.*, EPNG alleges for its secondary claim the following violations of RCRA: 1) Defendants'
violation of Subtitle C of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.
§ 6901 *et seq.*, relating to their treatment, storage or disposal of hazardous waste at the
Properties; 2) Defendants' past or present handling, storage, treatment, transportation, or disposal
of solid or hazardous waste which may present an imminent and substantial endangerment to
health or the environment at the Properties; 3) the Administrator of EPA's failure pursuant to
Section 6927(c) of RCRA to perform a non-discretionary duty by undertaking on an annual basis
a thorough inspection of each facility for the treatment, storage, or disposal of hazardous waste
which is owned or operated by a department, agency, or instrumentality of the United States on
the Properties to enforce its compliance with Subtitle C of RCRA; and, 4) Defendants'
performance of solid waste management practices or disposal of solid waste or hazardous waste
at the Properties in a manner constituting open dumping of solid waste or hazardous waste in
violation of Section 6945(a) of RCRA, 42 U.S.C. § 6945(a).

3.    At the direction and instruction of the United States Atomic Energy Commission
("AEC"), n/k/a DOE, and DOD, the Mill was operated by EPNG or its predecessor Rare Metals
Corporation of America ("RMCA") from approximately 1956 to 1966 to process uranium ore to
certain specifications for Defendants' Cold War nuclear weapon program.  In 1968, Defendants
directed EPNG to stabilize the Mill, including its tailings and other Mill-related waste, in the
manner required by then-applicable law.  Defendants required this Mill reclamation and
stabilization as a condition of terminating licenses issued to EPNG under the Atomic Energy
Act.  Since terminating EPNG's Atomic Energy Act licenses and directing EPNG to leave the
Mill in December 1968, Defendants have owned, maintained or operated the Mill and certain of
its vicinity properties for nearly four decades.

4.      In 1978, Congress declared through the passage of UMTRCA that the United
States shall be exclusively responsible for the remediation of uranium mill tailings and related
waste generated at the Mill and for the remediation of "vicinity properties" containing soil or
ground water impacted by this residual radioactive uranium mill waste.

5.      In stating the legislative purpose for UMTRCA, Congress explained: "There is a
general finding that uranium mill tailings pose a potential and significant radiation health hazard
to the public and that the protection of the public health, safety, and welfare . . . require a federal
effort to provide for the stabilization, disposal, and control, in a safe and environmentally sound
manner, of the tailings in order to prevent and minimize health and environmental hazards."
H.R. Rep. 95-1480(II), 1978 U.S.C.C.A.N. 7450, at 7461-62.

6.      In addition, Congress described in various reports the nature of the threat posed
by uranium mill tailings and the importance of a federal response to these threats:

> Uranium mill tailings are the sandy waste produced by the uranium
> ore milling process.  Because only 1 to 5 pounds of usable uranium
> is extracted from each 2,000 pounds of ore, tremendous quantities
> of waste are produced as a result of milling operations.  These
> tailings contain many naturally-occurring hazardous substances,
> both radioactive and nonradioactive.  The greatest threat to public
> health and safety is presented by the long radioactive decay
> process of radium into Radon-222, an inert gas which may cause
> cancer or genetic mutations.  This decay process, and the dangers
> which accompany it, will continue for a billion years.  As a result
> of being for all practical purposes, a perpetual hazard, uranium mill
> tailings present the major threat of the nuclear fuel cycle.
>
> In its early years, the uranium milling industry was under the
> dominant control of the Federal government.  At that time,
> uranium was being produced under federal contracts for the
> government's Manhattan Engineering District and Atomic Energy
> Commission Program. Under these contracts, uranium tailings
> piled up so that now nearly 90 million tons of such waste are
> attributable to Federally-induced production.  Of this amount,
> about 27 million tons of tailings have been left at sites where no
> commercial milling has taken place and which are not the
> responsibility of any active milling company.

H.R. Rep. 95-1480(I), 1978 U.S.C.C.A.N. 7433, at 7434.

7.      The Navajo Nation and the Hopi Tribe (the "Tribes") have informed EPNG that they have identified and observed certain residually radioactive uranium mill-related waste, including but not limited to yellowcake (which is used to manufacture nuclear weapons), ceramic mill balls, tailings and other hazardous waste, on the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.  The Tribes have informed EPNG that these materials were disposed of in drums or other containers or placed on the ground at the Properties, and have discharged, spilled and leaked, and continue to discharge, spill and leak into the soil and ground water at the Properties.  The Tribes have also informed EPNG that notwithstanding the observation of these residual radioactive uranium mill-related waste materials at levels above the regulatory level set by the EPA to protect human health and the environment at 40 C.F.R. Part 192, Defendants have made a determination that this adjacent property is not a "vicinity property" within the meaning of 42 U.S.C. § 7911(6)(B) and that Defendants have no obligation to perform remediation of these residual radioactive uranium mill-related wastes or impacted groundwater.  As a result of Defendants' determination, the Tribes have now threatened to file a lawsuit against EPNG to force EPNG to pay for or to perform cleanup activities the Tribes have informed EPNG are necessary to abate threats to human health and the environment posed by these residually radioactive uranium mill-related wastes.

8.      For these reasons, and for its primary claim, EPNG now requests a judicial determination that: 1) the Highway 160 Dump Site, the Tuba City Open Dump Site and certain Properties which contain soil or groundwater impacted by residually radioactive uranium mill waste materials are "vicinity properties" within the meaning of 42 U.S.C. § 7911(6)(B); 2) the residually radioactive materials located at these "vicinity properties" are "source, special nuclear

or byproduct materials" as defined under the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*;

3) DOE is exclusively responsible for the remediation of groundwater and soil at these vicinity

properties which are impacted by residually radioactive uranium mill waste materials; 4) DOE's

decision not to designate these vicinity properties adjacent to the Mill was arbitrary and

capricious, an abuse of discretion or not in accordance with law; 5) DOE, EPA and NRC failed

to comply with the public participation provisions of UMTRCA, 42 U.S.C. § 7921, inasmuch as

they failed to encourage public participation or to hold public hearings relating to the designation

of vicinity properties immediately adjacent to or in the vicinity of the Mill; and 6) DOE failed to

designate vicinity properties of the Mill, and to develop a Remedial Action Plan for such vicinity

properties, prior to and following November 8, 1979 to the maximum extent practicable as

required by Section 7912 of UMTRCA, 42 U.S.C. §§ 7912(a) & (e), and the Cooperative

Agreement entered between DOE and the Navajo Nation and Hopi Tribe pursuant to Section

7915 of UMTRCA, *id.* § 7915.

9.    In the alternative, and to the extent the hazardous wastes the Tribes have informed

EPNG are located on the Properties are not exclusively regulated under UMTRCA, are not

residually radioactive source, special nuclear or byproduct materials, or are otherwise subject to

RCRA, EPNG states a citizen suit claim under RCRA, 42 U.S.C. § 6972, against Defendants:

1) for violation of Subtitle C of RCRA, 42 U.S.C. §§ 6922, 6924, 6925, 6930 & 6937, and

regulations promulgated thereunder, 40 C.F.R. Parts 262, 264, 265, 268 & 270; 2) to abate the

imminent and substantial endangerment caused by Defendants at the Properties; 3) for failure of

the Administrator of EPA to perform a non-discretionary duty under Section 3007(c) of RCRA,

42 U.S.C. § 6927(c), to conduct annual inspections at the Properties that are owned or operated

by the United States which are hazardous waste treatment storage and disposal facilities to

ensure its compliance with Subtitle C of RCRA; and, 4) for performing solid waste management practices or disposing of solid waste or hazardous waste in a manner constituting open dumping in violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a).

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367. This action arises under and requires the interpretation and construction of the United States Constitution and laws of the United States, including but not limited to the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, UMTRCA, the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* EPNG has provided notice of intent to sue under RCRA to Defendants as required pursuant to 42 U.S.C. § 6972(b).

11.    Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1) and 42 U.S.C. § 6972(a) because one or more Defendants reside in the District of Columbia, because one or more of Defendants' violations of Subtitle C of RCRA (including but not limited to Defendants' failure to file a permit application, to have a permit, and to maintain financial assurance) occurred in the District of Columbia, and because the Administrator of EPA failed to perform a non-discretionary duty under RCRA in the District of Columbia.

12.    There exists now between the parties an actual, justiciable controversy in which the Plaintiff is entitled to have a declaration of its rights and of the Defendants' obligations, and further relief because of the facts and circumstances set forth below.

13.    This Court also has jurisdiction over the parties to this action. EPNG, and its former subsidiary RMCA, operated the Mill under contract with the AEC from 1956 to 1966. DOE, NRC and EPA are administrative agencies created by federal statute, having authority and

responsibility to conduct activities on behalf of the federal government relating to the designation and remediation of uranium mill sites and vicinity properties under UMTRCA. DOE, DOI, BIA, DHHS, IHS and DOD each own or have owned, and have stored or disposed of uranium mill-related hazardous waste, medical waste and other solid and hazardous waste at, the Tuba City Open Dump Site, the Highway 160 Dump Site or other Properties in violation of Subtitle C of RCRA, in a manner constituting open dumping or in a manner constituting an imminent and substantial endangerment to health or the environment.

14.    The United States has waived sovereign immunity under Sections 7002 and 6001 of RCRA, 42 U.S.C. §§ 6972, 6961, for claims of liability brought thereunder, and under the APA and UMTRCA for review of Defendants' decision not to designate "vicinity properties" under UMTRCA.

## PARTIES

15.    Plaintiff EPNG is a Delaware corporation whose principal place of business is in Colorado Springs, Colorado.  RMCA was incorporated in Delaware on May 24, 1954, and, on July 9, 1962, was merged into EPNG pursuant to the provisions of Section 253 of the Delaware General Corporation Law.  Beginning in approximately 1955, RMCA entered into contracts with the AEC, including but not limited to mining contracts, leases and mining claims, to mine for and to process uranium bearing ores for the recovery of uranium to be sold to the AEC.  EPNG ceased these uranium mining, milling and processing operations in 1966.

16.    Defendants include the United States of America, acting for itself and through its federal agencies.

17.    Defendant DOE is responsible for the designation and remediation of the Mill and its "vicinity properties" pursuant to 42 U.S.C. § 7912.  DOE is also responsible for remediation

8

of the Mill and its "vicinity properties" pursuant to UMTRCA.  On information and belief, at various times since December 1968, DOE owns or has owned, and has stored or disposed of uranium mill-related hazardous waste and other solid and hazardous waste at, the Tuba City Open Dump Site, the Highway 160 Dump Site or other Properties in violation of Subtitle C or Section 6945 of RCRA or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.

18.    Defendant NRC has responsibility for the regulation, oversight and management of uranium mill tailings-related activities at the Mill and its vicinity properties.  It is also responsible for reviewing and concurring with remedial actions taken at the Mill and its vicinity properties by DOE, and for providing post-cleanup oversight of these sites, among other things, pursuant to the Atomic Energy Act and UMTRCA.  In this regard, Congress explicitly directed the NRC to set all standards and requirements relating to management concepts, specific technology, engineering methods, and procedures to be employed to achieve desired levels of control for limiting public exposure, and for protecting the general environment.  On information and belief, the NRC is also partly responsible for designation of vicinity properties of the Mill or for approval or implementation of activities relating to the treatment, storage, or disposal of hazardous waste at the Mill or its vicinity properties.

19.    Defendants EPA and Johnson (collectively "EPA") are responsible for promulgating standards applicable to DOE's planned remedial actions at the Mill and its vicinity properties designated pursuant to UMTRCA.  Congress explicitly directed that the standards and criteria developed should limit the exposure or potential exposure of the public and protect the general environment from either radiological or non-radiological substances to acceptable levels. EPA has failed to perform a non-discretionary duty under Section 6927(c) of RCRA by failing to

undertake on an annual basis a thorough inspection of each facility located on the Highway 160 Dump Site, the Tuba City Open Dump Site or other Properties for the treatment, storage, disposal of hazardous waste which is owned or operated by a department, agency, or instrumentality of the United States to enforce its compliance with Subtitle C of RCRA.

20.     Defendant DOI on information and belief owns or has owned, and has stored or disposed of uranium mill-related hazardous waste, medical waste and other solid and hazardous waste at, the Tuba City Open Dump Site or other Properties in violation of Subtitle C of RCRA, 42 U.S.C. §§ 6922, 6924, 6925, 6930 & 6937, and regulations promulgated thereunder, 40 C.F.R. Parts 262, 264, 265, 268 & 270, or Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.  DOI manages or operates, or has managed or operated, the Tuba City Open Dump Site.

21.     Defendant DHHS on information and belief has stored or disposed of medical waste and other solid and hazardous waste at the Tuba City Open Dump Site or other Properties in violation of Subtitle C of RCRA, 42 U.S.C. §§ 6922, 6924, 6925, 6930 & 6937, and regulations promulgated thereunder, 40 C.F.R. Parts 262, 264, 265, 268 & 270, or Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.

22.     Defendant DOD on information and belief at times relevant to the facts stated in this Complaint directed the AEC, NRC or others in the manner and scope of uranium exploration, mining, milling, processing, storage and disposal at the Mill and other Properties necessary to generate yellowcake needed for the production of nuclear weapons.  On information and belief, by and through these activities DOD generated hazardous waste or operated the Mill

or other Properties. On information and belief, by and through these activities DOD has stored or disposed of uranium mill-related hazardous waste, medical waste and other solid and hazardous waste at, the Tuba City Open Dump Site, the Highway 160 Dump Site or other Properties in violation of Subtitle C of RCRA, 42 U.S.C. §§ 6922, 6924, 6925, 6930 & 6937, and regulations promulgated thereunder, 40 C.F.R. Parts 262, 264, 265, 268 & 270, or Section 6945(a) of RCRA, 42 U.S.C. § 6945(a), or in a manner constituting or contributing to an imminent and substantial endangerment to health or the environment.

## FACTS

### A.    Uranium Processing for Nuclear Weapons at Tuba City

23.    During the period 1955 to 1968, Defendants directed and contracted with EPNG or its predecessor RMCA to mine, mill and process uranium ore, and to deliver yellowcake for the manufacture of nuclear weapons.

24.    EPNG and its predecessor RMCA's mining and milling operations were conducted pursuant to federal mining circulars and schedules, licenses issued by the AEC, contracts between the AEC and EPNG, leases between EPNG and the Navajo Nation which were approved by DOI, and subleases between the AEC and EPNG, and were performed in compliance with applicable federal, state and tribal law. Importantly, the land leased from the Navajo Nation for the Mill and related activities, as well as the land subleased by the AEC, included the land upon which both the Mill and the Highway 160 Dump Site are located.

25.    On July 15, 1955, RMCA entered into a contract with the AEC, Contract No. AT(05-1)-293.

26.    Contract AT(05-1)-293 was authorized and executed under the Atomic Energy Act of 1954, in the interest of the common defense and security. The AEC's stated purpose for

11

entering into contract AT(05-1)-293 was the AEC's desire "to increase the domestic production of source material by having uranium-bearing ores tributary to the Tuba City, Arizona district, processed for the recovery of uranium to be sold to the [AEC] in the form of uranium concentrate. . . ."

27.     Under the terms of Contract AT(05-1)-293, RMCA agreed to construct a uranium processing mill at Tuba City, Arizona, for the processing of uranium-bearing ore mined by RMCA.  The uranium processed was for exclusive purchase by the AEC.  From 1956 to 1966, the Mill received and processed uranium ore from mines in the area.  During this time, the Mill processed a total of 796,489 tons of uranium ore.

28.     The AEC received 100 percent of the Mill's production for the national defense program, specifically, the development of nuclear weapons.

29.     Under the terms of the agreement between AEC and RMCA, the AEC set price schedules for uranium ore and established bonuses for new discoveries of uranium ore.

30.     In 1955 and 1956, RMCA obtained from the federal government various mining permits, lease agreements and licenses in order to operate open-pit, class 1 uranium mines in the Cameron/Tuba City area within the Navajo Reservation, including but not limited to a Prospecting Permit covering the entirety of the Navajo Reservation.

31.     On December 14, 1955, the AEC entered into an agreement with RMCA under which the AEC subleased land that RMCA had leased from the Navajo Nation to conduct its milling operations.

32.     On January 1, 1956, the AEC entered into an agreement with RMCA under which the AEC subleased land that RMCA had leased from the Navajo Nation and upon which RMCA had built its ore buying station and sampling plant.

12

33.     These contracts contained the specifications for mining and milling uranium ore at the Mill.  These contracts also made Defendants exclusively responsible for the uranium mill tailings materials generated by or disposed of at the Mill, the Highway 160 Dump Site, the Tuba City Open Dump Site or any other Properties.  Indeed, these contracts made the government the owner of these materials.

**B.     Conditions for Discontinuing Tuba City Uranium Operations**

34.     Beginning in 1963, Defendants informed EPNG of the conditions for their potential discontinuation of uranium processing activities at Mill.

35.     On November 14, 1963, AEC sent a letter to EPNG explaining that AEC would not terminate any uranium milling licenses without reaching a decision as to what control measures were appropriate under the circumstances of each site.

36.     In November 1965, the Arizona State Department of Health studied the Mill and concluded that the tailings at the Mill would need to be reconfigured and stabilized from wind erosion prior to EPNG's ceasing operations.

37.     On December 6, 1965, the Navajo Nation Tribal Mining Department sent a letter to EPNG inquiring whether EPNG had evaluated the potential harmful effects the Mill tailings may present after the Mill ceased operations.

38.     On December 13, 1965, EPNG responded to the Navajo Nation Tribal Mining Department explaining that it was studying the potential harmful effects the Mill tailings may present after the Mill ceased operations.

39.     On February 7, 1966, EPNG wrote again to the Navajo Nation Tribal Mining Department to explain that although there were no existing regulations regarding the remediation

or reclamation of tailings, EPNG intended to meet with the AEC to determine an appropriate

method for addressing any potential impacts from tailings at the Mill.

40.     On May 27, 1966, EPNG sent a letter to the AEC explaining that it was studying

the potential hazards associated with tailings at the Mill after EPNG ceased operations, and that

it would determine a feasible solution to such hazards if one was required.

41.     On December 6, 1966, the State of Arizona Atomic Energy Commission

("AAEC") sent a letter to EPNG stating, in part, that: "[I]t is apparent that we cannot rightfully

require stringent measures from your company . . . .  We, therefore, request only that the

company use its best efforts to stabilize the piles to a reasonable extent, such as firming the

berms that circle the downstream borders of the piles."

42.     In July 1967, the Technical Services Program for the Southwestern Radiological

Health Laboratory, National Center for Radiological Health, U.S. Public Health Service,

Department of Health, Environment and Welfare ("DHEW") (the "U.S. Public Health Service"

or "Service"), n/k/a DHHS, performed and published an "Environmental Survey of Uranium

Mill Tailings Pile, Tuba City, Arizona" to "evaluate any potential radiation hazards which exist

and to recommend methods of control" at the Mill and its "vicinity properties."  After inspecting

the properties in the vicinity of the Mill, the Service concluded, in part, that: "At the present time

there appears to be no contamination of surface or ground water in the surrounding area from

leaching of radioactive materials from the tailings area."  The Service concluded further that:

"As a result of the external radiation levels on the tailings area itself, this area should not be

released for public use in its present state.  Action which would permit release of the area would

be to cover the tailings with uncontaminated dirt to an extent that would diminish the external

radiation to an acceptable level and to stabilize the covering against wind erosion."

43.     On November 29, 1967, the AAEC sent a letter to EPNG explaining that its

tailings reclamation obligation would be satisfied, and EPNG could cease operations and leave

the Mill, upon stabilization of the tailings piles at the Mill.  More specifically, the AAEC stated:

> You are directed to develop a plan for the stabilizing of the
> [tailings] pile against wind erosion and a time schedule indicating
> the dates on which work will be commenced and finished.  This
> plan and schedule are to be submitted to this Commission for
> review by March 31, 1968.  The work itself must be completed by
> the end of 1970.
>
> To be acceptable the work must encompass (1) rounding off and
> surface stabilization of the pile to prevent wind scour; (2) return to
> the pile of visible tailings material which has already blown
> outside the mill site; and (3) adequate restoration of the radiation
> warning signs and the fence surrounding the mill site, to prevent
> access by unauthorized people.
>
> The Bureau of Mines of the Department of Interior has developed
> a competence in the stabilizing of waste piles.  Extensive
> consultation is available to your company should you desire to help
> in planning the work . . . .
>
> A meeting of officials of the Navajo Tribe, the U.S. Public Health
> Service, and this Commission was held in Farmington, New
> Mexico on November 27, 1967.  At that time, the extent of control
> measures needed for the tailings pile was agreed upon.  It was
> determined that if the El Paso Natural Gas Company adequately
> protects the pile against wind erosion, no further control work will
> be required at a later date against other lesser hazards, such as
> underground water pollution, radon gas emanation hazard directly
> on the pile, or gamma radiation over the pile.  The Tribe will
> undertake to protect the public against these hazards by restricting
> access to the fenced area indefinitely.

44.     On March 25, 1968, DOI inspected the Mill and prepared a written

recommendation to EPNG detailing the specific stabilization practice which EPNG was required

to implement at the Mill.  Specifically, DOI made the following "Recommendations" to EPNG:

> 1.      The berms should be leveled to eliminate irregularity of
> outline and thus to decrease wind erosion.  The sand drift area
> should be returned to the tailing pond proper.

> 2.      DCA-70, an elastomeric polymer, should be applied to the approximately 40,000 square yards of berms and beaches surrounding the carbonate No. 1 and acid tailings area. Application of DCA-70 at the rate of 8 cents per square yard reagent cost should effectively stabilize these areas for an indefinite time.

> 3.      Application of Trastan SL or Torinal B may be beneficial for other areas including the beaches of the carbonate No. 1 and acid piles if access to these areas is possible.

45.      On March 27, 1968, EPNG submitted to AAEC a work plan for stabilizing the tailings piles at the Mill adopting precisely the "Recommendations" made by DOI.  EPNG explained to AAEC in its transmittal letter that: "Mr. [Karl] Dean [of the U.S. Bureau of Mines] has assured me by telephone that he and his department will aid El Paso with the acquisition and proper application of the polymer as well as the execution of his recommended plan."

46.      On April 22, 1968, AAEC approved EPNG's stabilization work plan, explaining that:

> Your Company's plan for the stabilizing of the tailings pile at the Tuba City millsite, as set forth in your letter of March 27, was sent for informal review to the Public Health Service office in Window Rock, the Public Health Service Laboratory in Las Vegas, and to the Minerals office of the Navajo Tribe in Farmington.  All of these agencies indicated their approval of the plan, and by this letter I am giving the formal approval of this Commission to the work as outlined.

47.      On May 15, 1968, AAEC sent a letter to EPNG providing EPNG with the appropriate language for warning signs posted on the fence surrounding the Mill.  More specifically, AAEC explained that:

> This letter has to do with the material to be put on the signs posted around the tailings pile at Tuba City.  It is suggested that each sign have three lines.  The top line could say "DANGER".  The middle line, "RADIATION AREA", and the bottom line "KEEP OUT". There need be no identity given at the bottom regarding who posted the sign.

> This Commission is waiving any requirement, real or implied,
> regarding inclusion of the conventional radiation symbol, the
> three-bladed propeller in purple on a yellow background. These
> colors fade rapidly in sunlight and would not be very meaningful
> on a fence surrounding an abandoned tailings pile. It is suggested
> the lettering on the sign be black against a white background.

48.     On May 21, 1968, AAEC wrote back to EPNG to suggest that EPNG change the

word "DANGER" to "CAUTION" on its sign, explaining that: "The latter conveys less of a

feeling of immediate hazard. As the material left in the tailings pile gives a high reading of

about 5 or 6 mR/hr, it does represent a long-term problem but not an hour-by-hour hazard to life

or limb."

49.     On July 17, 1968, the Navajo Nation wrote to the AAEC to request that the EPNG

work plan be modified to include restrictions against entry by unauthorized personnel.

50.     On July 19, 1968, AAEC wrote to BIA to explain that EPNG had agreed to

stabilize the tailings piles at the Mill as recommended by the Bureau of Mines, and that once this

work was completed AAEC would terminate EPNG's radioactive material license. AAEC

stated, in part, that: "In the view of the [AAEC], the El Paso Company has done everything

within reason to leave the property in a safe condition. With the covering of the pile there will

be no health hazard outside of the fence and a minimal hazard over the pile itself. This

Commission, in fact, has been very impressed with the willingness of the El Paso Company to

carry out the protective measures recommended by the Public Health Service and the Bureau of

Mines."

51.     On July 26, 1968, AAEC wrote to EPNG to explain that any residually

radioactive mill equipment could be disposed of at the Mill site. More specifically, AAEC stated

that: "The El Paso Company has done a more than adequate job of recording the levels of

contamination in mill equipment as this has been dismantled. Any equipment removed from the

premises has been monitored; that with measurable levels of radiation have been returned to

El Paso property elsewhere. That equipment left on mill premises at Tuba City may be disposed

of by burial in the emergency waste holding pit inside the fenced area. Following burial of all

contaminated material, the pit should be filled with earth and the surface stabilized as the pile has

been (or soon will be)."

52.    On August 1, 1968, BIA wrote to EPNG and approved EPNG's work plan for

stabilizing the tailings piles at the Mill.

53.    On October 17, 1968, AAEC wrote to EPNG to memorialize that the tailings pile

had been stabilized, and that once the mill equipment was buried in the emergency waste holding

pit and fenced in, AAEC would terminate EPNG's radioactive material license. More

specifically, AAEC stated that:

> I am pleased to report that the pile has been stabilized in
> accordance with the plans of the Bureau of Mines and the
> recommendations of the Southwestern Radiological Health
> Laboratory. Also, tailings material which had migrated downwind
> has been returned to the pile. The entire pile has been securely
> fenced except for access to the emergency waste holding pit, and it
> has been posted in the manner we requested.
>
> Accordingly, we have determined that the El Paso Natural Gas
> Company has fulfilled its responsibility with regard to safe
> abandonment of the tailings pile. At such time as you inform us
> that contaminated material in the mill building has been buried in
> the emergency waste holding pit and fencing completed past the
> pit, we will terminate your license (SUA-666) upon your request.

54.    By the end of October 1968, on information and belief EPNG or Defendants had

stabilized all mill tailings and other uranium mill-related waste at the Mill, the 160 Highway

Dump Site, the Tuba City Open Dump Site, or other vicinity properties of the Mill pursuant to

work plans approved by the AEC and the AAEC.

55. On December 9, 1968, AAEC issued a formal termination of EPNG's Radioactive Material License No. SUA-666, stating in part that:

> WHEREAS the licensee has terminated the activities authorized by this license and desires to abandon his uranium mill property located six (6) miles east of Tuba City, Arizona;
>
> WHEREAS the licensee has effectively decontaminated the mill building;
>
> WHEREAS the licensee has stabilized the tailings pile against wind erosion, in accord with letter dated March 27, 1968, signed by W.T. Hollis;
>
> WHEREAS the licensee has fenced and posted the tailings pile in accord with our letters of May 15, 1968, and May 21, 1968;
>
> NOW THEREFORE this license numbered SUA-666, issued by the United States Atomic Energy Commission and administered by the State of Arizona Atomic Energy Commission is hereby TERMINATED, effective this date.

### C. Defendants' Decision Not to Designate UMTRCA Vicinity Properties

56. The lands upon which the Highway 160 Dump Site and Tuba City Open Dump Site are located on, and on information belief other "vicinity properties" of the Mill are held in trust by the United States for, as appropriate, the Navajo Nation or Hopi Tribe. Thus, fee title to these properties resides in the United States, with, as appropriate, the Navajo Nation or Hopi Tribe holding beneficial title thereto.

57. The United States and the Defendants owe a general fiduciary duty to the Navajo Nation and the Hopi Tribe and specifically a trust responsibility to protect, enhance, and ameliorate damage caused to the beneficial ownership interests of the Tribes in the lands comprising the Highway 160 Dump Site, the Tuba City Open Dump Site and other "vicinity properties" of the Mill; particularly when the damage done thereto or the contamination in question occurred at the hands and/or direction of the Tribes' trustee, *i.e.*, the United States.

58.     On January 17, 1985, the United States, by and through DOE, signed a "Cooperative Agreement Between the United State Department of Energy, the Navajo Tribe of Indians and the Hopi Tribe of Indians," DOE Cooperative Agreement Number DE-FC04-85AL26731 (the "Cooperative Agreement"), in which DOE agreed, among other things, to identify and remediate vicinity properties of the Mill.

59.     The Cooperative Agreement provides, in part, that: "DOE is responsible for selecting and performing remedial actions at the Tuba City millsite and vicinity properties."  The Cooperative Agreement defines "Remedial Action" to mean "the assessment, design, construction, renovation, reclamation, decommissioning, and decontamination activities of DOE, or such person as it designates, in order to stabilize and control residual radioactive materials at a millsite, vicinity property or depository site in a safe and environmentally sound manner that will minimize or eliminate radiation health hazards to the public which may exist at the sites."  The Cooperative Agreement further provides that: "DOE shall pay for all costs it incurs in performing remedial actions and otherwise performing its responsibilities under this Agreement."

60.     Section 5 of the Cooperative Agreement, entitled, "Description of Remedial Action Program," provides, in part, the following:

> 5.     DESCRIPTION OF REMEDIAL ACTION PROGRAM
>
> a.     Designation and Priorities.
>
> . . .
>
> (2)     From time to time during the term of this Agreement, DOE **shall**, pursuant to Section 102 [of UMTRCA], identify vicinity properties associated with the Tuba City site, at which time DOE **shall** provide the Tribes with a notice of such and a description of the vicinity properties so identified.

20

. . .

    b.    <u>Remedial Action Plan</u>.

DOE **shall** develop, in accordance with the relative priority of remedial action **to the greatest extent practicable**, a Remedial Action Plan for the stabilization and control of residual radioactive materials which are currently located at the Tuba City millsite and its associated vicinity properties.

. . .

    c.    <u>Radiological and Engineering Assessments</u>.

In addition to the requirements set forth above, for each vicinity property:

(1)    DOE **shall** develop and submit to the Tribal Site Representatives and the Area Directors a draft Radiological and Engineering Assessment (REA) of the vicinity property, based upon radiological measurement and design work performed in connection with the vicinity property.

(2)    The Tribes (through the Tribal Site Representatives) and the Area Directors will be provided a reasonable opportunity to review the draft REA and provide comments thereon to DOE; DOE **shall** consider such comments in preparing a final REA for the concurrence of the Tribal Site Representatives.

. . .

    d.    <u>DOE Remedial Actions</u>.

After the preparation of a Remedial Action Plan or Radiological Engineering Assessment in accordance with Paragraphs b. and c. of this article, DOE **shall** perform remedial action. DOE **shall** use technology in performing the remedial action that will assure compliance with the EPA Standards and will assure the safe and environmentally sound stabilization of residual radioactive materials consistent with existing applicable law.

61.    Despite these facts and legal requirements, the Defendants have taken no steps to cleanup the Highway 160 Dump Site, the Tuba City Open Dump Site and other "vicinity properties" of the Mill. Quite to the contrary, the Defendants took affirmative actions seeking to

disavow their responsibilities for such sites and thereby their trust and fiduciary obligations to the Tribes.

62.    Congress granted the DOE the continuing responsibility for the remediation and long-term stewardship of the Mill and its vicinity properties, including the groundwater cleanup program and long-term site monitoring.  DOE and the Navajo Nation executed a Custodial Access Agreement ("CAA") that "conveys to the federal government title to the residual radioactive materials stabilized at the repository site and ensures that DOE has perpetual access to the site."  Further, per requirements of the NRC and under authority of UMTRCA, DOE entered into the Cooperative Agreement with the Navajo Nation to perform remedial actions at the Mill, which brought the site under the NRC general license.   Currently, DOE is the general licensee and is responsible for the custody and long-term care of the site, as defined by DOE Policy 454.1 (including general control of premises, fencing, signage, and security).

63.    UMTRCA was passed in 1978 and assigned DOE the responsibility for remediating residual radioactive material at mill sites and "vicinity properties."

64.    UMTRCA required the Secretary of DOE, after consultation with EPA and the NRC, to designate twenty-two processing sites at locations specified by the Act to be evaluated and remediated.  42 U.S.C. § 7912(a)(1).  Tuba City, Arizona is one of the original 22 "processing sites" designated for DOE remediation.

65.    UMTRCA also required EPA to promulgate standards for the protection of the public health, safety, and the environment from hazards associated with the possession, transfer, and disposal of byproduct materials, and required NRC to implement and enforce the EPA standards.

22

66.    Finally, UMTRCA continued DOE's authority to remediate ground water at the UMTRCA mill sites.

67.    In April 2007, the Tribes contacted EPNG to inform it that: (a) Defendants had taken final agency action by deciding not to designate as vicinity properties the Highway 160 Dump Site, the Tuba City Open Dump Site, and other sites; and (b) the Highway 160 Dump Site, the Tuba City Open Dump Site, and other vicinity properties of the Mill may present an immediate and substantial endangerment to public health and the environment.

68.    The Navajo Nation has informed EPNG that in June 2003, it discovered residual radioactive materials, including but not limited to mill tailings, ceramic mill balls, yellowcake and other mill-related waste, located on the surface of the Highway 160 Dump Site.  The Navajo Nation has informed EPNG that these materials were disposed of in drums or other containers or placed on the ground at the Properties, and have discharged, spilled and leaked, and continue to discharge, spill and leak into the soil and ground water at the Properties.  The Navajo Nation has also informed EPNG that in 2001, a water sample from a well near the Tuba City Open Dump Site indicated elevated uranium at 60.1 micrograms per liter, which is above the health-based standards set by EPA.  The Navajo Nation has informed EPNG that residents living near these two sites have stated that they recall seeing residual radioactive materials from the Mill buried or placed at both the Highway 160 Dump Site and the Tuba City Open Dump Site.  Finally, the Navajo Nation has informed EPNG that it believes uranium contamination from residual radioactive materials at the Mill and the Highway 160 Dump Site have entered into the groundwater and migrated in ground water to locations underneath the Tuba City Open Dump Site.

69.     On December 1, 2003, the Navajo Nation wrote a letter to DOE requesting that two sites, which it described as being located "at the former Tuba City open dump sites [a/k/a the Tuba City Open Dump Site] that encompasses both Navajo Nation and Hopi Tribal Partition Lands, and at sites located northwest of the Rare Metals site [a/k/a the Highway 160 Dump Site] located on Navajo Nation trust land," be investigated and remediated by DOE as vicinity properties under the agency's UMTRCA authority.  In support of its request, the Navajo Nation explained that: 1) lifelong residents living near these two sites have stated that they recall seeing residual radioactive materials from the Mill buried or placed at both the Highway 160 Dump Site and the Tuba City Open Dump Site; 2) ground water beneath the Tuba City Open Dump Site is contaminated with uranium above EPA health-based standards; 3) residual radioactive material, including but not limited to mill-related waste, is exposed at the surface of the Highway 160 Dump Site at radiological readings 1,000 times above background.

70.     In April 2007, the Tribes provided EPNG with a copy of a document containing a final agency action from Donna Bergman-Tabbert, the Director of Land & Site Management for DOE, to Joe Shirley, Jr., President of the Navajo Nation.  In that document, dated April 22, 2004, the DOE issued a determination that the Tuba City Open Dump Site, the Highway 160 Dump Site, and other properties adjacent to the Mill were not vicinity properties under UMTRCA and, based on this determination, denied remediation of ground water contamination at the Tuba City Open Dump Site, the Highway 160 Dump Site and other vicinity properties of the Mill. Ms. Bergman-Tabbert explained that: "We have discussed this situation with retired Atomic Energy Commission employees who routinely inspected the Tuba City mill and have researched information about this site.  The DOE did not find any evidence that would support the allegations that Rare Metals Corporation disposed of contaminated equipment or uranium mill

24

tailings at the Tuba City Open Dump Site." Ms. Bergman-Tabbert also stated in her decision that "DOE believes that the ground water contamination discussed in your letter is not from the former mill site but is from the Tuba City Open Dump Site or some other nearby source."

71.    One of the retired AEC employees interviewed by DOE for purposes of preparing its April 22, 2004 response to the Navajo Nation was William Chenoweth. Mr. Chenoweth worked as a geologist for the AEC in the 1950s and 1960s. Prior to April 22, 2004, DOE visited with Mr. Chenoweth and shared with him the information discovered by the Navajo Nation that residual radioactive materials, including but not limited to mill-related waste, were found exposed at the surface or in ground water at the Highway 160 Dump Site and Tuba City Open Dump Site. DOE asked Mr. Chenoweth what he thought of these findings and how he thought this waste may have come to be located at these sites. Mr. Chenoweth responded by stating: 1) it looks like you have found two new vicinity properties of the Mill; and, 2) it is possible the waste may have been placed at these locations by a sloppy cleanup contractor or by a local construction firm that may have taken tailings materials prior to the completion of the UMTRCA remediation of the Mill to the extent access to the site was not strictly controlled.

72.    In May 2004, EPA conducted a radiological survey of the Highway 160 Dump Site. At the time of this survey, a DOE contractor, S.M. Stoleer, was also present and identified visible waste at the surface as "burn debris" from the Mill. The contractor explained that certain types of waste from the Mill were often burned prior to disposal. This "burn debris" from the Mill qualifies as residual radioactive material derived from the Mill.

73.    DOE's April 22, 2004 determination that the Highway 160 Dump Site, the Tuba City Open Dump Site or other properties adjacent to the Mill are not "vicinity properties" under UMTRCA, and its decision to deny remediation of ground water contamination at the Highway

25

160 Dump Site, the Tuba City Open Dump Site and other vicinity properties of the Mill violates the Administrative Procedures Act ("APA").

74.    DOE's failure to designate known "nearby" areas as being vicinity properties to the Tuba City "processing site" or Mill designated for DOE remediation was arbitrary and capricious, not in accordance with law or otherwise constituted an abuse of discretion.  In addition, DOE, NRC and EPA's failure to initiate section 7921 public participation, comment, and input once they learned of ground water contamination near the Highway 160 Dump Site or other vicinity properties of the Mill, was arbitrary and capricious, not in accordance with law or an abuse of discretion.

75.    DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Open Dump Site and other properties in the vicinity of the Mill "vicinity properties" and to deny remediation at these "vicinity properties" is now final and ripe for judicial review.

76.    Because DOE has not assumed the responsibilities mandated under UMTRCA and completed the clean-up at the Highway 160 Dump Site, the Tuba City Open Dump Site and other vicinity properties of the Mill, EPNG has been harmed.  Among other things, and without limitation, the Tribes have informed EPNG that children and other tribal members are living and playing in, on or adjacent to residually radioactive materials or other radioactive materials at the Mill, the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.  The Tribes have further informed EPNG that the continued exposure to these materials presents a threat or potential threat to the health of these individuals.  One such family, the Netzsosie family, has already sued EPNG for personal injury and wrongful death allegedly stemming from such exposure.  Although EPNG served as an independent contractor to AEC and operated the Mill and certain vicinity properties from 1956 to 1966, EPNG no longer has any ownership

interest or legal right to enter upon these properties.  As a result, if Defendants continue to deny statutory and trust responsibility to remediate these wastes, with each passing day EPNG's exposure to liability or potential liability for Defendants' historic operation of these properties for the production of nuclear weapons will continue to grow.

> **D.    RCRA Violations, Failure to Perform Non-Discretionary Duty and Imminent and Substantial Endangerment Posed by Defendants' Radioactive Waste**

77.    On information and belief, during the period 1968 through the present Defendants have owned or operated the Tuba City Open Dump Site, the Highway 160 Dump Site and other Properties, and have handled, managed, treated, stored, disposed of, or transported solid or hazardous waste at various Properties, including but not limited to the Highway 160 Dump Site and the Tuba City Open Dump Site, without a permit or interim status as required by Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), and 40 C.F.R. § 270.1(c), or otherwise in violation of Subtitle C of RCRA, 42 U.S.C. §§ 6922, 6924, 6925, 6930 & 6937, and regulations promulgated thereunder, including but not limited to the Part 262 generator requirements, 40 C.F.R. Part 262, the Part 270 permit requirements, 40 C.F.R. Part 270, the Part 265 interim status TSD requirements (including but not limited to the requirement to implement a ground water monitoring program pursuant to 40 C.F.R. § 265, Subpart F, and the requirement to obtain, establish or maintain financial assurance for closure and post-closure at the Properties and the failure to obtain insurance, in violation of Section 3004 of RCRA, 42 U.S.C. § 6924 and 40 C.F.R. § 265.143), 40 C.F.R. Part 265, the Part 264 TSD requirements, 40 C.F.R. Part 264, and the Part 268 land disposal requirements, 40 C.F.R. Part 268, and in violation of the open dumping requirements set forth at Section 4005(a) of RCRA, 42 U.S.C. § 6945(a).  These violations are continuing and remain unabated.

78.     Prior to ceasing operations at the Mill and other Properties, including but not limited to the Highway 160 Dump Site, EPNG reclaimed or remediated these sites at the direction of the AEC, the AAEC and the Navajo Nation, and in compliance with applicable federal, state and local law.

79.     The Tribes have informed EPNG that residually radioactive materials, including but not limited to yellowcake, mill tailings containing uranium, radon, molybdenum, selenium, nitrate or other hazardous wastes, ceramic mill balls, cables and other mill equipment (the "Mill Waste"), and other solid and hazardous wastes, have been stored or disposed of in drums or containers or directly on the ground at the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties and that these wastes have discharged, spilled and leaked, and continue to discharge, spill and leak, into the soil and ground water at the Properties.

80.     On information and belief, during the period 1968 through the present and following EPNG's reclamation of and departure from the Mill and other Properties, Defendants have periodically and continuously handled, managed, generated, treated, stored, disposed of, transported or engaged in open dumping of the Mill Waste and other solid and hazardous waste, including mill tailings, soil, ground water, equipment and other mill-related waste, each containing uranium, radon, molybdenum, selenium or nitrate, at the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.

81.     On information and belief, during the period 1968 through the present Defendants DHHS or IHS have disposed of medical waste and other solid and hazardous waste at the Tuba City Open Dump Site.

82.     EPA has failed to perform a non-discretionary duty by not undertaking on an annual basis during the period 1976 through the present to perform a thorough inspection of each

28

facility on the Properties for the treatment, storage, or disposal of hazardous waste which is owned or operated by a department, agency, or instrumentality of the United States to enforce its compliance with Subtitle C of RCRA.  Among other things, and without limitation, Defendants have owned or operated such facilities on the Highway 160 Dump Site and the Tuba City Open Dump Site during the period 1968 through the present.  Defendants have not listed or identified these sites as federal facilities treating, storing or disposing of hazardous waste, and have not performed thorough annual inspections of these facilities to ensure compliance with Subtitle C of RCRA.

83.    In addition, on information and belief, Defendants' past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the Mill or other Properties, including but not limited to the Highway 160 Dump Site and the Tuba City Open Dump Site, may present an imminent and substantial endangerment to health or the environment.

84.    The Tribes have informed EPNG that Mill Waste, medical waste and other solid and hazardous waste has been disposed of and is currently lying exposed on the surface of the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.  On information and belief, these wastes were treated, stored or disposed of by Defendants at these properties, and may present an imminent and substantial endangerment to health or the environment.

85.    The Tribes have further informed EPNG that children have been observed playing in or on the Mill Waste, medical waste and other solid and hazardous waste which has been disposed of and is currently lying exposed on the surface of the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.

86.    The Tribes have further informed EPNG that the Mill Waste, medical waste and other solid and hazardous waste which has been disposed of and is currently lying exposed on

the surface of the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties has impacted ground water underneath these properties, including certain ground water which may be used for drinking water, during the period 1968 through the present.  The Tribes have informed EPNG that the impacts to groundwater caused by this disposal of Mill Waste, medical waste and other solid and hazardous waste are continuing, and that plumes containing Mill Waste, medical waste and other solid and hazardous waste continue to emanate from Properties on which such disposal occurred.

87.     On information and belief, as a result of Defendants' treatment, storage or disposal of the Mill Waste, medical waste and other hazardous waste, and Defendants' decision not to maintain the protective covering stabilizing these hazardous wastes at the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties during the period 1968 through present, the wind transport, erosion and migration of hazardous wastes at these sites has continued to occur and may present a threat or potential threat of imminent and substantial endangerment to human health and the environment, including but not limited to impacts to surface and ground water adjacent to and beneath these sites and impacts to the health of children and other residents who live adjacent to and who have been observed by the Tribes to play in or on these materials.

**First Claim for Relief**
**(Declaratory Judgment – UMTRCA Vicinity Properties)**

88.     Plaintiff repeats the allegations of paragraphs 1 through 87, inclusive, as if set forth fully herein.

89.     Pursuant to 42 U.S.C. §§ 7912(a)(1), (e)(1) & (e)(2), and the Cooperative Agreement, the Secretary of DOE was required to designate a processing site at the Mill, and to

the maximum extent practicable to designate and to develop Remedial Action Plans and to
remediate vicinity properties relating to this site under 42 U.S.C. § 7911(6)(B).

90.    Pursuant to 42 U.S.C. § 7912(a)(1), the Secretary of DOE "shall complete
remedial action at the above listed sites before his authority terminates."  While the Secretary's
authority to perform remedial action under UMTRCA terminated on September 30, 1998, the
Secretary's authority to perform groundwater restoration activities is without limitation.

91.    Pursuant to 42 U.S.C. § 7921, in connection with the designation of processing
sites and vicinity properties "the Secretary [of DOE], the Administrator [of EPA], and the [NRC]
shall encourage public participation and, where appropriate, the Secretary [of DOE] shall hold
public hearings relative to such matters in the States where processing sites and disposal sites are
located."

92.    The Highway 160 Dump Site, the Tuba City Open Dump Site and other properties
at which residually radioactive materials from the Mill have been disposed of are in the vicinity
of the Mill.

93.    The Tribes have informed EPNG that the Highway 160 Dump Site, the Tuba City
Open Dump Site and other properties in the vicinity of the Mill are contaminated with residual
radioactive materials, including but not limited to yellowcake, ceramic mill balls, uranium mill
tailings and other materials.  The Tribes have further informed EPNG that these properties
contain ground water impacted by residual radioactive materials.

94.    The Highway 160 Dump Site, the Tuba City Open Dump Site and other vicinity
properties contain residual radioactive materials that are derived from the Mill.

95.    The Secretary of DOE, the Administrator of EPA and the NRC have not
encouraged public participation in, or held public hearings relating to, the designation of the

31

Highway 160 Dump Site, the Tuba City Open Dump Site and certain other properties at which residually radioactive materials from the Mill are alleged to have been disposed.

96.    DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Open Dump Site, and other properties as "vicinity properties" under UMTRCA, 42 U.S.C. §§ 7912(a) & (e), at which residually radioactive materials derived from the Mill have been disposed of constitutes final agency action.

97.    Because of DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Open Dump Site, and other properties at which residually radioactive materials derived from the Mill have been disposed of as "vicinity properties" under UMTRCA, EPNG has and will suffer direct and immediate harm.

98.    EPNG is an aggrieved party under 5 U.S.C. § 702 whose rights are within the zone of interest contemplated by Congress in enacting UMTRCA.  Action and threatened action by the Tribes to hold EPNG liable for continued clean-up at the Mill and its "vicinity properties," including but not limited to the Highway 160 Dump Site and the Tuba City Open Dump Site, could subject EPNG to the burden, expense, and hardship of a uranium mill tailings site clean-up that Congress unequivocally directed DOE to undertake.

99.    DOE's decision not to designate the Highway 160 Dump Site, the Tuba City Open Dump Site and other properties at which residual radioactive materials derived from the Mill have been disposed of as "vicinity properties" under UMTRCA is arbitrary and capricious, not in accordance with law, constitutes an abuse of discretion, and is subject to review under 5 U.S.C. § 706.

100.    DOE, EPA and NRC's decision not to encourage public participation in, or hold public hearings relating to, the designation of the Highway 160 Dump Site, the Tuba City Open

Dump Site and certain other properties at which residual radioactive materials derived from the Mill have been disposed of as required by UMTRCA, 42 U.S.C. § 7921, is arbitrary and capricious, not in accordance with law, constitutes abuse of discretion, and is subject to review under 5 U.S.C. § 706.

101.    An actual and justiciable controversy presently exists between EPNG and DOE concerning: (a) EPNG's potential liability for damage to human health and the environment and clean-up costs relating to disposal of residual radioactive materials and other hazardous and radioactive waste for which Defendants are responsible at the Mill, the Highway 160 Dump Site, the Tuba City Open Dump Site or other "vicinity properties" of the Mill; and (b) DOE's authority and responsibility to designate and remediate such processing sites and "vicinity properties" under UMTRCA.

102.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, UMTRCA and the APA, 5 U.S.C. § 706, EPNG is entitled to a judicial declaration that DOE has not met its obligations under federal law, and that Defendants, and not EPNG, are legally liable for the remediation costs and damage to the environment resulting from residual radioactive material or other deleterious or hazardous substances that emanated or are emanating from the Mill.

<u>**Second Claim for Relief**</u>
**(RCRA Citizen Suit, 42 U.S.C. §§ 6972(a)(1)(A) & (B), 6972(a)(2))**

103.    Plaintiff repeats the allegations of paragraphs 1 through 102, inclusive, as if set forth fully herein.

104.    Defendants are persons as defined by 42 U.S.C. § 6903(15).

105.    Defendants are in violation of, and continue to violate, a permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to Subtitle C of RCRA, 42 U.S.C. §§ 6921-6939e.  More specifically, and without limitation, on

information and belief Defendants have handled, disposed of, stored, treated or transported

hazardous waste containing uranium, radon, molybdenum, selenium, nitrate and other materials

generated at the Mill at various locations in the vicinity of the Mill, including but not limited to

the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties without a

permit or interim status as required by Section 3005(a) of RCRA and 40 C.F.R. § 270.1(c), or in

violation of the requirements applicable to generators of hazardous substances at 42 U.S.C.

§ 6922 and 40 C.F.R. Part 262, as well as the Part 270 permit requirements, 40 C.F.R. Part 270,

the Part 265 interim status TSD requirements (including but not limited to the requirement to

implement a ground water monitoring program pursuant to 40 C.F.R. § 265, Subpart F, and the

requirement to obtain, establish or maintain financial assurance for closure and post-closure at

the Properties and the failure to obtain insurance, in violation of Section 3004 of RCRA and 40

C.F.R. § 265.143), 40 C.F.R. Part 265, the Part 264 TSD requirements, 40 C.F.R. Part 264, the

Part 268 land disposal requirements, 40 C.F.R. Part 268, and the open dumping prohibition set

forth at Section 6945(a) of RCRA.

106.    Defendants are in violation of, and continue to violate, a permit, standard,

regulation, condition, requirement, prohibition, or order relating to open dumping which is set

forth at Section 6945(a) of RCRA, 42 U.S.C. § 6945(a).  More specifically, and without

limitation, on information and belief Defendants have engaged in a solid waste disposal practice

or the disposal of solid waste or hazardous waste which constitutes the open dumping of solid

waste or hazardous waste at various locations in the vicinity of the Mill, including but not limited

to the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties in violation

of the open dumping requirements set forth at Section 6945(a) of RCRA.

107.    The waste disposed of, stored or treated by Defendants is solid waste as defined at 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.2.  Among other things and without limitation, on information and belief Defendants have abandoned, stored or disposed of this waste at the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.

108.    The waste disposed of, stored or treated by Defendants is hazardous waste as defined at 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.3.  Among other things and without limitation, on information and belief this waste is characteristic hazardous waste due to its elevated levels of cadmium, chromium and selenium.  In addition, because of its quantity, concentration, or physical, chemical, or infectious characteristics, this waste may cause, or significantly contribute to, an increase in mortality or an increase in serious, irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

109.    Defendants are past or present generators, past or present transporters, or past or present owners or operators of a treatment, storage or disposal facility, including but not limited to the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties.

110.    Defendants have contributed to or are contributing to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the Highway 160 Dump Site, the Tuba City Open Dump Site and other Properties which may present an imminent and substantial endangerment to health or the environment.

111.    EPA has failed to perform a non-discretionary duty under Section 6927(c) of RCRA by failing to conduct on an annual basis a thorough inspection of each facility on the Properties for the treatment, storage, or disposal of hazardous waste which is owned or operated

by a department, agency, or instrumentality of the United States to enforce its compliance with Subtitle C of RCRA.

112.    EPNG has provided prior notice to Defendants, the Administrator of EPA, the Navajo Nation, the Hopi Tribe and the State of Arizona regarding the foregoing alleged violations and imminent and substantial endangerment, and EPNG's intent to file a lawsuit to abate these matters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EPNG prays for entry of judgment against Defendants as follows:

A.    For judgment declaring that the Highway 160 Dump Site, the Tuba City Open Dump Site and certain other properties in the vicinity of the Mill which contain soil or groundwater impacted by residual radioactive uranium mill waste materials are "vicinity properties" within the meaning of 42 U.S.C. § 7911(6)(B).

B.    For a judgment declaring that the residual radioactive materials located at the Highway 160 Dump Site, the Tuba City Open Dump Site and certain other properties in the vicinity of the Mill are "source, special nuclear or byproduct materials" as defined under the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*

C.    For a judgment declaring that DOE is exclusively responsible for the remediation of the groundwater and soil at the Highway 160 Dump Site, the Tuba City Open Dump Site and certain other properties in the vicinity of the Mill which are impacted by residually radioactive uranium mill waste materials.

D.    For a judgment declaring that DOE has violated UMTRCA and the APA through their failure to designate the Highway 160 Dump Site, the Tuba City Open Dump Site and certain other properties in the vicinity of the Mill as "vicinity properties."

E.    For judgment declaring that DOE, EPA and NRC have violated the public participation requirements of Section 7921 of UMTRCA and ordering that DOE immediately notice and convene a public hearing to discuss the status of efforts to designate the Highway 160 Dump Site, the Tuba City Open Dump Site and properties in the vicinity of the Mill contaminated with residual radioactive waste derived from the Mill as "vicinity properties" of the Mill under 42 U.S.C. §§ 7912 & 7911(6)(B).

F.    For judgment declaring, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 6972, that EPA has failed to perform a non-discretionary duty under Section 6927(c) of RCRA by failing to undertake on an annual basis a thorough inspection of each facility on the Properties for the treatment, storage, or disposal of hazardous waste which is owned or operated by a department, agency, or instrumentality of the United States to enforce its compliance with Subtitle C of RCRA, and for a preliminary and permanent injunction ordering that EPA perform this non-discretionary duty at each facility on the Properties.

G.    For judgment declaring, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 6972, that Defendants have violated and are violating Subtitle C of RCRA or have created and are creating an imminent and substantial endangerment to public health and the environment by their treatment, storage, disposal or management of solid or hazardous wastes at the Highway 160 Dump Site, the Tuba City Open Dump Site or other Properties.

H.    For a permanent injunction ordering that Defendants perform cleanup activities necessary to abate present and imminent threats to human health or the environment caused by

Defendants' treatment, storage, disposal or management of solid, hazardous or radioactive wastes at the Highway 160 Dump Site, the Tuba City Open Dump Site Site or other Properties.

I.      For appropriate civil penalties to be paid to the U.S. Treasury pursuant to 42 U.S.C. §§ 6972(a), 6928(a) & 6928(g) in response to the ongoing violations alleged by EPNG.

J.      For an order directing Defendants to prospectively reimburse EPNG for the cost of all cleanup activities which EPNG is ordered or required to perform at the Highway 160 Dump Site, the Tuba City Open Dump Site or other Properties;

K.      For moratory, pre-judgment and post-judgment interest, to the maximum extent permitted by law;

L.      For Plaintiffs' attorneys' fees, costs and expert witness fees to the maximum extent permitted by law; and

M.      For such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury of any and all issues so triable.

Dated this 12th day of July 2007.

Respectfully submitted,

By:_____s/_____

Thomas L. Sansonetti, D.C. Bar No. 949610
HOLLAND & HART, LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY 82001-3164
307.778.4200 (Telephone)
303.778.8175 (Facsimile)

By:_____s/_____
William G. Myers III, D.C. Bar No. 408573
HOLLAND & HART, LLP
U.S. Bank Plaza
101 S. Capitol Boulevard, Suite 1400
Boise, ID 83702-7714
208.342.5000 (Telephone)
208.343.8869 (Facsimile)

By:_____s/_____

Jerry Stouck, D.C. Bar No. 343400
Robert L. Shapiro, D.C. Bar No. 415854
GREENBERG TRAURIG, LLP
800 Connecticut Ave., N.W., #500
Washington, DC 20006
202.331.3100 (Telephone)
202.331.3101 (Facsimile)

David G. Palmer
Brian L. Duffy
Naomi G. Beer, D.C. Bar No. 450875
Christopher J. Neumann, D.C. Bar No. CO0044
GREENBERG TRAURIG, LLP
The Tabor Center
1200 Seventeenth Street
Twenty-Fourth Floor
Denver, CO 80202
303.572.6500 (Telephone)
303.572.6540 (Facsimile)

*Attorneys for PLAINTIFF El Paso Natural Gas Company*

## CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Amended Complaint be served by first

class mail this 12th day of July 2007 on:

        Eric G. Hostetler
        UNITED STATES DEPARTMENT OF JUSTICE
        P.O. Box 23986
        Washington, DC 20026-3986
        Attorney for Defendants

        Robert L. Shapiro