IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
EL PASO NATURAL GAS COMPANY,                  )
                                              )
         Plaintiff,                           )
                                              )
         v.                                   )      Civ. Action No. 07-cv-00905 (RJL)
                                              )
UNITED STATES OF AMERICA,  et al.,            )
                                              )
         Defendants.                          )
_____)

## UNITED STATES' MOTION TO DISMISS PLAINTIFF'S APA
## CLAIM FOR LACK OF SUBJECT MATTER JURISDICTION

Defendants United States of America, United States Department of Energy and its

Secretary, the Honorable Samuel W. Bodman, the United States Nuclear Regulatory

Commission, the United States Environmental Protection Agency and its Administrator, the

Honorable Stephen L. Johnson, the United States Department of the Interior and its Secretary, the

Honorable Dick Kempthorne, the Bureau of Indian Affairs, the United States Department of

Health and Human Services and its Secretary, the Honorable Michael O. Leavitt, the Indian

Health Service, the United States Department of Defense and its Secretary, the Honorable Robert

Gates (collectively "Federal Defendants") hereby move to dismiss, pursuant to Federal Rule of

Civil Procedure 12(b)(1), Plaintiff's first claim for relief for lack of subject matter jurisdiction.

Plaintiff El Paso Natural Gas Company ("EPNG") brings claims relating to a former

uranium mill in Tuba City, Arizona.  EPNG's principal and first claim for relief in its amended

complaint is a challenge to alleged agency action brought under the Administrative Procedure

Act ("APA").  As discussed in the accompanying memorandum, this Court lacks subject matter

jurisdiction to consider this claim for multiple reasons.  First, EPNG lacks prudential standing.

Second, EPNG fails to identify a judicially reviewable final agency action.  Third, the Uranium

Mill Tailings Radiation Control Act ("UMTRCA") expressly precludes judicial review.  Finally,

to the extent EPNG alleges agency action has been unlawfully withheld, EPNG fails to identify

any applicable nondiscretionary duty that DOE has failed to perform.

WHEREFORE, pursuant to Fed. R. Civ. P. 12(b)(1), Plaintiff's first claim for relief

should be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
        Division
U.S. Department of Justice


_____/s/_____
ERIC G. HOSTETLER, Attorney
D.C. Bar No. 445917
Environmental Defense Section
P.O. Box 23986
L'Enfant Plaza Station
Washington, D.C.  20026-3986
(202) 305-2326

April 18, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
EL PASO NATURAL GAS COMPANY,                  )
                                              )
         Plaintiff,                           )
                                              )
         v.                                   )    Civ. Action No. 07-cv-00905 (RJL)
                                              )
UNITED STATES OF AMERICA,  et al.,            )
                                              )
         Defendants.                          )
_____)

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO
DISMISS PLAINTIFF'S APA CLAIM
<u>FOR LACK OF SUBJECT MATTER JURISDICTION</u>**

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
         Division
U.S. Department of Justice

ERIC G. HOSTETLER, Attorney
D.C. Bar No. 445917
Environmental Defense Section
P.O. Box 23986
L'Enfant Plaza Station
Washington, D.C.  20026-3986
(202) 305-2326

April 18, 2008

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    UMTRCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    The APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    The Tuba City Uranium Processing Mill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The Tuba City Landfill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    The Highway 160 Site and the EPNG-Navajo Cooperative Agreement . . . . . . . . 9

III.    THIS LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    EPNG LACKS PRUDENTIAL STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.    EPNG DOES NOT IDENTIFY A FINAL AGENCY ACTION CONCERNING THE
      DESIGNATION OF VICINITY PROPERTIES NEAR THE MILL . . . . . . . . . . . . . . 15

III.    UMTRCA PRECLUDES JUDICIAL REVIEW OF AGENCY DECISIONS
       CONCERNING DESIGNATION OF PROCESSING SITES . . . . . . . . . . . . . . . . . . . 20

IV.    EPNG CANNOT BRING ITS APA CLAIM UNDER SECTION 706(1) . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES:**

*ANR Pipeline Co. v. FERC*, 205 F.3d 403 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*AT&T Co. v. EEOC*, 270 F.3d 973 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*American Portland Cement Alliance v. EPA*, 101 F.3d 772 (D.C. Cir. 1996) . . . . . . . . . . . . . 23

*Atlas Corp. v. United States*, 15 Cl. Ct. 681 (1988), *aff'd*, 895 F.2d 745 (Fed. Cir. 1990) . . . . . 14

*Bates v. Rumsfeld*, 271 F. Supp. 2d 54 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 17

*Bender v. Williamsport Area School District*, 475 U.S. 534 (1986) . . . . . . . . . . . . . . . . . . . . . 10

*Bennett v. Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 18

*Block v. North Dakota*, 461 U.S. 273 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . 14

*Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*DRG Funding Corp. v. Secretary of Housing & Urban Development*,
    76 F.3d 1212 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*FDIC v. Meyer*, 510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fletcher v. District of Columbia*, 481 F. Supp. 2d 156 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . 20

*Gibbs v. Buck*, 307 U.S. 66 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D.D.C. 2001) . . . 11

*Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989) . . . . . . . . . . 14

*Hecla Mining Co. v. United States*, 909 F.2d 1371 (10th Cir. 1990) . . . . . . . . . . . . . . 23

*Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004) . . . . . . . . . . . 19

*Irwin v. Department of Vetran Affairs,* 498 U.S. 89 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005) . . . . . . . . . . . . . . . . . . . 25

-iii-

*Kansas State Network, Inc. v. FCC*, 720 F.2d 185 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . 25

*Kokkonen v. Guardian Life Insurance Co.*, 511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lane v. Pena*, 518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*National Ass'n of Home Builders v. United States Army Corps of
Eng'rs*, 417 F.3d 1272 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*National Coalition to Save Our Mall v. Norton,* 161 F. Supp. 2d 14 (D.D.C. 2001),
*aff'd*, 269 F.3d 1092 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . 4, 24

*Physicians Comm. for Responsible Medicine v. EPA*, 451 F. Supp. 2d 223 (D.D.C. 2006) . . . 12

*Public Citizen v. Office of the U.S. Trade Representatives*, 970 F.2d 916 (D.C. Cir. 1992) . . . 16

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sierra Club v. Edwards*, Civ. Action No. 81-1368, 1983 U.S. Dist. LEXIS
17625 (D.D.C. Apr. 18, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Tozzi v. EPA*, 148 F. Supp. 2d 35 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States Dep't of Energy v. Ohio*, 503 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATUTES:**

Administrative Procedure Act ("APA"):

5 U.S.C. § 701(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 20

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 20

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"),
42 U.S.C. §§ 9601-9675 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. §§ 9604, 9606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k . . . . . . . . . . . 8

Uranium Mill Tailings Radiation Control Act ("UMTRCA"):

42 U.S.C. § 7901(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

42 U.S.C. § 7901(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 7901(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 7911(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7911(6)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20

42 U.S.C. §§ 7912-7918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 7912(a) & (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 7912(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

42 U.S.C. § 7912(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21, 22

42 U.S.C. § 7912(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 20, 21, 22, 23

42 U.S.C. § 7912(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21, 22

42 U.S.C. § 7912(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 19, 21, 23, 24, 25

42 U.S.C. § 7921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19, 23

42 U.S.C. § 7922(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17

42 U.S.C. § 7925(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**RULES:**

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 17, 25

**REGULATIONS:**

40 C.F.R. part 300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**INTRODUCTION**

Plaintiff El Paso Natural Gas Company ("EPNG") seeks to compel Federal Defendants to clean up certain real properties within the vicinity of a former uranium mill near Tuba City, Arizona, that are allegedly contaminated with radioactive materials derived from the mill. The mill was operated by EPNG or its predecessor, Rare Metals Corporation of America, from 1956 to 1966, to process uranium ore. The mill and properties in the vicinity of the mill are located on Navajo and Hopi Pueblo Reservations.

The principal claim EPNG raises in its amended complaint is an Administrative Procedure Act ("APA") claim. EPNG's APA claim seeks to challenge a purported April 2004 determination by the United States Department of Energy ("DOE") that certain real properties within the vicinity of the mill should not be included as part of the Tuba City "processing site" under the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), 42 U.S.C. § 7912(a) & (e).[1]

The Court lacks subject matter jurisdiction to consider EPNG's APA claim for multiple reasons. First, EPNG lacks prudential standing to bring a claim under UMTRCA. EPNG's sole alleged injury is an economic injury stemming from EPNG's own potential liability to the Navajo Nation and the Hopi Tribe. *See* Amended Complaint ¶ 98. This alleged economic injury, however, is not within the zone of environmental and health interests that UMTRCA was intended to protect. In enacting UMTRCA in 1978, Congress provided DOE with authority, under Title I of the Act, to address residual radioactive materials at certain inactive uranium mill

---

[1] EPNG brings additional secondary claims against DOE and other federal defendants under the Resource Conservation and Recovery Act ("RCRA"), which are not at issue in the instant motion.

sites, or "processing sites," including the Tuba City site.[2]  Congress, however, was not concerned

with immunizing private parties from liability arising from their own disposal activities at the

site.

Second, EPNG does not identify a final agency action pursuant to UMTRCA that is

subject to challenge under the APA.  EPNG alleges that DOE, in an April 2004 letter to the

Navajo Nation, made a "determination" under section 102(e)(2) of UMTRCA, 42 U.S.C.

§ 7912(e)(2), that certain properties in the vicinity of the mill should not be included as part of

the Tuba City processing site.  Amended Complaint ¶ 70.  But the letter upon which EPNG

premises its claim speaks for itself and contains no final agency action.  DOE's April 2004 letter

does not determine rights or impose obligations, or otherwise have legal consequences.  Nor does

the letter mark the consummation of a DOE decisionmaking process.  Thus, the referenced letter

does not satisfy either condition for finality established by the Supreme Court in *Bennett v.

Spear*, 520 U.S. 154, 178 (1997).

Third, even if EPNG had identified some final agency action, Congress has expressly

precluded judicial review of DOE determinations designating the boundaries of "processing

sites" under UMTRCA.  42 U.S.C. § 7912(d).  Congress provided that "[t]he designations made,

and priorities established, by the Secretary" under UMTRCA "shall be final and *not be subject to

judicial review*." *Id*.  (emphasis added).  The APA does not confer subject matter jurisdiction to

review agency action where another statute specifically precludes judicial review.  5 U.S.C.

§ 701(a)(1).

_____

[2]  With the exception of groundwater restoration activities, DOE's authority to perform remedial
action under UMTRCA expired in 1998.

Finally, to the extent that EPNG purports to bring a claim that DOE action has been "unlawfully withheld," EPNG fails to identify an applicable nondiscretionary duty under UMTRCA that DOE has failed to perform. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

Accordingly, EPNG's first cause of action should be dismissed for lack of subject matter jurisdiction.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    UMTRCA

Congress enacted UMTRCA in 1978 to address potential radiation health hazards to the public caused by uranium mill tailings located at active and inactive mill operations around the country. 42 U.S.C. § 7901(a). The Act provides, among other things, for a program of assessment and remedial action at inactive mill sites in order to stabilize and control mill tailings in a safe and environmentally sound manner, and to minimize or eliminate radiation health hazards to the public. 42 U.S.C. § 7901(b). The Act grants DOE and its Secretary primary responsibility for carrying out this program. *See generally* 42 U.S.C. §§ 7912-7918.

Section 102(a)(1) of UMTRCA, 42 U.S.C. § 7912(a)(1), requires the Secretary of Energy to designate within one year after November 8, 1978, inactive uranium mill sites at or near twenty specifically-identified locations, including a site at Tuba City, Arizona, as "processing sites" requiring remedial action. Section 102(a)(2), 42 U.S.C. § 7912(a)(2), requires the

Secretary to determine the boundaries of each "processing site" as part of his designation.[3]   The

term "processing site" is defined by the Act to include property "in the vicinity" of sites where all

or substantially all uranium was produced for sale to any federal agency and which "is

determined by the Secretary, in consultation with the [Nuclear Regulatory] Commission, to be

contaminated with residual radioactive materials derived from such." 42 U.S.C.

§ 7911(6)(B).  The Act provides that the "designation of processing sites within one year after

November 8, 1978, . . . shall include, to the maximum extent practicable," these "vicinity" areas

referred to in section 7911(6)(B). 42 U.S.C. § 7912(e)(1).  The Secretary, however, may after

one year "include any area described in section 7911(6)(B) . . . as part of a processing site

designated under [Section 7912] if he determines such inclusion to be appropriate to carry out the

purposes of [UMTRCA]." 42 U.S.C. § 7912(e)(2).

    The "designations made, and priorities established, by the Secretary" under UMTRCA are

"not . . . subject to judicial review." 42 U.S.C. § 7912(d).  With the exception of authority to

perform groundwater restoration activities, the authority of the Secretary to perform remedial

action under UMTRCA terminated on September 30, 1998. 42 U.S.C. § 7922(a)(1).

    UMTRCA section 111, 42 U.S.C. § 7921, provides that "[i]n carrying out the provisions

of this subchapter, including the designation of processing sites . . . the Secretary, the

_____

[3]  The Act defines the term "processing site" generally as "any site, including the mill, containing
residual radioactive materials at which all or substantially all of the uranium was produced for
sale to any Federal agency prior to January 1, 1971 under a contract with any Federal agency . . .
unless – (i) such site was owned or controlled as of January 1, 1978, or is thereafter owned or
controlled, by any Federal agency, or (ii) a [Nuclear Regulatory Commission or State] [Atomic
Energy Act] license . . . for the production at such site of any uranium or thorium product derived
from ores is in effect on January 1, 1978, or is issued or renewed after such date . . . ." 42 U.S.C.
§ 7911(6).

Administrator [of EPA], and the [Nuclear Regulatory] Commission shall encourage public

participation and, where appropriate, the Secretary shall hold public hearings relative to such

matters in the States where processing sites and disposal sites are located."

### B.    The APA

The APA confers jurisdiction to the federal courts to hear claims by persons "adversely

affected or aggrieved by agency action" within the meaning of a relevant statute," 5 U.S.C.

§ 702.  However, such jurisdiction is withdrawn if the relevant statute precludes judicial review.

5 U.S.C. § 701(a)(1).

## II.    FACTUAL BACKGROUND

This background statement contains facts material to the jurisdictional issues raised in the

instant motion to dismiss, and also general background facts for the Court's convenience that are

not material to the jurisdictional issues raised.  To the extent that the United States sets forth

facts material to jurisdiction that either supplement or refute the allegations in the Complaint, the

United States relies on the exhibits attached hereto.  *See Bates v. Rumsfeld*, 271 F. Supp. 2d 54,

60 (D.D.C. 2002) (in deciding a Rule 12(b)(1) motion, the court is not limited to the allegations

in the complaint but may consider such materials outside the pleadings as it deems appropriate to

resolve the question whether it has jurisdiction in the case).[4]

### A.    The Tuba City Uranium Processing Mill

The Rare Metals Corporation and its successor, EPNG, operated a uranium processing

mill near Tuba City, Arizona ("the Mill") between 1956 to 1966.  Amended Complaint ¶ 27.  The

---

[4] We note that to the extent we accept EPNG's allegations, this is based solely on the nature of
our motion, which is a motion to dismiss under Fed. R. Civ. P. 12(b)(1).  This background
discussion does not concede that any of EPNG's allegations are true or correct.

Mill is a 145-acre site within the Navajo Nation Reservation and close to the Hopi Reservation,

approximately 5 miles east of Tuba City, Arizona.  Tuba City, Arizona, Disposal Site Fact Sheet,

(available at http://www.lm.doe.gov/documents/sites/az/tuba/fact_sheet/tubacity.pdf) (attached

hereto as Exhibit 1).  During its ten years of operations, the Mill processed about 800,000 tons of

uranium ore.  *Id.* at 1.  The milling operations created radioactive mill tailings.  *Id*.

Following passage of UMTRCA in 1978, the Mill was designated by DOE as a

"processing site" pursuant to UMTRCA.  DOE remediated the site under UMTRCA in

accordance with standards promulgated by the United States Environmental Protection Agency

("EPA").  Exhibit 1 at 1.  Surface remedial action began in 1988.  *Id.*  All uranium mill tailings

from on-site piles, debris from demolished buildings, and windblown tailings were moved and

stabilized in an engineered disposal cell on site.  *Id*.  The five-sided disposal cell occupies an area

of 50 acres on the 145-acre site.  *Id*. at 2.  In addition, DOE has an active remediation system for

contaminated ground water which has been in place since mid-2002.  The objective of the system

is to pump groundwater from the portion of the aquifer defined by a uranium plume, treat the

water by distillation to remove contaminants, and return the treated water to the aquifer.  *Id*.

DOE manages the disposal site according to a site-specific Long-Term Surveillance Plan to

ensure that the disposal cell systems continue to prevent release of contaminants to the

environment.  *Id.* at 3.  Under provisions of this plan, DOE conducts annual inspections of the

site to evaluate the condition of surface features, performs site maintenance as necessary, and

monitors groundwater to verify the continued integrity of the disposal cell.  *Id.*

B.    **The Tuba City Landfill**

The Tuba City landfill ("the Landfill") is located approximately four miles southwest of

the Mill, and is located on Navajo Nation and Hopi Tribe Reservations.  It was reportedly used

for approximately 30 years, beginning well before enactment of RCRA, as an open, uncontrolled,

dump receiving solid waste from local communities.  During the late 1990s, the Bureau of Indian

Affairs ("BIA") undertook activities to close the Landfill to dumping and to address

environmental conditions there.  Among other actions, BIA consolidated the remaining solid

waste, installed a soil cover over a portion of the Landfill, and fenced a portion of the Landfill to

limit access.

 In February 2000, EPA issued to BIA a notice of violation pursuant to the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, and directed BIA to

complete closure of the Landfill and to conduct further investigations into subsurface soils and

groundwater conditions.  From February 2000 to date, BIA has conducted or sponsored, at a cost

of more than $2 million, numerous studies to further characterize the Landfill and to plan and

implement response actions that may be necessary to protect human health and the environment.

In undertaking activities at the Landfill, BIA has consulted closely with EPA and the Navajo

Nation and Hopi Tribes.  BIA's activities have been undertaken pursuant to both RCRA and the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42

U.S.C. §§ 9601-9675, and are being undertaken in a manner not inconsistent with the National

Contingency Plan at 40 C.F.R. part 300.

 In 2007, BIA initiated a CERCLA remedial investigation/feasibility study of the Landfill

to further characterize the Landfill conditions and identify remedial alternatives.  BIA has also

undertaken, in response to concerns about elevated radionuclides detected in shallow

groundwater, actions directed at investigating groundwater potentially migrating downgradient of

the Landfill.

### C.    The Highway 160 Site and the EPNG-Navajo Cooperative Agreement

The "Highway 160 Site" is a site located north-northwest of the Mill and on the north side of Highway 160.  The Highway 160 Site is located within the Navajo Nation Reservation. The Navajo Nation and EPNG believe the Highway 160 Site contains residual radioactive materials that are derived from the Mill.  Amended Complaint ¶¶ 93, 94.  Representatives from DOE, EPA, BIA, the Nuclear Regulatory Commission ("NRC") and other federal agencies met with representatives from the Navajo Nation and EPNG in Tuba City in February 2008 to discuss, among other things, actions that might be taken to address any residual radioactive materials at the Highway 160 Site.

EPNG in June 2007 entered into a cooperative agreement with the Navajo Nation pursuant to which EPNG is currently engaged in an effort to characterize the Highway 160 site and to conduct certain interim remedial actions.  *See* June 2007 Cooperative Agreement Between Navajo Nation and EPNG (Exhibit 2).  EPNG agreed, among other things, to underwrite the Navajo Nation's costs of environmental investigation and remediation activities related to contamination emanating from the Mill and its known or potential vicinity properties, in an amount not to exceed $350,000.  *Id*. at 2-3.  EPNG and the Navajo Nation further agreed to participate in a "joint governmental affairs initiative . . . aimed at amending UMTRCA specifically to include the Highway 160 Site and the Tuba City open dump site as UMTRCA 'vicinity properties.'"  *Id*. at 3. The Navajo Nation agreed that during the period of the joint governmental affairs initiative it would not "take any affirmative actions that would cause or encourage the U.S. Environmental Protection Agency to initiate environmental investigation or

remediation activities with respect to the Tuba City Uranium Mill or its known or potential

UMTRCA 'vicinity properties.'" *Id*.

## III.    THIS LITIGATION

EPNG filed the instant lawsuit in May 2007.  EPNG alleges in part that mill tailings and

other uranium mill-related waste are located in the vicinity of the Mill, including at the Landfill

and the Highway 160 Site.  Amended Complaint ¶ 54.  EPNG's principal claim for relief is

brought under the APA and UMTRCA.  *Id.*  ¶¶ 88-102.  In this claim, EPNG challenges a

purported DOE 2004 "determination" to not include the Landfill, the Highway 160 Site, and

certain other unspecified locations in the vicinity of the Mill, within the Tuba City UMTRCA

"processing site."  *See id.* ¶¶ 70, 88-102.  EPNG alleges that such a "determination" is set forth in

an April 22, 2004, letter from a DOE official, Donna Bergman-Tabbert, to Mr. Joe Shirley,

President, the Navajo Nation.  *See id.* ¶ 70; *see also* EPNG Mem. in Opp. to Motion to Dismiss

or Transfer for Improper Venue at 5 (Docket No. 11) (characterizing APA claim as a challenge to

an April 2004 DOE decision).  EPNG alleges that this letter constitutes a "final agency action,"

and is subject to judicial review under 5 U.S.C. § 706.  Amended Complaint ¶¶ 96, 99.  In

addition to alleging that the purported April 2004 DOE determination is arbitrary and capricious,

EPNG alleges that DOE, EPA and NRC failed to encourage public participation or hold public

hearings related to the purported April 2004 decision, and that such failure violated the

UMTRCA public participation provision at 42 U.S.C. § 7921.  *Id.* ¶ 100.

**STANDARD OF REVIEW**

The federal courts are courts of limited jurisdiction and may only exercise that

jurisdiction which has been granted to them by Congress.  *Bender v. Williamsport Area School*

9

*Dist.*, 475 U.S. 534, 541 (1986).  Plaintiff bears the burden of proving that subject matter jurisdiction exists.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  A plaintiff must plead and, if challenged, prove the existence of the requisite jurisdictional facts.  *Gibbs v. Buck*, 307 U.S. 66, 72 (1939).  If plaintiff cannot meet this burden, the case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

It is axiomatic that the United States as sovereign may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Block v. North Dakota*, 461 U.S. 273, 280 (1983).  Waivers of sovereign immunity "must be unequivocally expressed in [the] statutory text, and will not be implied.  *Irwin v. Department of Veteran Affairs*, [498 U.S. 89, 95 (1990)]."  *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citation omitted).  *See also United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 619-20 (1992) (holding waivers may not be inferred).

Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  In deciding a Rule 12(b)(1) motion, a court is not limited to the allegations in the complaint but may consider materials outside the pleadings as it deems appropriate to resolve whether it has jurisdiction in the case.  *Bates v. Rumsfeld*, 271 F. Supp. 2d at 60.  In deciding a 12(b)(1) motion, a court will more closely scrutinize plaintiff's factual allegations than when resolving a 12(b)(6) motion to dismiss for failure to state a claim.  *Id*. at 59-60.

10

**ARGUMENT**

I.     **EPNG LACKS PRUDENTIAL STANDING**

As an initial matter, EPNG lacks prudential standing to pursue its APA claim because its alleged economic interest in avoiding liability for cleanup costs does not fall within the environmental zone of interests protected by UMTRCA.

If a plaintiff is suing under the APA, the plaintiff must show that the alleged injury falls within the zone of interests that the statute on which the plaintiff bases the complaint seeks to protect. *Physicians Comm. for Responsible Medicine v. EPA*, 451 F. Supp. 2d 223, 229 (D.D.C. 2006). The zone-of-interests test is intended to exclude those whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to protect the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

EPNG premises its APA claim upon UMTRCA. UMTRCA is a statute intended to protect public health and the environment. In enacting UMTRCA, Congress found that:

> [U]ranium mill tailings located at active and inactive mill operations may pose a potential and significant radiation health hazard to the public, and that the protection of the public health, safety, and welfare and the regulation of interstate commerce require that every reasonable effort be made to provide for the stabilization, disposal, and control in a safe and environmentally sound manner of such tailings in order to prevent or minimize radon diffusion into the environment and to prevent or minimize other environmental hazards from such tailings.

42 U.S.C. § 7901(a). Thus, Congress explained that the purpose of UMTRCA, with respect to inactive mill tailing sites, was to provide "a program of assessment and remedial action at such sites . . . in order to stabilize and control such tailings in a safe and environmentally sound

11

manner and to minimize or eliminate radiation health hazards to the public."  42 U.S.C.

§ 7901(b)(1).

EPNG alleges that its interest in pursuing this lawsuit is its economic interest in avoiding

liability for cleanup.  *See* Amended Complaint ¶¶ 7, 76, 98.  EPNG explains that "[a]ction and

threatened action by the Tribes to hold EPNG liable for continued clean-up at the Mill and its

'vicinity properties,' . . . could subject EPNG to the burden, expense, and hardship of a uranium

mill tailings site clean-up." Amended Complaint ¶ 98.  EPNG further alleges that it does not

have any "ownership interest or legal right" in the properties at issue.  Amended Complaint ¶ 76.

Contrary to EPNG's argument (*see* Amended Complaint ¶ 98), EPNG's economic

interest in avoiding liability to the Tribes does not fall within the environmental zone of interests

protected by UMTRCA.  Congress did not intend for UMTRCA to protect persons with liability

arising from the disposal of uranium mill tailings.  Indeed, Congress made this point explicitly

clear in enacting UMTRCA section 115(b), 42 U.S.C. § 7925(b).  In section 7925(b), Congress

directed the Attorney General to conduct a study to "determine the identity and legal

responsibility which any person (other than the United States, a State or Indian tribe) who owned

or operated or controlled . . . such site . . .may have under any law or rule of law for reclamation

or other remedial action with respect to such site." 42 U.S.C. § 7925(b).  Congress further

directed the Attorney General, to the extent the Attorney General deemed it appropriate and in

the public interest, "to take such action under any provision of law in effect when uranium was

produced at such site to require payment by [former private owners and operators of sites] of all

or any part of the costs incurred by the United States for . . . remedial action for which he

determines such person is liable."  *Id*.  Thus, Congress plainly did not intend for UMTRCA to

nullify liability of former mill operators such as EPNG for clean up costs.  Instead, Congress specifically directed the Attorney General to pursue claims against such persons, as appropriate, for reimbursement of cleanup costs incurred by DOE under UMTRCA's remedial program.  *See also Atlas Corp. v. United States*, 15 Cl. Ct. 681, 690 (1988) (interpreting section 115 of UMTRCA and noting that "rather than expressing an intent to pay the entire bill for all mill sites, it is clear that Congress desired that those who operated the [inactive] mills pay the costs of cleanup"), *aff'd*, 895 F.2d 745, 758 (Fed. Cir. 1990).

It is well-established in this judicial circuit that parties with an economic interest, but no environmental interest, in enforcing the terms of an environmental statute lack the prudential standing to do so.  *See, e.g., National Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 417 F.3d 1272, 1286-89 (D.C. Cir. 2005) (holding that home building trade association with no apparent environmental interest could not raise claim under National Environmental Policy Act ("NEPA")); *Sierra Club v. EPA*, 292 F.3d 895, 902-03 (D.C. Cir. 2002) (holding that trade association of firms involved in disposal of hazardous wastes lacked standing to challenge EPA rule under RCRA for determining when certain wastewater sludges were hazardous); *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 869-71 (D.C. Cir. 2001) (holding that trade association of waste disposal firms lacked prudential standing to challenge Clean Air Act regulations aimed at competitors); *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 407-08 (D.C. Cir. 2000) (holding natural gas pipeline operator's economic interest in suppressing competition did not fall within zone of interests of NEPA); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 921-26 (D.C. Cir. 1989) (holding that trade association of firms involved in disposal of hazardous wastes lacked standing to challenge RCRA rule).  Thus, EPNG's reliance on an

13

alleged economic injury is insufficient to establish prudential standing.

Although the existence of an economic interest does not automatically disqualify a party from pursuing a claim under an environmental statute, a party with an economic interest must show a substantial probability that it has also incurred an actual or imminent environmental injury within the zone of interests protected by such a statute. *See National Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 417 F.3d at 1287-88. Here EPNG has not alleged any environmental interest at all, much less evidence supporting the proposition that there is a "substantial probability" of actual or imminent environmental injury to the company. *See id*. Instead, EPNG merely alleges in the amended complaint that it believes it is within the zone of interests of UMTRCA based solely on an alleged economic injury arising from the possibility that it will be held liable to the Tribes for cleanup costs or damages. *See* Amended Complaint ¶ 98.[5] This purely economic injury is insufficient to give it prudential standing under UMTRCA.

## II.    EPNG DOES NOT IDENTIFY A FINAL AGENCY ACTION CONCERNING THE DESIGNATION OF VICINITY PROPERTIES NEAR THE MILL

EPNG's APA claim must also be dismissed because EPNG has not identified any final

---

[5] The absence of any environmental interest on the part of EPNG is underscored by the terms of its cooperative agreement with the Navajo Nation. Under the agreement, the Navajo Nation committed to cooperate with EPNG in a lobbying initiative to persuade Congress to amend UMTRCA to provide DOE with renewed authority to address vicinity properties, and that further, during this initiative, the Navajo Nation would "not take any affirmative action that would cause or encourage the U.S. Environmental Protection Agency to initiate environmental investigation or remediation activities with respect to the Tuba City Uranium Mill or its known or potential UMTRCA 'vicinity properties.'" Ex. 2 at 3. EPA and other federal agencies possess authority under CERCLA to perform cleanup actions or to require potentially responsible parties to conduct cleanup actions in the event that they determine that any imminent or substantial endangerment exists. *See* 42 U.S.C. §§ 9604, 9606.

agency action subject to judicial review.  Judicial review under the APA is limited to review of

final agency action.  *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001).  The absence of

final agency action is a jurisdictional defect that bars a court from considering an APA claim.  *See*

*DRG Funding Corp. v. Secretary of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996)

(if agency action is not final, court cannot reach merits of dispute); *Public Citizen v. Office of the*

*United States Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992) (finality is a

jurisdictional requirement, and its absence precludes consideration of merits of a claim).

       The Supreme Court has established two conditions that must be satisfied for agency action

to be final.  *Bennett v. Spear*, 520 U.S. at 178.  First, the action "must be one from which 'rights

or obligations have been determined,' or from which 'legal obligations will flow.'"  *Id.* (citations

omitted).  Second, the action "must mark the 'consummation' of the agency's decisionmaking

process," and not be "of a merely tentative or interlocutory nature."  520 U.S. at 177-78.  EPNG

fails to identify, in its amended complaint, a final agency action that meets the two conditions for

reviewability set forth in *Bennett v. Spear*.

       EPNG alleges that in a December 1, 2003, letter, the Navajo Nation requested that certain

sites near the Tuba City Mill "be investigated and remediated by DOE as vicinity properties under

the agency's UMTRCA authority."  Amended Complaint ¶ 69.  EPNG further alleges that in an

April 22, 2004, letter responding to the Navajo Nation's letter, DOE determined that the Landfill,

the Highway 160 Site, and other properties adjacent to the mill are "not vicinity properties under

UMTRCA."  *Id* ¶ 70.  EPNG contends that this April 2004 letter constitutes a reviewable final

agency action.  Amended Complaint ¶¶ 70, 96.

       The Navajo Nation's December 2003, letter and DOE's April 2004, letter responding to

the Navajo Nation's letter speak for themselves and are attached as exhibits hereto. *See* December 1, 2003, letter from Joe Shirley, President, Navajo Nation to Donna Bergman-Tabbert, Director of Land & Site Management (Exhibit 3), and April 22, 2004, letter from Donna Bergman-Tabbert, Director of Land & Site Management for DOE, to Joe Shirley, Jr. President of the Navajo Nation (Exhibit 4). The plain language of the letters demonstrates that EPNG has inaccurately characterized them, and that DOE did not take any reviewable final agency action within its April 2004 response letter.[6/]

In the first place, contrary to EPNG's allegation (*see* Amended Complaint ¶ 69), the December 2003, Navajo Nation letter to DOE does not contain any request that DOE make any determination with respect to the designation of additional vicinity properties as UMTRCA "processing sites." *See* Exhibit 3. Indeed, the December 2003 letter does not contain any reference to UMTRCA at all. The absence of any request for designation of properties under UMTRCA is not surprising, in view of the fact that DOE's authority to conduct remediation of surface contamination under UMTRCA expired in 1998. *See* 42 U.S.C. § 7922(a)(1).

In the December 2003 letter, Mr. Shirley states that the "Navajo Nation Environmental Protection Agency . . . has completed a preliminary investigation of alleged disposal of mixed waste by the former Rare Metals Corporation of America prior to the closure of the uranium mill operation in 1966." Exhibit 3 at 1. The letter further states that the disposal sites in question are located "at the former Tuba City open dump sites that encompasses both Navajo Nation and Hopi

---

[6/] It is appropriate for this Court to review the actual letters in question in deciding a Rule 12(b)(1) motion. In deciding a Rule 12(b)(1) motion, the Court is not limited to the allegations in the complaint and may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case. *Bates v. Rumsfeld*, 271 F. Supp. 2d at 60.

Tribal Partition Lands and at sites located northwest of the Rare Metals site located on Navajo

Nation trust land." *Id*. The letter additionally states that BIA and the Department of the Interior,

on behalf of the Navajo Nation and Hopi Tribe, has previously requested a meeting with DOE and

other federal agencies, including EPA and the U.S. Indian Health Service, "to discuss and agree

on appropriate corrective actions." *Id*. at 2. The letter indicates that EPA has previously agreed to

such a meeting. *Id*. The letter concludes with a request for a meeting with DOE to "discuss these

matters and begin to formulate appropriate actions for the clean closure of the illegal disposal sites

and eliminate the current and potential risks to Navajo health and the Navajo Nation

environment." *Id.* at 2.

The April 2004, letter from Ms. Bergman-Tabbert, Director, Land & Site Management,

responds to the December 2003 letter, and conveys DOE's willingness to meet with the Navajo

Nation to discuss the Navajo Nation's concerns. Specifically, the April 2004 DOE letter relays

that "the DOE is willing to meet with representatives of the Navajo Nation to discuss the current

situation at the Tuba City landfill." *Id*. at 2. The DOE letter further indicates that BIA should be

included in any meeting, as "it appears to DOE that BIA has accepted responsibility for closure of

the Tuba City landfill." *Id*.

The April 2004 letter relied upon by EPNG to support its APA claim does not contain any

final agency action meeting the two conditions set forth by the Supreme Court in *Bennett v. Spear*,

520 U.S. 154, 178 (1997). First, an agency letter *granting* a request for a meeting to discuss the

Navajo Nation's concerns cannot be said to "mark the consummation" of an agency

decisionmaking process. By accepting the request for a meeting, DOE clearly indicated a

willingness to continue to discuss with the Navajo Nation and other federal agencies potential

17

actions that might be taken with respect to the matters at issue.

In addition, the letter also fails to meet the first condition of the *Bennett* test because it does not have any concrete legal consequences.  EPNG's theory that the letter constitutes final agency action is premised on informational statements in the letter in which DOE: (1) indicates that it had not found "any evidence that would support allegations that Rare Metals Corporation disposed of contaminated equipment or uranium mill tailings at [the Landfill]," (2) indicates that it "believes that the ground water contamination discussed in your letter is not from the former mill site but is from the [Landfill] or some other nearby source," and (3) indicates that if groundwater contamination is not from the former mill site, such contamination "would not qualify to be remediated" under DOE's remaining UMTRCA authority.  *See* Exhibit 4; Amended Complaint ¶ 70.

None of these informational statements, either viewed individually or cumulatively, create any obligations, determine rights, or otherwise have any binding legal effect on anyone.  *Cf. Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (holding that informational statements by an agency that lack legal significance do not constitute final agency action and are unreviewable).  Contrary to EPNG's characterization, DOE was not asked to make, and did not make, a legal determination pursuant to UMTRCA section 102(e)(2), 42 U.S.C. § 7912(e)(2), as to whether any particular sites should be included as vicinity properties within the Tuba City "processing site."

EPNG's failure to identify a reviewable final agency action further dooms APA review of EPNG's claim (*see* Amended Complaint ¶ 100) that DOE, EPA and the NRC failed to comply with the UMTRCA public participation provision prior to DOE's alleged determination, 42

18

U.S.C. § 7921.  To bring an APA claim premised on a failure to comply with procedural requirements of a statute, a person must first identify some final agency action.  *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 898-899 (1990).  As discussed above, EPNG has failed to do so.

### III.    UMTRCA PRECLUDES JUDICIAL REVIEW OF AGENCY DECISIONS CONCERNING DESIGNATION OF PROCESSING SITES

Even if EPNG had identified some final agency action concerning the designation of processing sites under UMTRCA, UMTRCA expressly precludes judicial review of such actions. Although the APA provides a limited waiver of sovereign immunity allowing judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," 5 U.S.C. §§ 702, 704, this waiver does not apply if statutes preclude judicial review.  5 U.S.C. § 701(a)(1); *Fletcher v. District of Columbia*, 481 F. Supp. 2d 156, 163 (D.D.C. 2007).  In enacting UMTRCA, Congress expressly precluded judicial review of "processing site" "designations" made by DOE.  *See* 42 U.S.C. § 7912(d) (providing that "designations made, and priorities established by, the Secretary, under this section shall . . . not be subject to judicial review").

Section 102(a)(1) of UMTRCA, 42 U.S.C. § 7912(a)(1), requires the Secretary of Energy to designate inactive uranium milling sites at or near twenty specifically-identified locations, including the milling site at Tuba City, Arizona,  as "processing sites" requiring remedial action. The term "processing site" in turn is defined by the Act to include not just the mill or other uranium production sites, but also property "in the vicinity" of such production sites which are "determined by the Secretary, in consultation with the [Nuclear Regulatory] Commission, to be contaminated with residual radioactive materials derived from" the uranium production sites.  42

19

U.S.C. § 7911(6)(B).

Here, EPNG asks this Court to second-guess a purported 2004 DOE determination that certain locations in the vicinity of the Tuba City uranium mill (including the Landfill and Highway 160 Site) should not be included within the boundaries of the Tuba City "processing site."[7] Even if DOE had made any such final determination, the plain language of UMTRCA would preclude judicial review.

Section 102(a)(2) of UMTRCA, 42 U.S.C. § 7912(a)(2), provides that "[as] part of his designation [of processing sites] under this subsection, the Secretary [of DOE], in consultation with the [Nuclear Regulatory] Commission, shall determine the boundaries of each such site." Section 102(d) of UMTRCA, 42 U.S.C. § 7912(d), in turn relates to judicial review of designations and provides in no uncertain terms that "[t]he designations made, and priorities established, by the Secretary under this section shall be final and *not be subject to judicial review*." (emphasis added).  Thus, 42 U.S.C. § 7912(d) constitutes an explicit statement of clear Congressional intent that decisions concerning designations of processing sites under UMTRCA, including decisions regarding the boundaries of processing sites, are unequivocally not subject to judicial review.  Such an explicit statutory command must be heeded.  *Cf. Tozzi v. EPA*, 148 F. Supp. 2d 35, 47-48 (D.D.C. 2001) (dismissing cause of action under Paperwork Reduction Act because of explicit bar on judicial review).

---

[7] The Act provides that the "designation of processing sites within one year after November 8, 1978, . . . shall include, to the maximum extent practicable," "vicinity" areas referred to in section 7911(6)(B).  42 U.S.C. § 7912(e)(1).  The Secretary, however, may after one year "include any area described in section 7911(6)(B) . . . as part of a processing site designated under [Section 7912] if he determines such inclusion to be appropriate to carry out the purposes of [UMTRCA]."  42 U.S.C. § 7912(e)(2).

To the extent that EPNG attempts to evade the bar on judicial review at 42 U.S.C.

§ 7912(d) by arguing that a decision not to include a vicinity property within an existing

"processing site" is not a "designation" of a site within the meaning of the judicial review

provision, such an argument lacks merit.  In enacting UMTRCA, Congress made clear that the

Secretary of DOE has authority to determine the boundaries of each processing site, and further

made clear that determinations concerning the boundaries of each processing site is an inherent

component of the Secretary's "designation" of a site.  *See* 42 U.S.C. § 7912(a)(2) (providing that

"*[a]s part of his designation* under this subsection, the Secretary, in consultation with the

Commission, shall determine the boundaries of each such site") (emphasis added).  Because

decisions regarding "processing site" boundaries are by definition part of the "designation" of

"processing sites," the bar on judicial review of "designations" plainly encompasses any decision

concerning whether the boundaries of an existing processing site should be expanded to include

additional vicinity properties.  Put simply, a challenge to a DOE decision declining to expand the

boundaries of a "processing site" is a challenge to DOE's "designation" of the "processing site"

and is precluded by 42 U.S.C. § 7912(d).

This Court's opinion in *Sierra Club v. Edwards*, Civ. Action No. 81-1368, 1983 U.S. Dist.

LEXIS 17625 (D.D.C. Apr. 18, 1983) – the one previous case of which we are aware involving

analysis of 42 U.S.C. § 7912(d) – supports the conclusion that the instant challenge is barred.  In

*Sierra Club*, environmental organizations alleged, in relevant part, that DOE had failed to

identify, within one year of November 8, 1978, "to the maximum extent practicable," properties

contaminated by mill tailings within the vicinity of inactive mines.  *See* 42 U.S.C. § 7912(e)(1).

The Court rejected the Government's argument that the claim was barred under 42 U.S.C.

21

§ 7912(d) on grounds that plaintiffs' challenge was to the *rate* of the Government's designations of vicinity properties, as opposed to a challenge to the substance of particular designations.  As the Court explained, plaintiffs were "not requesting the Court to second-guess defendants' determinations that locations near processing sites either are or are not contaminated."  1983 U.S. Dist. LEXIS 17625, at *9.  As the Court further explained, "[i]n contrast to issues of nonfeasance and the appropriateness of designating or refusing to designate a particular location as a vicinity property, the issue of the adequacy of defendants' rates of considering designations of vicinity properties appears to be more amenable to judicial review and more clearly beyond the scope of the nonreviewability provision of section 7912(d)."  *Id.*, at *10.  Unlike in *Sierra Club*, here EPNG plainly is trying to challenge the appropriateness of a purported DOE decision declining to include, pursuant to 42 U.S.C. § 7912(e)(2), particular locations as vicinity properties within the scope of the Tuba City "processing site."  Accordingly, EPNG's claim, unlike Sierra Club's claim, is barred by the nonreviewability provision at section 7912(d).[8/]

The nonreviewability provision at 42 U.S.C. § 7912(d) further precludes EPNG's claim that DOE, EPA and NRC have failed to comply with UMTRCA's public participation provision, 42 U.S.C. § 7921.  If an agency decision is not subject to judicial review, any procedural requirements that are preliminary to such an agency action are also unreviewable.  *See National*

---

[8/]  In one other UMTRCA case, *Hecla Mining Co. v. United States*, 909 F.2d 1371 (10th Cir. 1990), the Tenth Circuit addressed the merits of a DOE decision not to include a site as part of a "processing site" under UMTRCA and upheld DOE's decision.  In *Hecla Mining*, however, the United States failed to raise a jurisdictional defense based on 42 U.S.C. § 7912(d) and brief this issue.  Accordingly, jurisdiction was assumed but not addressed in the court's opinion.  The D.C. Circuit has made clear that jurisdictional issues that are assumed but never expressly decided in prior opinions do not thereby become precedents.  *American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996).  Thus, *Hecla Mining* has no relevance here.

22

*Coalition to Save Our Mall v. Norton*, 161 F. Supp. 2d 14, 20 (D.D.C. 2001) (holding that where decision concerning location and design of memorial was unreviewable, agency's compliance with procedural requirements of NEPA was also unreviewable), *aff'd*, 269 F.3d 1092 (D.C. Cir. 2001).

## IV.    EPNG CANNOT BRING ITS APA CLAIM UNDER SECTION 706(1)

EPNG in its amended complaint characterizes its claim as an APA section 706(2) challenge to final agency action. *See* Amended Complaint ¶ 75 (alleging that DOE's "decision not to designate . . . properties in the vicinity of the Mill . . . is now final and ripe for judicial review." *See also* EPNG Opp'n to DOE's Mot. to Dismiss or Transfer for Improper Venue at 6 ("EPNG's UMTRCA Claim alleges that DOE's April 2004 decision not to designate the Properties as 'vicinity properties' under UMTRCA, and its decision to deny remediation of ground water contamination at these sites, was arbitrary and capricious, not in accordance with the law, and constitutes an abuse of discretion under the [APA]"). To the extent, however, that EPNG attempts, in opposition to the instant motion, to recast its APA claim as a section 706(1) claim to compel agency action unlawfully withheld, EPNG has failed in its amended complaint to identify any applicable waiver of sovereign immunity.

A claim under section 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 64. Thus, a section 706(1) claim can only be brought to enforce a specific, unequivocal, command about which an agency has no discretion whatsoever. *Id*. at 63. UMTRCA provides the Secretary of DOE with discretion to determine whether to expand the scope of a processing site by including additional vicinity properties within the site. *See* 42

U.S.C. § 7912(e)(2).  In particular, UMTRCA provides that after November 8, 1979, the DOE

Secretary "*may* . . . include any area described in section 7911(6)(B) of this title as part of a

processing site designated under this section if he determines such inclusion to be appropriate to

carry out the purposes of this subchapter."  *Id.* (emphasis added).  The word "may" connotes

discretion.  *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005).  In addition,

the use of the word "appropriate" connotes discretion.  *Cf. Kansas State Network, Inc. v. FCC*,

720 F.2d 185, 189 (D.C. Cir. 1983) ("What is 'necessary' or 'appropriate' in particular

circumstances is never a 'fact' but always a matter of informed judgment.").  Accordingly, 42

U.S.C. § 7912(e)(2) does not create a nondiscretionary duty to designate particular "vicinity

properties."

## CONCLUSION

WHEREFORE, pursuant to Fed. R. Civ. P. 12(b)(1), Plaintiff's first claim for relief should

be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,


RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice



_____/s/_____
ERIC G. HOSTETLER, Attorney
D.C. Bar No. 445917
Environmental Defense Section
P.O. Box 23986
L'Enfant Plaza Station
Washington, D.C.  20026-3986
April 18, 2008                                              (202) 305-2326

# EXHIBIT 1



# Tuba City, Arizona, Disposal Site



## FACT SHEET

*This fact sheet provides information about the Uranium Mill Tailings Radiation Control Act of 1978 Title I disposal site at Tuba City, Arizona. This site is managed by the U.S. Department of Energy Office of Legacy Management.*

## Site Description and History

The Tuba City, Arizona, Disposal Site is within the Navajo Nation and close to the Hopi Reservation, approximately 5 miles east of Tuba City and 85 miles northeast of Flagstaff, Arizona. The Rare Metals Corporation and its successor, El Paso Natural Gas Company, operated a uranium mill at the site between 1956 and 1966. During its 10 years of operations, the Tuba City mill processed about 800,000 tons of uranium ore. The milling operations created radioactive mill tailings, a predominantly sandy material. The tailings were conveyed in a slurry from the mill to evaporation ponds at the site. These ponds covered an area of 33.5 acres, and windblown tailings affected an additional 250 acres northeast of the millsite. The U.S. Department of Energy (DOE) began surface remedial action at the Tuba City site in 1988. All uranium mill tailings from the on-site piles, debris from demolished mill buildings, and windblown tailings were moved and stabilized in an engineered disposal cell on site. DOE completed site cleanup in 1990.

## Regulatory Setting

Congress passed the Uranium Mill Tailings Radiation Control Act (UMTRCA) in 1978 (Public Law 95-604), which required the cleanup of 24 inactive uranium ore processing sites. DOE remediated these sites under the Uranium Mill Tailings Remedial Action Project in accordance with standards promulgated by the U.S. Environmental Protection Agency in Title 40 *Code of Federal Regulations* (CFR) Part 192. Subpart B of 40 CFR 192 regulated cleanup of contaminated ground water at the processing sites. The radioactive materials were encapsulated in U.S. Nuclear Regulatory Commission-approved disposal cells. The U.S. Nuclear Regulatory Commission general license for UMTRCA Title I sites is established in 10 CFR 40.27. The Tuba City Disposal Cell was included under the general license in 1996.

## Disposal Site

The disposal site is approximately 6,000 feet northwest of and 300 to 400 feet in elevation above Moenkopi Wash, an intermittent stream that drains to the



M:\LTS\111\0001\04\001\S01836\S0183600.mxd  carverh  11/26/2007 3:38:16 PM

*Location of the Tuba City Disposal Site*

southwest into the Little Colorado River. The disposal site lies at an elevation of approximately 5,100 feet above sea level on the middle of three alluvial terraces associated with ancestral flows in Moenkopi Wash. Thin surficial deposits of unconsolidated dune sand and gravels overlie the Navajo aquifer, which is the main aquifer near the Tuba City site. On a regional scale, the Navajo aquifer is vast and encompasses all the Navajo Sandstone deposits. The saturated thickness of the aquifer near the disposal cell is about 500 feet, although within 2,000 feet south of the disposal cell the aquifer thins rapidly. Depth to ground water ranges from about 60 to 75 feet below land surface.

Land near the site is used only for occasional grazing. The Navajos and Hopis near the site use water from Moenkopi Wash for stock watering and agricultural diversions. The limited and highly variable supply of surface water makes ground water an important resource in the area. Analyses of surface water samples from seeps draining to Moenkopi Wash indicate that contamination from the disposal site has not migrated to the wash.



*North-South Cross Section of the Tuba City Disposal Cell*

Historical milling operations contaminated ground water in the Navajo aquifer. The primary source of contamination is water that drained from the unlined evaporation ponds and infiltrated into the subsurface. Site-related contamination in the uppermost part of the aquifer has been detected 2,500 feet hydraulically downgradient from the disposal site. Monitoring Results indicate that the original volume of contaminated ground water was between 1.5 and 3 billion gallons. Ground water contaminants with concentrations that exceed their standards in 40 CFR 192 are molybdenum, nitrate, selenium, and uranium. High levels of sulfate are also present in the ground water. Although sulfate is not a constituent included in 40 CFR 192, its concentration in the ground water is high enough to cause a potential health risk.

### Compliance Strategy

**Middle Terrace.** The compliance strategy for contaminated ground water underlying the middle terrace is active remediation. The objective is to pump ground water from the portion of the aquifer defined by the uranium plume, treat the water by distillation to remove contaminants, and return the treated water to the aquifer through an infiltration trench located upgradient of the contaminant plume. The concentrated brine containing the contaminants and other dissolved solids that remained after distillation are pumped to a lined evaporation pond, where the liquid evaporates. The remaining brine solids will be removed to an approved repository at the completion of remedial action.

The active remediation system has been in full-scale operation since mid-2002. DOE continues to evaluate system performance through the observational approach and in 2005 installed additional extraction wells to decrease the time needed to achieve remediation goals. DOE also increased the existing

treatment plant capacity through various efficiency improvements in 2004, eliminating the need for a second treatment plant.

**Lower Terrace.** Because the extent and magnitude of ground water contamination underlying the lower terrace is much less than in the middle terrace, the compliance strategy for the lower terrace is natural flushing with continued monitoring. This process relies on natural phenomena such as dispersion, adsorption, and evapotranspiration to reduce contaminant concentrations in a reasonable time frame. Although ground water that is discharged as spring flow to Moenkopi Wash may occasionally be consumed for ceremonial or other purposes, the water is presently not contaminated by site-derived constituents. It is likely that natural dispersion will reduce ground water contaminant concentrations to acceptable levels within 100 years on the lower terrace and that concentrations will indefinitely remain at acceptable levels at the seeps.

### Disposal Cell Design

The five-sided disposal cell occupies an area of 50 acres on the 145-acre site. The cell rises 44 feet above the surrounding land. An interceptor ditch was constructed on the upslope side of the cell. A woven wire fence with locked gates surrounds the cell, and the site perimeter is marked with warning signs and permanent monuments.

The cover of the disposal cell is a multicomponent system designed to encapsulate and protect the contaminated materials. The disposal cell cover comprises (1) a low-permeability radon barrier (first layer placed over compacted tailings) consisting of clayey soil, (2) a granular bedding material placed as a capillary break, and (3) rock (riprap) erosion protection layers.

The cell location and design were selected to minimize the potential for erosion from wind and storm water runoff. Surrounding disturbed areas were regraded and reseeded with native vegetation.

## Legacy Management Activities

DOE is responsible for ensuring that the selected ground water compliance strategy at the Tuba City Disposal Site continues to be protective of human health and the environment.

DOE manages the disposal site according to a site-specific Long-Term Surveillance Plan to ensure that the disposal cell systems continue to prevent release of contaminants to the environment. Under provisions of this plan, DOE conducts annual inspections of the site to evaluate the condition of surface features, performs site maintenance as necessary, and monitors ground water to verify the continued integrity of the disposal cell. The encapsulated materials will remain potentially hazardous for thousands of years.

In accordance with 40 CFR 192.32, the disposal cell is designed to be effective for 1,000 years, to the extent reasonably achievable, and, in any case, for at least 200 years. However, the general license has no expiration date, and DOE's responsibility for the safety and integrity of the Tuba City Disposal Cell will last indefinitely.

## Contacts

Documents related to the Tuba City Disposal Site are available on the DOE Office of Legacy Management website at
http://www.LM.doe.gov/land/sites/az/tuba/tuba.htm.

For more information about DOE Office of Legacy Management activities at the Tuba City Disposal Site, contact

U.S. Department of Energy
Office of Legacy Management
2597 B¾ Road, Grand Junction, CO 81503

(970) 248-6070 (monitored continuously), or
(877) 695-5322 (toll-free)

**EXHIBIT 2**

## COOPERATION AGREEMENT

This Cooperation Agreement ("Agreement") is entered into as of the dates indicated below by and between The Navajo Nation ("Navajo Nation"), on the one hand, and El Paso Natural Gas Company ("EPNG"), on the other hand (collectively, "the parties").

The parties hereto have continuing differences of interest with respect to factual and legal issues related to the historical operation of the Tuba City uranium mill, located in the vicinity of Tuba City, Arizona, (the "Mill"), which differences neither party wishes to compromise through this Agreement. Despite their differences, the parties have identified the following measures which are intended to evaluate and mitigate present health risks to people and livestock in the vicinity of the Mill, to further investigate the environmental condition of lands and/or groundwater in the vicinity of the Mill, and to establish the basis for the parties' mutual efforts to cause the United States to fully investigate and remediate all adverse environmental impacts to surrounding lands that were caused by the operation of the Mill.

In view of the foregoing, the parties (through their duly authorized representatives) agree to the following:

1.  Risk Assessment Activities at Highway 160 Site

    a.  El Paso will promptly begin and diligently pursue to completion a non-invasive geophysical investigation in and in the vicinity of the 5-acre parcel covered by the March 8, 2007 draft report of William J. Walker, Ph.D., entitled *Preliminary Results of Forensic Research: The Role of Uranium Milling on Local Environmental Geochemistry, Tuba City MTRA Site, Tuba City, AZ.*, to verify the extent of surface and near surface contamination. The five acre area, plus additional contaminated land identified in the proposed geophysical investigation shall be referred to as the "Affected Area." Geophysical technologies to be employed in the investigation may include:

        i.    Radiological Scan
        ii.   Ground Penetrating Radar
        iii.  Magnetic and Conductivity Scanning
        iv.   High Resolution Resistivity Scan

    b.  El Paso will fence the Affected Area with 6-foot-high, chain-link fencing, trenched 1 foot below surface, and post signs warning of potential hazards. El Paso will maintain the fence in a reasonably effective and safe condition for a period of not less than 2 years. Arrangements for any extension of fencing maintenance will be the subject of future dialogue between El Paso and the Navajo Nation.

    c.  El Paso will apply a spray-on dust control polymer to the Affected Area (Soil Sement product or equivalent), and will maintain the integrity of the dust control measures for a period of not less than 2 years. Arrangements for any extension of dust-control maintenance will be the subject of future dialogue between El Paso and the Navajo Nation.

2. Water Survey/Data Gathering/Testing

    a. El Paso will promptly begin and diligently pursue to completion a drinking and livestock water well and spring survey, data gathering and testing study (the "Water Program"), involving domestic drinking water wells, livestock water wells and springs potentially affected by any deleterious substances emanating from the Tuba City Mill UMTRCA Site and Highway 160 Site ("Potentially Affected Wells and Springs").

    b. The Water Program will consist of the following and be coordinated with the Navajo Nation:

        i. El Paso will locate Potentially Affected Wells and Springs. El Paso will collect and assess existing and readily available analytical data for relevance and completeness in assessing potential threats to the health of humans and livestock posed by contaminants related to operation of the Tuba City Mill.

        ii. Four, scientifically valid rounds of sampling, on a quarterly basis, of Potentially Affected Wells and Springs will be conducted and the resulting samples analyzed for deleterious substances potentially associated with historical operation of the Tuba City Mill.

        iii. Collected data will be subjected to quality control and quality assurance review and compared to existing health-based criteria (for example, federal Maximum Contaminant Levels). Data will be shared contemporaneously and routinely with designated representatives of the Navajo Nation, and the Navajo Nation shall receive three (3) copies of any final reports containing or referencing such data.

        iv. If contaminants are found in excess of applicable health-based criteria, El Paso will propose and (for a period of not less than two years) implement reasonable measures, to include a suitable alternative water supply, and undertake additional measures to reduce risk, with the specific measures to be determined on a case-by-case basis and in consultation with the Navajo Nation. Arrangements for any extension of water quality measures will be the subject of future dialogue between El Paso and the Navajo Nation.

3. El Paso Contribution Toward Navajo Nation Environmental Investigation/Remediation Expenses

    a. El Paso will underwrite the Navajo Nation's direct, third party costs of environmental investigation and remediation activities related to assessing and/or remediating contamination at, or emanating from, the Tuba City

Uranium Mill and its known or potential UMTRCA "vicinity properties," in an amount not to exceed Three Hundred Fifty Thousand Dollars ($350,000), subject to the following conditions:

    i. All expenses submitted for payment shall be supported by invoices and such backup documentation as El Paso shall reasonably request.

    ii. El Paso shall receive three (3) copies of any final reports containing or referencing such data.

4. <u>Full Navajo Nation Participation and Cooperation in Governmental Initiative</u>

    a. For a period beginning on the date when this Agreement is fully executed, and for at least sixty days thereafter on which the Congress of the United States is conducting business ("Congressional Working Days"), the Navajo Nation will fully participate in a joint governmental affairs initiative (the "Governmental Initiative") with El Paso aimed at amending UMTRCA specifically to include the Highway 160 Site and the Tuba City open dump site as UMTRCA "vicinity properties" and authorize expenditures to investigate, identify and remediate any other contamination at sites associated with the operation of the Tuba City Mill at such site(s). (This sixty Congressional-Working-Day period shall be referred to as the "Governmental Initiative Period.") El Paso will underwrite all reasonable Navajo travel expenses related to the Governmental Initiative. All air travel and lodging arrangements shall be made exclusively through El Paso's designated travel agency.

    b. During the Governmental Initiative Period, the Navajo Nation shall not attempt to extend the scope of the Governmental Initiative to include properties other than known or potential Tuba City Uranium Mill UMTRCA "vicinity properties."

    c. During the Governmental Initiative Period, the Navajo Nation need not oppose, but shall not take any affirmative actions that would cause or encourage the U.S. Environmental Protection Agency to initiate environmental investigation or remediation activities with respect to the Tuba City Uranium Mill or its known or potential UMTRCA "vicinity properties."

5. All actions on the part of El Paso as contemplated by this Agreement shall be performed only after close consultation with the Navajo Nation Environmental Protection Agency and in accordance with any applicable standards promulgated by the Navajo Nation Environmental Protection Agency or, in the absence of such standards, in accordance with any applicable federal or state standards.

6. The fact that the Navajo Nation Environmental Protection Agency may authorize a third-party contractor to replicate a risk evaluation activity taken by El Paso shall not constitute a reason for El Paso to refuse to underwrite the costs of said replicated activity under the protocol set forth at paragraph 3 of this Agreement.

7. By entering into this Agreement, neither the Navajo Nation nor El Paso shall release the other from any potential liability or otherwise waive any claim, potential claim, cause of action, defense, or legal argument either may have against the other or any third party. The parties' willingness to enter into this Agreement shall not be interpreted to be a concession or admission by the Navajo Nation or El Paso as to any fact whatsoever. This Agreement shall remain fully covered, protected and privileged under Rule 408 of the Federal Rules of Evidence and analogous state and tribal rules, and neither El Paso nor the Navajo Nation shall contend that the existence or content of this Agreement supports or refutes any liability or potential liability.

8. The parties understand and acknowledge that the actions described in this Agreement are preliminary and humanitarian in nature and are not intended to constitute a final remedial response for any of the referenced properties.

THE NAVAJO NATION                                EL PASO NATURAL GAS COMPANY

By: _____                      By: _____
Its: Navajo Nation Vice-President                Its: President
Dated: JUN 1 5 2007                              Dated: June 25, 2007

# EXHIBIT 3



**THE**
**NAVAJO**
**NATION**
P.O. Box 9000 • Window Rock, Arizona • 86515

PRESIDENT
JOE **SHIRLEY, Jr.**
VICE PRESIDENT
FRANK J. **DAYISH, Jr.**

**DEC 0 1 2003**

DEC – 4 2003

GRAND JCT. OFFICE

Donna A. Bergman-Tabbert
NE-ID, Building #810
U.S. Department of Energy
Grand Junction Office
2597 B3/4 Road
Grand Junction, Colorado 81503

Reference: Alleged Illegal Disposal of Mixed Waste by Rare Metals Corporation of
America, Tuba City, Arizona

Dear Ms. Bergman-Tabbert:

The Navajo Nation Environmental Protection Agency (EPA) has completed a
preliminary investigation of alleged disposal of mixed waste by the former Rare Metals
Corporation of America prior to the closure of the uranium mill operation in 1966. The
alleged illegal disposal sites are located at the former Tuba City open dump sites that
encompasses both Navajo Nation and Hopi Tribal Partition Lands, and at sites located
northwest of the Rare Metals site located on Navajo Nation trust land. Navajo families
reside adjacent to both sites.

Briefly, the Navajo Nation EPA has determined the following based on the enclosed
reports:

- Shallow ground water at the former Tuba City open dump sites, including a
  hand dug water well at Mr. Cecil Begay's residences, is contaminated (60.1
  $\mu R/h$) with uranium (radionuclides). Mr. Begay's well is used for livestock
  watering (and perhaps for ceremonial purposes at a sweat lodge that is adjacent
  to the well).

- There are no ground water monitoring wells on Navajo Nation land to monitor
  the movements of a uranium plume of contamination from Hopi Tribal Partition
  Land.

- Lifelong residents of the affected areas (both Navajo and Hopi) allege that
  trucks from Rare Metals dumped waste at the former Tuba City open dump
  sites.

Letter to Ms. Donna A. Bergman-Tabbert, U. S. Department of Energy
Reference: Alleged Illegal Disposal of Mixed Waste by Rare Metals Corporation of
America, Tuba City, Arizona
November 2003
Page Two

- The Navajo Nation and Hopi Tribe want clean closure (excavation and removal of all waste and transport and dispose the waste at a permitted disposal facility) of the former Tuba City open dump sites.

- On behalf of the Navajo Nation and Hopi Tribe, the BIA Western (Phoenix) Regional Office and the U.S. Department of Interior previously requested (in 2001) that the U.S. Environmental Protection Agency, U.S. Department of Energy and the U.S. Indian Health Service meet with the Tribes and federal agencies to discuss and agree on appropriate corrective actions. The U.S. Department of Energy and the U.S. Indian Health Service refused.

- Currently, solid waste (including medical waste) is exposed at the surface at the former Tuba City open dump sites. The illegal dump sites northwest of Rare Metals also has solid waste exposed at the surface and there are excessive radiological readings (400-1600 µR/h) at the surface.

As you know, the U.S. Department of Energy has an Environmental Strategic Goal: "To protect the environment by providing a reasonable resolution to the environmental legacy of the Cold War and by providing for the permanent disposal of the Nation's high-level radioactive waste." This is a very admirable goal and it complements the principles of the *U.S. Department of Energy's American Indian Policy* (April 8, 1992) to work with the Navajo Nation on a government-to-government basis to "ensure that tribal rights and interests are identified and considered (in) pertinent decision-making." Because we both have responsibilities to protect the environment and to work government-to government, I am requesting a meeting, at your earliest convenience, to discuss these matters and begin to formulate appropriate actions for the clean closure of the illegal disposal sites and eliminate the current and potential risks to Navajo human health and the Navajo Nation environment. I have designated Mr. Stephen B. Etsitty, Executive Director for the Navajo Nation EPA as my contact. You may reach Mr. Etsitty at (928) 871-7692 to schedule a date, time and location for the meeting.

Thank you for your interest and support.

Respectfully,

THE NAVAJO NATION

Joe Shirley, Jr., President

Enclosures

**EXHIBIT 4**





**U.S. Department of Energy**
2597 B¾ Road
Grand Junction, CO 81503

APR 2 2 2004

Mr. Joe Shirley, Jr., President
The Navajo Nation
P.O. Box 9000
Window Rock, AZ 86515

- STEVE ETSITTY
- ARLENE LUTHER
- CASSANDRA BLOEPEL

RECEIVED
APR 28 2004
NAVAJO ENVIRONMENTAL
PROTECTION AGENCY

Subject: Tuba City Landfill

Reference: Your Letter Dated December 1, 2003, Alleging Illegal Dumping of Mixed Waste by
Rare Metals Corporation of America, Tuba City, Arizona

Dear President Shirley:

The U.S. Department of Energy (DOE) would like to thank you for your letter dated
December 1, 2003. We have discussed the situation with retired Atomic Energy Commission
employees who routinely inspected the Tuba City mill and have researched information about
this site. The DOE did not find any evidence that would support the allegations that Rare Metals
Corporation disposed of contaminated equipment or uranium mill tailings at the Tuba City
landfill. Rare Metals Corporation operated under a licensing agreement with the U.S. Nuclear
Regulatory Commission and the State of Arizona, and contaminated equipment and residual
radioactive materials were to be controlled in accordance with the licensing requirements.

The Uranium Mill Tailings Radiation Control Act (UMTRCA) was passed in 1978 and assigned
DOE the responsibility for remediating residual radioactive material at 24 UMTRA Title I mill
sites and surrounding properties. The Tuba City mill site was remediated under that program,
and surrounding properties where residual radioactive materials were identified were cleaned up
by the DOE. The Tuba City landfill was not identified as being a concern by the Navajo
authorities actively working with the UMTRA program at that time; therefore, it was not
surveyed nor considered for remediation. In 1998, Congress revoked the DOE's authority and
responsibility for any further remediation of residual radioactive materials.

However, Congress did continue DOE's authority to remediate ground water at the 24 UMTRA
Title I mill sites. DOE believes that the ground water contamination discussed in your letter is
not from the former mill site but is from the Tuba City landfill or some other nearby source.
Therefore, ground water at the Tuba City landfill would not qualify to be remediated under the
existing UMTRA program.

Congress also directed DOE to keep the UMTRA Grand Junction, Colorado, disposal cell open
to receive any UMTRCA materials that may be discovered after the UMTRA surface program
was terminated. If you determine that the material in the landfill meets the definition of
UMTRA materials allowed for disposal and you request us to do so, I will discuss with Mesa
County officials and regulators whether the Grand Junction disposal cell can be made available

Mr. Joe Shirley             -2-             APR 2 3 2002

to the Navajo Nation for disposal of such materials that may be removed from the Tuba City landfill. All waste would need to meet existing disposal criteria. For example, in your letter, it was mentioned that some of the wastes are medical waste, which does not meet criteria and cannot be accepted at the repository.

The DOE is willing to meet with representatives of the Navajo Nation to discuss the current situation at the Tuba City landfill. However, in a letter dated June 19, 2001, and signed by Donald Sutherland, Acting Chief of the Environmental and Cultural Resources Management Division, the U.S. Department of Interior, Bureau of Indian Affairs (BIA), stated that the BIA intended to proceed with the closure of the Tuba City landfill under appropriate federal law. It appears to DOE that BIA has accepted responsibility for closure of the Tuba City landfill, and any such meeting should include the BIA.

If you have any questions concerning this matter, please contact Mr. Art Kleinrath of my staff at 970/248-6037 or give me a call at 970/248-6001.

Sincerely,

Donna Bergman-Tabbert
Director, Land & Site Management

cc:
N. Honi, Hopi Tribe
W. Taylor, Hopi Tribal Chairman
R. Sakiestewa, Jr., Hopi Tribe
S. Etsitty, Navajo Nation EPA
M. Roanhorse, Navajo Nation
D. Sutherland, BIA
S. Grey, DOE-HQ
R. Bush, LM-50
M. Ghate, LM-5
C. Carpenter, Stoller
TUB200.02B (D. Roberts)

awk/Tuba City Landfill.doc