## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EL PASO NATURAL GAS COMPANY, )
         )
    **Plaintiff,**    )
         )
THE NAVAJO NATION    )
         )
    **Intervenor-Plaintiff,** )  **Civil Case No. 07-905 (RJL)**
         )
v.         )
         )
UNITED STATES OF AMERICA, *et al.,* )
         )
    **Defendants.**   )

## MEMORANDUM OPINION
(March 27, 2011) [#52]

Intervenor-plaintiff Navajo Nation brings this suit against the United States in connection with a former uranium mill located on the Navajo Nation Reservation near Tuba City, Arizona. Specifically, intervenor-plaintiff alleges violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*, the Uranium Mill Tailing Radiation Control Act ("UMTRCA"), 42 U.S.C. §§ 7901, *et seq.*, the American Indian Agriculture Resources Management Act ("AIARMA"), 25 U.S.C. §§ 3701, *et seq.*, the Indian Lands Open Dump Cleanup Act ("ILODCA"), 25 U.S.C. §§ 3901, *et seq.*, the federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq.*, various Navajo Nation laws and the United States' trust duty to the Navajo Nation. Currently before this

1

Court is defendant's motion for partial dismissal. For the reasons set forth below, defendant's motion is GRANTED.

## BACKGROUND

The complaint in this case was originally filed by El Paso Natural Gas Company ("EPNG") on May 15, 2007, EPNG Compl. [#1], with an amended complaint filed on July 12, 2007, EPNG Am. Compl. [#7]. EPNG alleges violations of the RCRA, UMTRCA and APA. EPNG Am. Compl. ¶¶ 88-112. In particular, EPNG's UMTRCA claim alleges that the United States and other federal defendants failed to fulfill their obligations under UMTRCA in connection with certain properties alleged to be contaminated with residual radioactive waste. *See* EPNG Am. Compl. ¶¶ 88-102. EPNG claimed jurisdiction in this Court under the APA. *See id.* The defendants moved to dismiss the APA/UMTRCA claims for lack of subject matter jurisdiction, and on March 31, 2009, this Court granted the defendants' motion. *See El Paso Natural Gas Co. v. United States*, 605 F. Supp. 2d 224 (2009). The defendants have not moved to dismiss EPNG's RCRA claims. *See* United States Mot. Dismiss, Apr. 18, 2008 [#19]. After this Court issued a Final Judgment as to the APA/UMTRCA claims, EPNG filed an appeal on March 24, 2010 to our Circuit. EPNG Notice of Appeal [#43].[1]

The Navajo Nation (or the "Tribe") filed an intervenor-complaint, alleging ten separate claims of relief against the United States ("defendant") on March 5, 2010. Intervenor-Compl. by the Navajo Nation, Mar. 5, 2010 ("Tribe Compl.") [#41]. On

---

[1] On January 28, 2011, the Court of Appeals for the DC Circuit affirmed this Court's March 31, 2009 decision. *El Paso Natural Gas Co. v. United States*, 2011 U.S. App. LEXIS 2842 (D.C. Cir. Jan. 28, 2011).

March 30, 2010, the Tribe, which alleges, *inter alia*, the same violations – Fifth and Sixth Claims of Relief – raised by EPNG's APA/UMTRCA claims, joined EPNG in appealing this Court's March 31, 2009 decision. Tribe Notice of Appeal [#46]. Of the remaining eight counts, the Tribe has conceded its claim under the CWA – Seventh Claim of Relief – as it failed to provide the requisite notice prior to suit. Tribe's Opp'n to United States Mot. Dismiss ("Tribe Opp'n") at 15.[2] Further, defendant does not move to dismiss the Tribe's claim under the RCRA – First Claim of Relief. Remaining are two additional claims brought under UMTRCA, as well as various other claims brought under federal and tribal law.

The background in this case was in large part set forth in this Court's March 31, 2009 Opinion. *See El Paso Natural Gas Co. v. United States*, 605 F. Supp. 2d 224, 225-27 (2009). By way of summary, from 1955 to 1968, the United States contracted with EPNG, and its predecessor Rare Metals Corporation, to mine, mill and process uranium and vanadium ore, which were used in the manufacture of nuclear weapons. Tribe Compl. ¶ 28. The uranium processing mill (the "Mill") near Tuba City, Arizona was located on the Navajo Nation Reservation and near the Hopi Reservation. *See* Tribe Compl. ¶¶ 4, 28. During its years of operation, the Mill generated radioactive mill tailings, a type of radioactive waste. *See* Tribe Compl. ¶¶ 4-8. Two additional sites, located near Tuba City, are also alleged to be contaminated with radioactive waste. The first of these sites is the Highway 160 Dump Site, located across Highway 160 from the

---

[2] The Tribe now requests, and this Court agrees, that its CWA claim be dismissed without prejudice. *See* Tribe's Opp'n at 15.

Mill. Tribe Compl. ¶ 9. In February 2009, Congress appropriated $5 million towards the cleanup of the Highway 160 Dump Site. Tribe Compl. ¶ 12. The second site is the Tuba City Open Dump ("TCOD"), located on both Hopi and Navajo Reservations. Tribe Compl. ¶ 13. TCOD was operated by the Bureau of Indian Affairs ("BIA") and ceased accepting new waste in 1997. Tribe Compl. ¶ 13. Since 1995, BIA and other authorities have been investigating TCOD "at a cost of several millions of dollars." Tribe Compl. ¶ 14. To date, however, no remedial action has been taken to address contamination at the site. Tribe Compl. ¶ 15.

In 1978, Congress enacted UMTRCA "to 'stabilize and control' the radioactive waste generated by the uranium mill operations that supported the United States' Cold War efforts." *El Paso Natural Gas Co.*, 605 F. Supp. 2d at 225-26 (citing 42 U.S.C. § 7901(a)-(b)). Pursuant to UMTRCA, 42 U.S.C. §§ 7911, 7912, the Department of Energy ("DOE") designated the Mill as a "processing site," and in 1985 entered into the "Cooperative Agreement between the United States Department of Energy, the Navajo Tribe of Indians and Hopi Tribe of Indians." DOE Cooperative Agreement No. DE-FC04-85AL26731 ("Coop. Agmt."). Thereby, DOE took responsibility for "selecting and performing remedial actions at the Tuba City millsite and vicinity properties." Coop. Agmt. at 4.

Various treaty obligations and statutes, particularly AIARMA and ILODCA, further define the relationship between defendant and the Tribe in relation to this suit. In 1850 the United States and Navajo Nation ratified a treaty in which the Tribe submitted to the federal government the exclusive right to regulate trade and dealings with the

4

Navajo. Treaty with the Navajo, art. I, Sept. 9, 1849, *ratified* Sept. 9, 1850, 9 Stat. 974

("1850 Treaty"). In return the federal government promised to "so legislate and act as to

secure permanent prosperity and happiness of said [Navajo] Indians." *Id.* art. XI. In

addition, under AIARMA defendant has undertaken the duty to "protect, conserve,

utilize, and manage Indian agricultural lands." 25 U.S.C. § 3701(2). Indeed, AIARMA

stipulates that such management be conducted in accordance with tribal law and

ordinances. § 3712(a). Finally, under ILODCA defendant has undertaken the duty to

work with Indian tribal governments in evaluating and prioritizing plans to close and

maintain open dumps on Indian lands. 25 U.S.C. § 3904.

The Tribe argues that these statutory obligations, together with various Navajo

tribal laws made applicable through AIARMA and defendant's general trust duty owed to

the Navajo Nation create enforceable duties, which defendant has failed to fulfill. In

response, defendant argues that: (1) the Tribe has waived its right to sue under

UMTRCA; (2) none of the federal statutes invoked by the Tribe create a right of action or

waive defendant's sovereign immunity; (3) the Tribe cannot bring any of its claims under

the APA as it has failed to allege any final agency action; and (4) the Tribe has failed to

identify a specific trust duty that defendant has failed to fulfill. I agree, and defendant's

motion to dismiss must, therefore, be GRANTED.

## ANALYSIS

### I. *Standard of Review*

As courts of limited jurisdiction, federal courts "have only the power that is

authorized by Article III of the Constitution and the statutes enacted by Congress

5

pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

Under Federal Rule of Civil Procedure 12(b)(1), therefore, "the plaintiff bears the burden

of establishing the factual predicates of jurisdiction by a preponderance of the evidence."

*Lindsey v. United States*, 448 F. Supp. 2d 37, 42 (D.D.C. 2006) (quoting *Erby v. United

States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006)). In other words, a court may dismiss a

complaint for lack of subject matter jurisdiction only if "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." *Richardson v. United States*, 193 F.3d 545, 549 (D.C. Cir. 1999) (quoting

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir.

1998)).

Furthermore, under the principle of sovereign immunity, "the United States may

not be sued without its consent." *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206,

212 (1983). This principle presents a jurisdictional prerequisite. *Id.* Thus, "[a]bsent a

waiver, sovereign immunity shields the Federal Government and its agencies from suit."

*FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "A waiver of sovereign immunity 'cannot be

implied but must be unequivocally expressed.'" *United States v. Mitchell* ("*Mitchell I*"),

445 U.S. 535, 538 (1980) (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).

Finally, under Rule 12(b)(6), dismissal of a complaint is appropriate if plaintiff's

factual allegations are insufficient to "raise a right to relief above the speculative level."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although the complaint "is

construed liberally in the plaintiffs' favor, and [the court must] grant plaintiffs the benefit

of all inferences that can be derived from the facts alleged," the court need not accept as

6

true "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## II. UMTRCA

The Tribe's third and fourth claims allege violations under UMTRCA and relevant regulations. Tribe Compl. ¶¶ 89-98. In particular, in its Third Claim of Relief, the Tribe alleges that applicable regulations promulgated by the Environmental Protection Agency ("EPA") require that DOE adopt a design to control radioactive materials at the Mill that will be effective "for at least 200 years." Tribe Compl. ¶ 91 (citing 40 C.F.R. § 192.02(a)). The Tribe alleges that because "[g]roundwater monitoring performed by or on behalf of DOE in 2008 indicates no significant change in groundwater quality[;] . . . DOE has failed and is failing to comply" with the regulations. Tribe Compl. ¶¶ 92-93. The Tribe's Fourth Claim of Relief alleges that under UMTRCA, DOE was required to complete remedial action at the Mill by September 1998 and is required to perform groundwater restoration activities without temporal limitation. Tribe Compl. ¶¶ 96-97 (citing 42 U.S.C. § 7912(a)(1)). Again, the Tribe alleges that DOE failed to comply with these requirements. Neither claim, however, is properly before this court.

Federal courts are limited in their ability to review agency action. The basis for such review must be found either in a specific statutory review provision or in the APA. *Fund for Animals, Inc. v. U.S. BLM*, 460 F.3d 13, 18 (D.C. Cir. 2006). Generally, in the absence of a specific statutory provision precluding judicial review, the APA provides a generic cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Indeed, when

reviewing such statutes, the Supreme Court itself has acknowledged a "strong

presumption that Congress intends judicial review of administrative action." *Bowen v.*

*Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986).

Here, there is no specific provision in UMTRCA that either grants or precludes

judicial review. *See* 42 U.S.C. §§ 7901, *et seq.*[3] As such, this Court must determine

whether the APA provides the necessary basis for judicial review. *See Fund for Animals,*

*Inc.*, 460 F.3d at 18. With respect to remedial action pursuant to UMTRCA, however,

Congress clearly intended to *preclude* adjudication under the APA.[4] Specifically,

---

[3] Indeed, UMTRCA neither provides a cause of action, nor waives sovereign immunity. *See generally* 42 U.S.C. §§ 7901, *et seq.*

[4] Defendant also challenges the Tribe's UMTRCA claims for failure to state a claim under Rule 12(b)(6). Because this court finds that it lacks jurisdiction to review the Tribe's UMTRCA claims, it need not reach this question here. Notwithstanding, it is clear from the pleadings that the Tribe's claims must fail for this reason as well. First, under the Tribe's Third Claim of Relief, the Tribe states that defendant has failed to comply with EPA regulations because monitoring confirms that there has been no significant change in groundwater quality. Tribe Compl. ¶ 92. However, the EPA regulations are clear that remedial action must be *designed* to "[b]e effective . . . for at least 200 years." 40 C.F.R. § 192.02(a). Monitoring after implementation is not required. § 192.02 n.1. Because the Tribe has failed to allege any facts to indicate that the remedial action was not *designed* to be sufficiently effective, its claim must fail. *See* § 192.02(a). Second, with respect to the Tribe's Fourth Claim of Relief, the Tribe alleges that: (1) defendant did not complete remedial action at the Mill prior to the statutory deadline; and (2) defendant did not take action to restore groundwater in a reasonable amount of time. *See* Tribe Compl. ¶ 98. However, with respect to groundwater restoration, the APA only permits courts to compel government action only "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 64 (2004) (emphasis in original). Not only does UMTRCA not specify any discrete actions that the DOE must take in order to restore groundwater, but Congress specified that "the authority of [DOE] to perform groundwater restoration activities under [UMTRCA] is without [time] limitation." 42 U.S.C. § 7922(a). With respect to groundwater restoration, therefore, there is simply nothing for this Court to compel. With respect to remediation at the Mill, the Tribe alleges that defendant "failed to complete remedial action,"

UMTRCA authorizes the Secretary of Energy "to enter into a cooperative agreement . . . with any Indian tribe to perform remedial action at a designated processing site located on land of such Indian tribe." 42 U.S.C. § 7915(a). UMTRCA then lists terms and conditions that the Secretary must include in the cooperative agreements. Among these terms and conditions is the requirement that "[t]he Indian tribe . . . execute a waiver (A) releasing the United States of any liability or claim thereof by such tribe or person concerning such remedial action and (B) holding the United States harmless against any claim arising out of the performance of any such remedial action." § 7915(a)(1). Accordingly, when the DOE and the Tribe entered into the "Cooperative Agreement between the United States Department of Energy, the Navajo Tribe of Indians and Hopi Tribe of Indians" on January 17, 1985 (the "Agreement"), the Agreement released the United States from all claims "arising out of the performance of any remedial action." *See* Coop. Agmt. at 17-18.

The Tribe does not contest that it has waived certain claims under the Agreement. Tribe Opp'n at 18. Instead, the Tribe argues that the violations alleged in the intervenor-complaint do not amount to "performance" of remedial action and are, therefore, not

---

however, the facts alleged in the complaint indicate that defendant did in fact take remedial action at the Mill, *see* Tribe Compl. ¶ 98. As noted above, the court need not accept as true "legal conclusions cast in the form of factual allegations." *Kowal*, 16 F.3d at 1276. To the extent that the Tribe claims that defendant failed to complete remedial action because testing indicates that groundwater has not been restored and, therefore, it appears that the remedial action is ineffective, this claim must fail for the reasons explained above with respect to DOE's mandate to restore groundwater. There is simply no discrete action that this Court can compel. *See SUWA*, 542 U.S. at 64.

covered in the Agreement's waiver provision. *Id.* This argument, however, is contrary to the plain text of the Agreement and must fail. How so?

The Cooperative Agreement defines remedial action as "the assessment, design, construction, renovation, reclamation, decommissioning, and decontamination activities of DOE . . . ." Coop. Agmt. at 4. The Tribe's third claim of relief alleges that defendant violated EPA regulations because "the remedial action for the Mill is *designed* to fail with respect to groundwater restoration." Tribe Opp'n at 17 (emphasis added). Unfortunately for the Tribe, this challenge to the efficacy of the remedial design is exactly the type of challenge to the performance of remedial action which is precluded under the Agreement. Likewise, the Tribe's fourth claim of relief alleges that defendant violated UMTRCA because "DOE failed to complete remedial action before September 30, 1998 and has failed to take appropriate action to restore groundwater at and near the Mill and its vicinity properties." Tribe Opp'n at 17-18. Again, these complaints regarding untimely performance and inappropriate performance, nonetheless, allege violations relating to the "performance" of remedial action. *See* Coop. Agmt. at 18.

Importantly, the Tribe does not allege that the defendant has failed to take any substantive remedial action related to the Mill. Instead, the Tribe alleges that the remedial action taken, i.e. mill tailing covers, which were put in place pursuant to UMTRCA, are ineffective. *See* Tribe Opp'n at 23. Moreover, the Tribe readily admits that the very tests on which it relies, at least in part, to challenge the efficacy of DOE's remedial design were conducted by DOE itself. *See* Tribe Opp'n at 23. Simply put, the

Tribe's challenge to the efficacy of defendant's efforts fall within the category of claims Congress clearly intended to preclude.[5]

### III. AIARMA and ILODCA

The Tribe's second claim alleges a violation of AIARMA. Tribe Compl. ¶¶ 84-88. In AIARMA Congress found that "the United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes" 25 U.S.C. § 3701(2). It, therefore, determined that the Secretary of the Interior "shall provide for the management of Indian agricultural lands." § 3711(a). The Secretary is further required to "conduct all land management activities on Indian agricultural land . . . in accordance with all tribal laws and ordinances, except in specific instances where such compliance would be contrary to the trust responsibility of the United States." § 3712(a). The Tribe alleges that because defendant has violated various Navajo laws, including the Navajo Nation Clean Water Act, Navajo Nation Code Ann. tit. 4 §§ 1301 et seq. (2005), and the Navajo Fundamental Law, Navajo Nation Code Ann. tit. 1 §§ 205(A) (2005), it is in violation of AIARMA's provision requiring compliance with tribal law.

---

[5] The Tribe's reliance on *Leedom v. Kyne*, 358 U.S. 184 (1958) as an alternative basis for jurisdiction is to no avail. Indeed, the Tribe fails to address why *Leedom* would apply in this case. Notwithstanding, this Court finds that *Leedom*'s "extraordinary" exception does not apply here. *See Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006). The preclusion of judicial review, here, is explicit, not implicit. *See Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Further, defendant does not "plainly act[] in excess of its delegated powers and contrary to a specific prohibition." *See id.* (internal quotation omitted).

The Tribe's ninth claim alleges violations of ILODCA. Tribe Compl. ¶¶ 116-20. As set forth in the statute, the purposes of ILODCA are to: "(1) identify the location of open dumps on Indian lands and Alaska Native lands; (2) assess the relative health and environmental hazards posed by such dumps; and (3) provide financial and technical assistance to Indian tribal governments and Alaska Native entities, either directly or by contract, to close such dumps." 25 U.S.C. § 3901(b). To achieve this purpose, the Director of the Indian Health Service ("IHS") is required, "[u]pon request by an Indian tribal government," to inventory and evaluate the open dumps located on Indian lands. § 3904(a). In evaluating the severity of the threat to public health posed by the open dumps, the Director must use pre-existing information unless, after consultation with the Indian tribal government, it is determined that further testing must be conducted. § 3904(a)(1)(B). Following such assessment, the Director must then provide financial and technical support to the Indian tribal government to close and maintain those dumps based on "priorities developed by the Director." § 3904(b)-(c). Further, "[p]riorities on specific Indian lands or Alaska Native lands shall be developed in consultation with the Indian tribal government." § 3904(c). The Tribe thus claims that defendant has violated ILODCA because it has "refused to consult with the Navajo Nation [or] otherwise perform the above-listed duties." Tribe Compl. ¶ 120.

The Tribe argues that both AIARMA and ILODCA contain implied private rights of action under which it may assert its claims. Tribe Opp'n at 25. In the alternative, it argues that it may bring its claims under the generic cause of action provided by the APA. Tribe Opp'n at 31. Defendant, however, contends that neither statute creates a

private right of action. Def.'s Mot. to Partially Dismiss (Def.'s Mot.") at 29; Def.'s Reply in Support of Def.'s Mot. ("Def.'s Reply") at 17-21. Further, defendant argues that the Tribe's claims under the APA must fail as the Tribe fails to identify any final agency action by either the Department of the Interior or IHS. Def.'s Reply at 15-17. I agree.

First, *neither* AIARMA nor ILODCA create a private right of action. A private right of action must be created by Congress. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Moreover, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* If a statute does not explicitly grant a private right of action and private remedy, the court must still determine if such a right is *implied*. *Anderson v. U.S. Air, Inc.*, 818 F.2d 49, 54 (D.C. Cir. 1987). In our Circuit, we look at four factors in making a determination as to an implied right of action:

> (1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.

*Tax Analysts v. IRS*, 214 F.3d 179, 185-186 (D.C. Cir. 2000). Indeed, "the most important consideration is whether the legislature intended to create a private right of

action." *Dial A Car v. Transp., Inc.*, 132 F.3d 743, 744 (D.C. Cir. 1998). The Supreme Court has given some guidance. For instance, the court may look at the existence of "rights-creating" language. Thus, if a statute focuses on the parties regulated or the agencies regulating, and not on the parties protected, the statute would not implicate an intent to confer rights. *Sandoval*, 532 U.S. at 289. Ultimately, the Supreme Court and our Circuit have been hesitant to read an implied right of action in the absence of Congress exercising its clear ability to explicitly create such rights. *See Id.*; *Godwin v. Sec'y of HUD*, 356 F.3d 310, 312 (D.C. Cir. 2004).

The Tribe argues that the statutes here manifest an implied private right of action. I disagree. With respect to AIARMA, the statute expressly states that it does not waive the sovereign immunity of the United States, manifesting a clear intent *not* to create a cause of action. *See* 25 U.S.C. § 3712(d) ("This section does not constitute a waiver of the sovereign immunity of the United States, nor does it authorize tribal justice systems to review actions of the Secretary.").[6] With regard to ILODCA, the text of the statute does not suggest any intent by Congress to create a private right of action. Indeed, ILODCA focuses on the regulating agency's obligations, and not on the rights of the protected party, i.e., the Indian tribes. *See Sandoval*, 532 U.S. at 289. In addition, the Supreme Court has itself held that a consultation requirement, such as the one found in ILODCA, does not create a right of action. *Lyng v. Nw. Indian Cemetery Prot. Ass'n*,

---

[6] Contrary to the Tribe's contention, this provision in AIARMA, Section 3712(d), is not limited to suits brought in tribal courts. The waiver is two-fold, expressing that: (1) there is no waiver of sovereign immunity in *any* court; and (2) the tribal justice system has no authority to review the Secretary of the Interior's actions in *any* capacity. *See* § 3712(d).

485 U.S. 439, 455 (1988). Similarly, the statute's broad purpose and discretionary mandate, across Indian and Alaskan Native lands, does not imply a clear private remedy. As such, it is unclear, at best, that a private right is consistent with the purpose of the statute. For these reasons, I find that ILODCA does not imply a private right of action.[7]

Second, the Tribe cannot bring its AIARMA or ILODCA claims under the APA. The Tribe claims that defendant failed to comply with tribal law as required by AIARMA and failed to consult with the tribal government and perform its duties under ILODCA. Notwithstanding these contentions, the Tribe fails to allege a final agency action, as required by the APA, with regard to either statute. A final agency action is defined by the APA as, *inter alia*, "a failure to act." 5 U.S.C. § 551(13). "Failures to act are sometimes remediable under the APA, but not always." *Norton v. S. Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 64 (2004). A reviewable failure to act is limited "to a *discrete* agency action." *Id.* (emphasis in original). Further, "the only agency action that can be compelled under the APA is action legally *required*." *Id.* at 63 (emphasis in original); *see also Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) ("[Where] an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review.").

---

[7] The Tribe's focus on legislative history here is inapposite. As the Supreme Court has made clear, the analysis must begin, and may end, with the text and structure of the statute itself. *See Sandoval*, 532 U.S. at 288. Further, while both AIARMA and ILODCA may have been passed in favor of the Indian tribes, this alone is not dispositive. *See Lyng*, 485 U.S. at 455 (refusing to find a private right of action implicit in a statute passed for the benefit of Indian tribes). Simply, there is no indication based on a reading of the statute that Congress intended to create a right of action.

The requirement under AIARMA that the Secretary "conduct all land management activities on Indian agricultural land . . . in accordance with all tribal laws and ordinances, except in specific instances where such compliance would be contrary to the trust responsibility of the United States," 25 U.S.C. § 3712(a), does not implicate any discrete agency action cognizable under the APA. *See SUWA*, 542 U.S. at 63. First, the text of the statute does not contain any discrete, legally required actions that the agency is required to take and that this Court could compel. *See* 25 U.S.C. § 3701. The requirement that any actions performed be performed in accordance with tribal law does not create a discrete mandate. Further, the Tribe only alleges that in *not* remediating the contamination at the Mill and other properties, defendant is violating tribal law. *See* Tribe Compl. ¶ 88. This argument, however, displays a clear misreading of the statute. The statute simply requires that when the agency acts, it act in compliance with tribal law. It does not impose an affirmative duty to act for the purpose of preventing violations of tribal law. *See* 25 U.S.C. §§ 3701, *et seq.* Finally, apart from stating that defendant generally fails to comply with tribal laws, there is no allegation that it has failed to do so while "conducting land management activities." *See* Tribe Compl. ¶ 88. The Tribe's claim with respect to AIARMA, therefore, must fail. Further any claims against defendant for violations of tribal law, which rely on AIARMA, such as the Navajo Nation Clean Water Act – Eighth Claim of Relief – must also fail for the same reasons.

Likewise, the Tribe has not alleged a discrete agency action that defendant was required to take in connection with TCOD. ILODCA's requirement that the Director of

IHS consult with tribal governments is predicated on a series of events occurring that all fall within the discretion of the Director of IHS. For instance, after a request is made by an Indian tribal government, the Director must: (A) "conduct an inventory and evaluation of the contents of open dumps . . . ;" (B) "determine the relative severity of the threat to public health and the environment . . . ;" and (C) "develop cost estimates for closure and postclosure maintenance of such dumps." 25 U.S.C. § 3904(a)(1). Only while determining the relative severity must the Director consult with tribal government and then only if the Director must determine if further testing is necessary to make such determination. 25 U.S.C. § 3904(a)(1)(B). Consultation may also be required, after the assessment above is completed, with respect to developing priorities in connection to open dumps on specific Indian lands. 25 U.S.C. § 3904(c). The Tribe fails to allege any facts relating to the pre-requisite requests, determinations and evaluations that would precede consultation with Indian tribal governments. Indeed the Tribe itself states that TCOD "has been studied and studied by federal agencies," indicating that far from ignoring its obligations, defendant is taking some action with respect to the dump. *See* Tribe Opp'n at 29. The pre-requisites to consultation, further, are broad, as they relate to all open dumps on Indian tribal lands. It is up to IHS to conduct the inventory and evaluations, prioritize across different Indian tribal lands, and develop cost estimates. Such requirements are broad, and conclusory allegations that defendant has failed to fulfill such requirements "'lack the specificity requisite for agency action.'" *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009) (quoting *SUWA*, 542 U.S. at 66). While it is disappointing that IHS has failed to keep the Tribe apprised of its

17

apparent efforts with respect to TCOD and to act swiftly for the benefit of all Indian tribes, the Tribe has not alleged a final agency action legally required that this Court could compel. *See SUWA*, 542 U.S. at 63. As such, the Tribe's ILODCA claims under the APA must fail.

## IV.    *United States' Trust Duties to the Navajo Nation*

In the Tribe's Tenth Claim for Relief, the Tribe alleges that defendant has violated its trust duties to the Navajo Nation, as established by the 1850 Treaty and federal common law. Tribe Compl. ¶ 126. The Tribe further argues that defendant "has waived its immunity for such [breach of trust] suits in the APA. Tribe Opp'n at 34. As this Court found in its earlier opinion, the APA does not provide a basis for review where such review is explicitly precluded by statute. *El Paso Natural Gas Co.*, 605 F. Supp. 2d at 227-28 (citing 5 U.S.C. § 702(a)(1)). Further, even where not precluded by statute, the APA requires that a plaintiff allege a final agency action in order to bring suit. 5 U.S.C. § 704. This standard applies equally to claims alleging breach of trust. *See Cobell v. Norton ("Cobell VI")*, 240 F.3d 1081, 1094-95 (D.C. Cir. 2001). Thus, the Tribe must allege facts that amount to a breach of duty cognizable under the APA. Unfortunately, for the Tribe, it has, for the following reasons, failed to do so here.

Generally, our Circuit has stated that "[w]hile it is true that the United States acts in a fiduciary capacity in its dealings with Indian tribal property, it is also true that the government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations." *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) (internal citations omitted). Thus, in order to bring a claim for breach of trust,

18

the Tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). Indeed, establishing a general trust relationship, though far from irrelevant, does not end the inquiry. *Id.* "[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* Common law trust principles may then "particularize [a statutory] obligation." *Cobell v. Norton* ("*Cobell XIII*"), 392 F.3d 461, 472 (2004); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003); *Mitchell II*, 463 U.S. at 225-26. Finally, if a trust duty is established, the Court must determine whether the APA's waiver of sovereign immunity allows for judicial review. *See Cobell VI*, 240 F.3d at 1094-95.

Here, the Tribe alleges breach of trust arising out of defendant's violations of various statutes including the RCRA, UMTRCA, CWA, ILODCA and AIARMA. The Tribe bases its allegation on the premise that the sites at issue, the Mill, the Highway 160 Dump Site and TCOD, are located on Navajo Nation tribal lands and, therefore, held by defendant in an express trust established by Congress. *See* Tribe Compl. ¶ 124 (citing 25 U.S.C. § 640d-9(a)); Tribe Opp'n at 34 (citing same). The Tribe further points to defendant's control of the Mill under UMTRCA and the reiteration of general trust duties under ILODCA and AIARMA to support its claim that particular common law trust duties (i.e. to use reasonable care and skill to preserve and maintain the trust property) are, therefore, enforceable. *See* Tribe Opp'n at 34-35 (citing *White Mountain Apache*

*Tribe*, 357 U.S. at 475). The Tribe, however, misinterprets Supreme Court and Circuit precedent.

First, the Tribe's trust claims based on defendant's obligations arising out of UMTRCA must fail. As stated above, in order to perform remedial action under UMTRCA, DOE must enter into cooperative agreements with tribal governments, in which the tribal governments agree to hold the United States harmless against any claims relating to remedial activity. 42 U.S.C. § 7915(a)(1). Indeed, the Tribe has waived "*any liability or claim* . . . arising out of the performance of any remedial action." *See* Coop. Agmt. at 17-18 (emphasis added). The plain text of the Cooperative Agreement does not limit this waiver to purely statutory claims. *See id.* Further, as this Court found in its March 31, 2009 opinion, any claims based on UMTRCA's designation and public participation requirements are explicitly barred. *El Paso Natural Gas Co.*, 605 F. Supp. 2d at 228-29. Because the APA does not provide a basis for review where such review is explicitly precluded by statute, 5 U.S.C. § 701(a)(1), the Tribe's trust claims based on defendant's performance of remedial action under UMTRCA must be dismissed.

Second, while the 1850 Treaty and other federal statutes clearly create a fiduciary relationship between the Tribe and defendant, they do not create an independent cause of action. *See Cobell XIII*, 392 F.3d at 471-72. This is equally true of the general trust relationship reflected in AIARMA and ILODCA. Notably, neither AIARMA nor ILODCA create any new trust duties or reiterate any particular trust obligations. AIARMA, 25 U.S.C. § 3701 (finding that "the United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its

20

fiduciary obligation and its unique relationship with Indian tribes"); ILODCA, 25 U.S.C.
§ 3901(a) (finding that "the United States holds most Indian lands in trust for the benefit
of Indian tribes and Indian individuals"). In fact, neither statute puts any Indian lands
under the control of the Government. *See* AIARMA, 25 U.S.C. 3711(b) ("Pursuant to a
self-determination contract or self-governance compact, an Indian tribe may develop or
implement an Indian agriculture resource plan. Subject to the provisions [relating to the
development of the resource plan], the tribe shall have broad discretion in designing and
carrying out the planning process."); ILODCA, 25 U.S.C. § 3904 (limiting the power of
the Director of the Indian Health Service to providing financial and technical assistance
to tribal governments). Accordingly, consistent with the Supreme Court's precedent,
neither statute implies a particular common law trust obligation. *Compare Mitchell I*,
445 U.S. at 542 (holding that the General Allotment Act, which with certain limitations
gave the Indian beneficiaries the right to posses and manage the lands, "created only a
limited trust relationship" and, therefore, "[did] not impose any duty upon the
government to manage timber resources"), *and Navajo Nation*, 537 U.S. at 507 (holding
that the Indian Mineral Leasing Act and relevant regulations, which do not contain
"elaborate" provisions nor assign a comprehensive managerial role to the Government,
do not imply any fiduciary obligations, even when the statutes impose one or more
specific obligations), *with Mitchell II*, 463 U.S. at 226 (holding that "the statutes and
regulations at issue in this case[, which give the Department of the Interior
comprehensive control over tribal timber,] clearly establish fiduciary obligations of the
Government in the management and operation of Indian lands and resources"), *and White*

21

*Mountain Apache Tribe*, 537 U.S. at 475 (holding that because the United States exercised not only daily supervision, but occupation of the Apache Fort, which pursuant to a 1960 statute was held in trust for the benefit of the Apache Tribe, the United States owed the Apache Tribe the fundamental common law trust duty to preserve and maintain trust assets).

Finally, the Tribe has failed to allege any independent cause of action based on a statutorily prescribed trust duty. *Cf. Cobell VI*, 240 F.3d at 1098-99. In the *Cobell* line of cases, our Circuit upheld the district court's finding that the Government had a specific fiduciary duty to manage Individual Indian Money ("IIM") trust accounts and take reasonable steps towards the discharge of that duty. *Id.* at 1098. As noted above, however, defendant does not have more than a limited trust relationship with the Tribe in relation to Navajo tribal lands. *See* 1850 Treaty, art. XI. Further, the Tribe has not alleged any specific fiduciary duties arising out of the RCRA and CWA, neither of which specifically deal with Indian tribal property. Indeed, while trust obligations towards Indian tribes demand that courts resolve statutory ambiguities in favor of the tribes, *see Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985), or limit an agency's discretion when dealing with such tribes, without specific statutory mandates, from which to infer fiduciary duties, there is no independent cause of action. *See Navajo Nation*, 537 U.S. at 506.

**CONCLUSION**

Accordingly, for the foregoing reasons, the Court GRANTS defendant's Motion to Dismiss [#52]. An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge